PREET BHARARA
United States Attorney for the
Southern District of New York
By: CRISTINE IRVIN PHILLIPS
     KIRTI VAIDYA REDDY
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2696/2751
Facsimile: (212) 637-2786
E-mail: cristine.phillips@usdoj.gov
        kirti.reddy@usdoj.gov

**14 CV 8593**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

NARCO FREEDOM, INC.,

        Defendant.

-------------------------------------------------------- x

14 Civ. _____ ( )

**COMPLAINT**

      Plaintiff, the United States of America, by its attorney, Preet Bharara, United States

Attorney for the Southern District of New York, hereby alleges upon information and belief as

follows:

## INTRODUCTION

    1.     The United States of America brings this action seeking preliminary and

permanent injunctive relief against Narco Freedom, Inc. ("Narco Freedom"), under 18 U.S.C.

§ 1345, to enjoin Narco Freedom from perpetrating an ongoing scheme to defraud the United

States in connection with a Federal health care offense, in violation of Section 1345 and the

Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B) ("Anti-Kickback Statute"). As

set forth more fully below, the United States alleges in this action that Narco Freedom, a not-for-

profit corporation, created a scheme to induce individuals who lack stable housing to receive short-term housing in exchange for enrolling in and attending its outpatient chemical dependency programs ("outpatient programs"), which include outpatient programs in which patients are treated for opioid addictions through medically prescribed methadone ("methadone outpatient programs"), as well as programs offering individual and group counseling for individuals who wish to recover from all chemical dependency ("drug-free outpatient programs").

2.      Specifically, Narco Freedom operates a large number of short-term residences commonly known as "three-quarter houses," and which Narco Freedom refers to as "Freedom Houses." Narco Freedom offers housing at the Freedom Houses to individuals seeking or already enrolled in its outpatient programs. But Narco Freedom conditions residency in its Freedom Houses upon enrollment in, and attendance at, an outpatient program operated by Narco Freedom. Any Freedom House resident who fails or refuses to adhere to this rule is removed from the Freedom House.

3.      Narco Freedom then bills Medicaid for the outpatient program services that are a condition of residency at its Freedom Houses. As a result of this illegal kickback scheme, Narco Freedom has received tens of millions of dollars in Medicaid funds.

4.      Injunctive relief under 18 U.S.C. § 1345 is necessary and appropriate because Narco Freedom will continue to engage in this fraudulent conduct unless the Court enjoins it. Specifically, absent court intervention, Narco Freedom will continue its practice of conditioning residency in its Freedom Houses upon enrollment in and attendance at Narco Freedom outpatient programs, and then billing Medicaid for the outpatient program services that it has fraudulently induced residents to obtain through kickbacks.

2

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 18 U.S.C. § 1345, as well as pursuant to the Court's general equitable jurisdiction.

6.      Venue is appropriate in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

7.      Plaintiff is the United States of America (the "Government").  Through its agency the United States Department of Health and Human Services, the Government provides funding for the Medicaid program, including Medicaid in New York State.

8.      Defendant Narco Freedom is a not-for-profit corporation with its corporate office located at 477-481 Willis Avenue, Bronx, New York 10455.  It provides outpatient programs at ten locations in Brooklyn, Queens and the Bronx.  It also operates three-quarter houses, referred to as "Freedom Houses."  Alan Brand ("Brand") is the sole member of, and until approximately July 2014 was the Chief Executive Officer of, Narco Freedom.

## STATUTORY FRAMEWORK

9.      Section 1345 of Title 18 provides that the Government may commence an action seeking an injunction to prevent the commission of "a Federal health care offense."  *See* 18 U.S.C. § 1345(a)(1)(C).

10.     Included in the definition of a "Federal health care offense" is violation of the Anti-Kickback Statute.  *See* 18 U.S.C. § 24(a)(1).

11.     Once the Government commences an action under Section 1345, the statute directs the Court to "proceed as soon as practicable to the hearing and determination of such an action" and states that the Court "may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b).

12.     The Anti-Kickback Statute prohibits payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . ." 42 U.S.C. § 1320a-7b(b)(2)(B).

## FACTS

**A.     Narco Freedom's Outpatient Programs**

13.     Narco Freedom operates ten outpatient programs at locations in Brooklyn, Queens, and the Bronx.

14.     Narco Freedom's outpatient programs are regulated by the New York State Office of Alcoholism and Substance Abuse Services ("OASAS").

15.     A substantial majority of the individuals who receive outpatient program services at Narco Freedom are eligible for Medicaid.

16.     For individuals enrolled in drug-free outpatient programs, Medicaid reimburses up to 75 services at a 100% rate under the new reimbursement guidelines for Ambulatory Patient Groups ("APGs"), which for outpatient programs began to be implemented on July 1, 2011.

Medicaid reimburses at a 75% rate for 76 to 95 services; the reimbursement rate is reduced to 50% for services in excess of 95 services.

**B.      The  Freedom Houses**

17.      Narco Freedom currently is the largest operator of three-quarter houses in the City of New York.

18.      Narco Freedom currently operates 18 Freedom Houses, in the Bronx, Brooklyn, and Queens.

19.      Freedom Houses are located in single-family or multi-family dwellings, in which residents are provided with a bunk bed in a shared bedroom and given access to bathroom and possibly kitchen facilities.  Freedom House capacities range from 30 to 200 residents.

20.      Freedom Houses provide no clinical services to residents.

21.      Freedom Houses are not regulated by OASAS or any other local, state or federal licensing entity or agency.

22.      A large majority of individuals who reside in Freedom Houses are Medicaid eligible and receive public assistance, including a monthly housing allowance, through the New York City Human Resources Administration ("HRA").  The amount of the HRA housing allowance is currently $215 per month.

23.      In order to reside in a Freedom House, an individual must assign his or her $215 monthly HRA housing allowance to Narco Freedom.

24.      Freedom House residents complain that the houses are full of individuals who are still using, and even selling, drugs, and thus do not provide an appropriate environment for residents who are attempting to abstain from drug use.  According to the residents, the Freedom

5

House staff members are aware of drug use in the houses and do not take sufficient steps to stop it.

25.     Freedom House residents report other problematic Freedom House conditions, including lack of heat and other basic facilities, vermin infestations, fighting among residents, aggressive behavior by Freedom House staff toward residents (including physical aggression), and overcrowding.

26.     Freedom Houses have received a large number of citations from city agencies such as the Fire Department of New York and the New York City Department of Buildings.

27.     On July 15, 2014, Freedom House 1, located at 315 Alexander Avenue, received a Notice of Violation from the New York City Department of Buildings.  The notice listed a "Class 1" violation, which is defined as identifying an "immediately hazardous" condition.  The basis for the violation was the fact that the building, which was intended to accommodate nine permanent, single-family apartments, in fact was being used as an "adult home" that housed 69 residents.

**C.     The Freedom House Kickback Scheme**

28.     In or around 2006, Narco Freedom began to operate the Freedom Houses, in order to drive more business to its outpatient programs.

29.     In or around 2006, Brand, then the Chief Executive Officer and sole member of Narco Freedom, met with an individual ("Developer") who agreed to purchase a building in which a three-quarter house operated by Narco Freedom would be located.  Brand agreed that Narco Freedom would be the tenant in that building and would make monthly rent payments.

30.     Brand's express purpose in expanding the scope of Narco Freedom to include operating three-quarter houses was to generate increased enrollment in Narco Freedom's outpatient programs, and to increase the retention rate in those programs.

31.     In order to drive business to its outpatient programs, Brand planned, as part of the Freedom House business model, to condition residence in a Freedom House upon enrollment in and attendance at one of Narco Freedom's outpatient programs.

32.     Brand's rationale was that offering a bed in a Freedom House to an individual who otherwise has no stable housing ensures that the individual will both enroll in and stay at Narco Freedom in order to maintain his or her place at the Freedom House.

33.     From the time that Narco Freedom began operating Freedom Houses, demand for beds in those houses has been consistently high.

34.     This demand gave Brand and Narco Freedom the incentive to continue to open new Freedom Houses from 2006 to 2013, for a total of 21 Freedom Houses in New York City. Of those houses, 18 currently remain operational as Freedom Houses.

35.     Most of the houses operate at or near full capacity a majority of the time.

36.     Fifteen of the Freedom Houses are located in buildings that are or were owned by an entity controlled by the Developer.

**D.     Marketing and "Filling" of the Freedom Houses Pursuant to the Scheme**

37.     Since in or about 2006, Narco Freedom has paid individuals to market its Freedom Houses.

38.     The primary individual who performs marketing for Narco Freedom (the "Marketer") was introduced to Brand by the Developer.  The purpose of the Developer's interest

in facilitating marketing for Narco Freedom was to ensure that the buildings he owned remained at or near capacity, thus motivating Narco Freedom to open more Freedom Houses in buildings that he would purchase and lease to Narco Freedom.

39.    Brand directed the Marketer at the outset to "fill" Narco Freedom's first Freedom House.  Since then, as more Freedom Houses have opened, Brand has similarly directed the Marketer to "fill" those houses.

40.    The goal of the Marketer and all individuals in the marketing department, as directed by Narco Freedom, was and is to keep the Freedom Houses "filled" with residents, who will enroll in and attend outpatient programs at Narco Freedom.

41.    The marketing efforts for Narco Freedom are directed toward institutions that are likely to make referrals, such as detox facilities and inpatient treatment facilities, as well as the New York State Division of Parole.  This marketing often includes an in-person presentation to the counselors or parole officers, which consists of describing the Freedom Houses and Narco Freedom's outpatient programs.

42.    The marketing department communicates to the referring entities that enrollment at a Narco Freedom outpatient program is a condition of residence at the Freedom House.

43.    Because finding affordable housing is extremely difficult for many of the patients or parolees, the availability of the Freedom Houses drives referrals to Narco Freedom.

44.    Typically, a counselor or parole officer will reach out to a member of the marketing department, who will arrange for a bed at one of the Freedom Houses to be reserved for the referred patient or parolee.

45.     Individuals seeking housing also hear about the Freedom Houses through word-of-mouth and initiate calls to Narco Freedom, which routes the calls to the marketing department. The marketing department then directs the individuals to report to a particular Freedom House.

**E.     Operation of the Freedom Houses Pursuant to the Scheme**

46.     All of the residents of the Freedom Houses were and are required to attend outpatient programs at Narco Freedom as a condition of residency.

47.     Freedom House residents also must attend all outpatient program services as directed by Narco Freedom. Freedom House residents who miss outpatient program services face removal from the Freedom House.

48.     Narco Freedom's practice of requiring Freedom House residents to attend Narco Freedom outpatient programs violates the Patient Rights provision of the New York State Code, 14 N.Y.C.R.R. § 815.5(15), which states that patients in outpatient programs have the right "to be free from any staff or patient coercion" or "undue influence."

49.     Once an individual arrives at a Freedom House, he or she is required to sign a series of forms that purport to waive certain of the individual's rights. These forms include a "Code of Conduct" and a "Waiver of Tenant[']s Rights."

50.     The Code of Conduct specifically states that "[u]se of the Sober House premises is for active and proper participants in Narco's program, only."

51.     The Waiver of Tenant's Rights states that "all residents, as a pre-supposed condition in residing at the program, will attend said resident[']s designated outpatient program,"

and further states that "[t]he resident does not have ANY claims to further stay or rights unto the property if the resident is asked to leave the program for any reason."

52.     The resident also is required to sign a waiver of his or her rights under the Health Insurances Portability and Accountability Act of 1996 ("HIPAA") and the federal regulations governing Confidentiality and Drug Abuse Patient Records, 42 C.F.R. Part 2, in order to allow Narco Freedom to disclose the resident's Toxicology and Treatment Report to the Freedom House staff.

53.     Freedom House residents also are required, upon initial arrival, to sign an acknowledgement that they can expect only "a 6-9 month stay, with a possible 30-day [e]xtension."

54.     Residents are told by the Freedom House staff that they have to report to the intake department at Narco Freedom in order to be placed in an outpatient program, and that enrollment and participation in the Narco Freedom outpatient program is a condition of Freedom House residency.

55.     Page 1 of the Code of Conduct states that intake is required within 24 hours of "checking in" at the Freedom House, and that "[i]f you fail to complete your intake, your room will be closed."

56.     If an individual does not attend all of the outpatient program services as directed by Narco Freedom, he or she risks being thrown out of the Freedom House.  This condition is generally known by all Freedom House residents.

57.     New Freedom House residents also are sent to HRA, to arrange for payment of their $215 monthly housing allowance directly to Narco Freedom.  Narco Freedom has a "rent"

10

department that collects the HRA housing allowances.  Typically, Freedom House residents are not required to pay any rent beyond the HRA housing allowance.

58.    Freedom House staff members monitor the residents' attendance at the Narco Freedom outpatient programs and take action against residents who do not attend all services as directed by Narco Freedom.

59.    At or around the time that Narco Freedom established the Freedom Houses, the residents were required to collect a slip of paper, referred to by the Freedom House staff as a "re-entry pass," from the outpatient program, and deliver it to the Freedom House staff upon returning to the Freedom House.  Residents who did not return with their "re-entry pass" faced consequences such as removal from the house or sequestration in an "isolation room."

60.    More recently, the use of re-entry passes was discontinued and the Freedom House staff members now simply access patient records in Narco Freedom's computer system in order to determine whether Freedom House residents are attending all outpatient program services as directed.

61.    In addition, before he stepped down as C.E.O. of Narco Freedom, Brand personally received a roster of the Freedom House residents and a weekly report showing the number of outpatient program services those residents attended.  If Brand saw that particular Freedom House residents were not attending all of their outpatient program services, he would direct the management of the Freedom House to speak with those residents, and/or to remove them from the Freedom Houses.

62.     If a resident fails to attend the required number of treatment sessions at Narco Freedom's outpatient program, he or she must make up the missed session that week or faces removal from the Freedom House.

63.     If an individual who is already enrolled in another outpatient program comes to reside in a Freedom House, he or she is directed to request a discharge from his or her existing program in order to enroll in a Narco Freedom outpatient program.  Narco Freedom requires this discharge even if the person is happy and progressing in recovery at the other program.

64.     Counselors from other outpatient programs who have contacted Narco Freedom to request that a Freedom House resident remain in their care were told that the resident needed to be discharged in order to enroll at a Narco Freedom outpatient program, or would be forced to leave the Freedom House.

65.     Because the Freedom House residents often are faced with an immediate and pressing need for housing, this policy typically results in a transfer from the other outpatient program to Narco Freedom, even if the resident does not wish to change outpatient programs.

66.     At Narco Freedom, typically after an individual in a drug-free outpatient program has completed the 75 services at which Medicaid reimburses at a 100% rate, he or she is deemed to have "graduated" and is discharged from the outpatient program.  Once a Freedom House resident is no longer enrolled in a Narco Freedom outpatient program, he or she is given 30 days or less to vacate the Freedom House.

67.     While Medicaid reimbursements are not reduced after 75 services for individuals enrolled in a methadone outpatient program, reimbursement rates for methadone outpatient programs are generally lower than for drug-free outpatient programs.  Narco Freedom disfavors

methadone outpatient program participants as Freedom House residents, because they generate fewer Medicaid funds for Narco Freedom.

68.     On one occasion in 2011 or 2012, Alan Brand ordered the removal of 60 Freedom House residents enrolled in Narco Freedom's methadone outpatient programs, in order to make room for prospective Freedom House residents who would enroll in Narco Freedom's drug-free outpatient programs.

69.     Freedom House residents often are told by Freedom House staff that they can move to a "graduate house" after they are required to leave the Freedom House; this is false, however, as Narco Freedom operates no three-quarter housing for "graduates," or anyone not actively enrolled in a Narco Freedom outpatient program.

70.     Typically, once the resident approaches "graduation" and asks about graduate housing, he or she is told that it is full.  The resident is then required to leave the Freedom House with no alternative housing option other than a referral to a shelter.

**F.     Narco Freedom's Financial Gain From the Scheme**

71.     Although the only source of direct income that Narco Freedom obtains from the Freedom Houses is the $215 monthly housing allowance provided by HRA for each resident, Narco Freedom receives significant Medicaid funds for the outpatient program services attended by the Freedom House residents, pursuant to their condition of Freedom House residency.

72.     For example, Freedom House 18, located at 224 East Tremont Avenue, has a capacity of 90 beds.  The 90 residents at Freedom House 18, all of whom are required to attend a Narco Freedom outpatient program, can generate approximately $49,680-$67,221 or more per month in Medicaid funds if all are enrolled in a methadone outpatient program, and $92,750-

$138,654 or more per month in Medicaid funds if all are enrolled in a drug-free outpatient program, based upon Medicaid reimbursement rates for the relevant time period and a conservative assumption that each resident is receiving three treatments per week (many patients receive more than three weekly treatments). Narco Freedom thus receives significant Medicaid funds in excess of its rent obligations under the Freedom House 18 building lease and other operating costs.

73.     When making the determination as to whether to agree to lease a particular building for use as a Freedom House, Brand employed a mathematical formula, which factored in the $215 monthly housing allowance provided by HRA for each potential Freedom House resident, as well as an average of 3.5 Medicaid-reimbursed outpatient program services per week for each resident, multiplied by the capacity of the house. This formula allowed Brand to estimate the total funds that Narco Freedom would receive as a result of its operation of the new Freedom House, and accordingly, whether Narco Freedom was willing to open a Freedom House in a particular building.

**G.     Other Kickback Schemes Perpetrated by Narco Freedom**

74.     In addition to owning and operating the Freedom Houses, Narco Freedom also entered into financial arrangements with operators of independent three quarter houses, in exchange for those operators referring all of their residents to Narco Freedom and requiring that the residents attend outpatient program services as directed by Narco Freedom. These agreements were made personally by Brand.

75.     Narco Freedom paid as much as $10,000 per month, or more, in exchange for referrals from numerous independent three-quarter houses.

76.     Once the independent three-quarter house operators referred their residents to Narco Freedom, Narco Freedom would contact the three-quarter house operators to report residents who were not attending their outpatient program services.  Narco Freedom also would ask the three-quarter house operators to enforce attendance at the outpatient programs, including by removing residents from the houses for non-attendance.

77.     Although Narco Freedom appears to have ceased these schemes with the independent three-quarter house operators in late 2011, payment records provided by Narco Freedom show payments as recently as 2013 to one of the independent three-quarter house operators with whom Narco Freedom previously held a "lease agreement."  Narco Freedom characterized these payments as "management fees."

## H.     The Ongoing Nature of Narco Freedom's Kickback Scheme

78.     The Freedom Houses continue to operate under the policy that attendance at a Narco Freedom outpatient program is a condition of residency, and failure to adhere to that condition will result in removal from the Freedom House.

79.     Both the Narco Freedom outpatient programs and the Freedom Houses remain operational and there has been no indication that those programs intend to cease operations.

80.     The Government has requested that Narco Freedom cease its illegal kickback scheme, but Narco Freedom has taken no steps to do so.

81.     Accordingly, there is no reason to believe that, absent court intervention, Narco Freedom will cease or curb its practice of billing Medicaid for outpatient program services that result from Narco Freedom's unlawful inducements to the Freedom House residents.

## CLAIM FOR INJUNCTIVE RELIEF UNDER 18 U.S.C. § 1345

82.     The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

83.     Narco Freedom unlawfully, knowingly and willfully executed a scheme and artifice to provide remuneration in the form of a good in kind, namely, residence in its Freedom Houses, to Medicaid beneficiaries.

84.     In connection with the fraudulent scheme, Narco Freedom provided the remuneration with the intent to induce the Medicaid recipients to obtain services in Narco Freedom's outpatient programs, which services were paid for by Medicaid, a federal health care program.

85.     Narco Freedom's scheme to generate Medicaid funds through these inducements violates the Anti-Kickback Statute, which is included in the definition of a "Federal health care offense" under 18 U.S.C. § 24(a)(1).

86.     As a result of Narco Freedom's knowing and willful conduct, the Government has paid tens of millions of dollars in Medicaid reimbursements for services predicated upon the unlawful inducements.

87.     Further, Narco Freedom's ongoing illegal kickback scheme exploits a vulnerable population of citizens who participate in the scheme because they lack alternatives for housing.

88.     The Freedom Houses continue to operate under the policy that residency is conditioned upon enrollment in and attendance at a Narco Freedom outpatient program.

89.     Both the Narco Freedom outpatient programs and the Freedom Houses remain operational and there has been no indication that those programs intend to cease operations.

16

90.     The Government has requested that Narco Freedom cease its illegal kickback scheme, but Narco Freedom has taken no steps to do so.

91.     Narco Freedom's ongoing illegal kickback scheme poses the prospect of a continuing and substantial injury to the United States and its citizens.

92.     Accordingly, Narco Freedom's ongoing illegal conduct should be enjoined, on both a preliminary and permanent basis, pursuant to 18 U.S.C. § 1345.

WHEREFORE, the United States demands judgment in its favor and against Narco Freedom and entry of a preliminary and a permanent injunction against Narco Freedom as follows:

(i)     enjoining Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, from conditioning residence at any "Freedom House" (defined as (i) any facility that is listed on Exhibit A to the Declaration of Sue O'Connor in support of the Government's motion for a temporary restraining order and preliminary injunction; or (ii) any facility that is leased, operated by, or affiliated with Narco Freedom that houses individuals receiving treatment in an outpatient chemical dependency or methadone program ("outpatient program")) upon the enrollment in an outpatient program operated by, or in any way affiliated with, Narco Freedom;

(ii)    enjoining Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, from evicting or otherwise removing any Freedom House resident based on his or her failure or refusal to enroll in or attend an outpatient program operated by, or in any way affiliated with, Narco Freedom;

(iii)      enjoining Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, from conditioning residence at any Freedom House upon the resident's waiver of his or her right to protect confidential health care-related information under any applicable law;

(iv)      enjoining Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, from evicting or otherwise removing individuals residing in any Freedom House, other than in accordance with all applicable laws including N.Y.C. Administrative Code § 26-521 and RPAPL § 711;

(v)      enjoining Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, from requiring individuals residing in any Freedom House to move within that Freedom House or to any other Freedom House, without that individual's written consent;

(vi)      enjoining Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, from closing or otherwise ceasing or materially altering the operations of Freedom House, without (i) a minimum of thirty (30) days advance notice to all residents therein, and (ii) a minimum of forty-five (45) days advance notice to the Government;

(vii)      requiring, within five (5) days of the entry of the injunction, that Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, provide written notice to all individuals who currently reside at any Freedom House that residence at any Freedom House is not conditioned

upon the enrollment in or attendance at an outpatient program operated by, or in any way affiliated with, Narco Freedom; and additionally requiring, with respect to all individuals who become Freedom House residents subsequent to the entry of the injunction, such notice to be provided within twenty-four (24) hours of the individual's arrival at the Freedom House. The form of this notice shall be approved in advance by the United States Attorney's Office for the Southern District of New York, and shall include a phone number that Freedom House residents can call to report any actions by Narco Freedom that are inconsistent with the terms of the notice;

(viii)    requiring Narco Freedom to post, at all Freedom Houses, in a high-visibility location in one or more common areas, a notice stating that residence at any Freedom House is not conditioned upon the enrollment in or attendance at an outpatient program operated by, or in any way affiliated with, Narco Freedom. This notice shall be posted within five (5) business days of the entry of the injunction. The form of this notice shall be approved in advance by the United States Attorney's Office for the Southern District of New York, and shall include a phone number that residents can call to report any actions by Narco Freedom that are inconsistent with the terms of the notice;

(ix)    requiring, within five business days of the entry of the injunction, Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, to notify all individuals and/or entities that have referred one or more individuals to Narco Freedom (including any Freedom House) in the past six (6) months, that residence at any Freedom House is not conditioned upon the enrollment in or attendance at an outpatient program operated by, or in any way affiliated with,

19

Narco Freedom.  The form of this notice shall be approved in advance by the United States Attorney's Office for the Southern District of New York;

(x)      requiring Narco Freedom and its officers, agents, servants, employees, and attorneys, and any other person or entity in active concert or participation with any of them, to allow any representative from the New York City Department of Buildings, New York City Fire Department, New York City Office of Housing Preservation and Development, and any other local or state agency tasked with overseeing the health and safety of individuals and/or residential facilities, to access and inspect any Freedom House;

(xi)      requiring, commencing 14 days after entry of the injunction, Narco Freedom to submit to the Government a list of all individuals who are currently residing in a Freedom House, including for each individual:  name, Medicaid identification number, address, telephone number, and the name of the outpatient chemical dependency program in which the individual is enrolled (collectively, the "Resident List"); and requiring, on the 15th of every month thereafter, Narco Freedom to submit to the Government an updated Resident List; in addition, on the 15th of every month after entry of this Order, requiring Narco Freedom to submit to the Government a list of all individuals who have moved out of any Freedom House during the prior month, and for each individual: name, Medicaid ID number, the address and number of the Freedom House at which the individual resided, the circumstances for the individual's departure, and all information, including address and telephone number, as to the individual's current location;

(xii)      requiring Narco Freedom to inform the Government within (14) days of any change in its Board of Directors; and

(xiii)    such further relief as is proper.

Dated: New York, New York
      October 28, 2014

                  PREET BHARARA
                  United States Attorney
                  Southern District of New York
                  Attorney for the United States of America

By:                           
                  CRISTINE IRVIN PHILLIPS
                  KIRTI VAIDYA REDDY
                  Assistant United States Attorneys
                  86 Chambers Street, 3rd Fl.
                  New York, New York 10007
                  Tel. (212) 637-2696/2751
                  Fax (212) 637-2786
                  cristine.phillips@usdoj.gov
                  kirti.reddy@usdoj.gov