**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------- x

UNITED STATES OF AMERICA,                 :
                                          :
        Plaintiff,                      :
                                          :
            v.                         :       14 Civ. 8593 (JGK)
                                          :
NARCO FREEDOM, INC.,                      :
                                          :
        Defendant.                     :

------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE UNITED STATES FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION <u>AGAINST DEFENDANT NARCO FREEDOM, INC.</u>

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York, 10007
Telephone: (212) 637-2751/2696

Of Counsel:

KIRTI VAIDYA REDDY
CRISTINE IRVIN PHILLIPS
Assistant United States Attorneys

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..............................................................................................1

FACTUAL BACKGROUND .............................................................................................3

I.   THREE-QUARTER HOUSES .................................................................................3

II.  THE FREEDOM HOUSE KICKBACK SCHEME..................................................4

     A.   Development of the Scheme by Narco Freedom C.E.O. Alan Brand.....................4

     B.   Expansion of the Freedom Houses and Narco Freedom's Ensuing
          Financial Gain .....................................................................................................6

     C.   Narco Freedom's Practices Regarding Marketing and "Filling" of the
          Freedom Houses...................................................................................................7

     D.   Narco Freedom's Practices Regarding the Operation of the Freedom
          Houses .................................................................................................................9

     E.   Drug-Free vs. Methadone Outpatient Program Participants at the Freedom
          Houses................................................................................................................11

     F.   Harm Incurred by Freedom House Residents Due to Narco Freedom's Policies
          and Practices ......................................................................................................13

III. RELATED SCHEMES PERPETRATED BY NARCO FREEDOM .................................15

IV.  THE ONGOING NATURE OF THE FREEDOM HOUSE KICKBACK SCHEME ..........16

ARGUMENT ....................................................................................................................16

I.   THE STANDARD FOR INJUNCTIVE RELIEF UNDER 18 U.S.C. § 1345 .......................16

II.  NARCO FREEDOM HAS BEEN VIOLATING THE ANTI-KICKBACK
    STATUTE THROUGH A CONSISTENT COURSE OF CONDUCT THAT
    CONTINUES TODAY .......................................................................................18

     A.   Narco Freedom Pays Remuneration Directly to Medicaid Recipients in the
          Form of Short-Term Residence in the Freedom Houses .....................................19

     B.   The Purpose of the Remuneration Provided by Narco Freedom Is to Induce
          the Residents to Arrange for Narco Freedom Outpatient Services That Are
          Paid for by Medicaid, a Federal Health Care Program .........................................20

III.  A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PREVENT
      NARCO FREEDOM FROM CONTINUING TO COMMIT AN ONGOING FEDERAL
      HEALTH CARE OFFENSE...................................................................................................21

      CONCLUSION..............................................................................................................................22

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*CFTC v. British American Commodity Options,*
  560 F.2d 135 (2d Cir. 1977)...............................................................21

*City of New York v. Golden Feather Smoke Shop, Inc.,*
  08-C 2009 WL 2612345 (E.D.N.Y. Mar. 16, 2009)...................................21

*Klaczak ex rel. United States v. Consolidated Medical Transport,*
  458 F. Supp. 2d 622 (N.D. Ill. 2006) ..................................................19

*Mullins v. City of New York,*
  626 F.3d 47 (2d Cir. 2010).................................................................18

*SEC v. Materia,*
  745 F.2d 197 (2d Cir. 1984)...............................................................18

*SEC v. Management Dynamics, Inc.,*
  515 F.2d 801 (2d Cir. 1975)....................................................17, 18, 21

*U.S. ex rel. Bilotta v. Novartis Pharmaceuticals Corp.,*
  -- F. Supp. 3d --, 2014 WL 4922291 (S.D.N.Y. Sept. 30, 2014)................19

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.,*
  778 F. Supp. 2d 709 (N.D. Tex. 2011) ................................................19

*United States ex rel. Kester v. Novartis Pharmaceuticals Corp.,*
  No. 11 Civ. 8196 (CM), 2014 U.S. Dist. LEXIS 124761
  (S.D.N.Y. Sept. 3, 2014)....................................................................18

*United States v. Aginsky,*
  165 F.3d 15 (2d Cir. 1998).................................................................19

*United States v. All Right, Title & Interest in Real Property etc.,*
  901 F.2d 288 (2d Cir. 1990)...............................................................17

*United States v. America Therapeutic Corp.,*
  797 F. Supp. 2d 1289 (S.D. Fla. 2011) ...............................................17

*United States v. Belden,*
  714 F. Supp. 42 (N.D.N.Y. 1987)........................................................17

*United States v. Fed. Record Serv. Corp.*, 99 Civ. 3290, 1999 WL 335826
    (S.D.N.Y. May 24, 1999) ........................................................................17

*United States v. McClatchey*,
    217 F.3d 823 (10th Cir. 2000) ..............................................................20

*United States v. Quadro Corp.*,
    928 F. Supp. 688 (E.D. Tex. 1996)...................................................18, 21

*United States v. William Savran & Associates, Inc.*,
    755 F. Supp. 1165 (E.D.N.Y. 1991) ......................................................17

## FEDERAL STATUTES

18 U.S.C. § 1345..............................................................1, 16, 17, 18, 22

18 U.S.C. § 1345(a)(1)(C) ...................................................................16

18 U.S.C. § 1345(b) .............................................................................17

18 U.S.C. § 24(a)(1).............................................................................16

31 U.S.C. § 3729 ..................................................................................18

42 U.S.C. § 1320a-7b.......................................................................1, 16

42 U.S.C. § 1301(a)(3).........................................................................19

42 U.S.C.A. § 1320a-7(b)(f)(1) ...........................................................18

# PRELIMINARY STATEMENT

Plaintiff the United States of America (the "Government"), by its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for a temporary restraining order ("TRO") and preliminary injunction against defendant Narco Freedom, Inc. ("Narco Freedom"), pursuant to the fraud injunction statute, 18 U.S.C. § 1345. A TRO and PI under section 1345 are necessary and appropriate because, unless enjoined, Narco Freedom is likely to continue engaging in an illegal and fraudulent kickback scheme, violating the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("Anti-Kickback Statute" or "AKS"), illegally coercing residents to use Narco Freedom's treatment programs, and fraudulently billing Medicaid for services tainted by illegal kickbacks, thus subjecting the Centers for Medicare and Medicaid Services at the United States Department of Health and Human Services, as well as the public fisc, to continuing and substantial economic harm.

Since approximately 2006, and continuing today, Narco Freedom has engaged in a scheme whereby it offers an inducement to Medicaid recipients, in the form of short-term residential housing in a facility known as a "three-quarter house," in order to generate business for its outpatient chemical dependency programs, which provide services that are funded through Medicaid. Specifically, Narco Freedom owns and operates three-quarter houses known as "Freedom Houses," and it allows individuals to reside in the Freedom Houses on a short-term basis, but conditions residency upon enrollment in and attendance at a Narco Freedom outpatient program. Narco Freedom markets its Freedom Houses to agencies such as the New York State Division of Parole, and to facilities such as inpatient chemical dependency programs, which often must find housing for individuals leaving their programs. Once individuals are referred to the Freedom Houses for short-term housing, Narco Freedom conditions their continued residence

upon enrollment in and attendance at a Narco Freedom outpatient program.  Enrollment and attendance at an equivalent outpatient program operated by a non-Narco Freedom entity is insufficient; if an individual refuses either to enroll in a Narco Freedom program or attend all treatments as directed by Narco Freedom, he or she faces immediate removal from the Freedom House.  Furthermore, as soon as the resident "graduates" from the Narco Freedom outpatient program, typically upon completing the 75 visits that are reimbursable by Medicaid at a 100% rate, he or she is given days to vacate the Freedom House.  This kickback scheme perpetrated by Narco Freedom not only has led to Narco Freedom's fraudulent receipt of tens of millions in Medicaid funds, but it also has exploited thousands of vulnerable individuals who are forced into the scheme due to their lack of a stable housing option.

Narco Freedom's fraudulent scheme is ongoing.  Current Narco Freedom employees who work with the Freedom Houses have confirmed as recently as last month that the policy requiring Freedom House residents to attend Narco Freedom outpatient programs is still in place. This policy has been further confirmed by counsel for Narco Freedom, which thus far has refused to negotiate a voluntary injunction whereby the illegal kickback relationship would be severed.[1]  Accordingly, the Court should grant the Government's motion and issue the attached TRO, and further, following a hearing (if necessary), should grant the preliminary injunction

---

[1] It is the Government's understanding that, following the indictment of former Narco Freedom C.E.O. Alan Brand and his son on October 22, 2014, by the Office of the New York State Attorney General ("AG"), for criminal offenses related to the operation of Narco Freedom including commercial bribes, grand larceny and money laundering, the AG is seeking to put Narco Freedom into receivership.  *See* Declaration of Cristine Irvin Phillips ("Phillips Decl."), ¶ 4.  Narco Freedom's counsel has taken the position that this potential impending receivership prevents the entity from negotiating a voluntary injunction in this matter.  *See* Phillips Decl. ¶ 5. The timing of any such receivership, however, assuming it occurs at all, is uncertain, *see id.* ¶ 4, and in the meantime, the fraudulent scheme and ensuing inducement and coercion of residents, and damage to the Government, remain ongoing.

requested by the Government in the attached proposed order, to enjoin Narco Freedom from continuing the fraudulent scheme.

## FACTUAL BACKGROUND

### I.     THREE-QUARTER HOUSES

Three-quarter houses primarily service Medicaid-eligible individuals who lack stable housing, and who seek to enroll or are enrolled in an outpatient program for chemical dependency (an "outpatient program"), either with the goal of becoming drug-free (a "drug-free outpatient program"), or to recover from an opioid addiction through the use of medically prescribed methadone (a "methadone outpatient program").  *See* Declaration of Sue O'Connor ("O'Connor Decl."), ¶ 5.  While three-quarter houses require residents to be enrolled in outpatient treatment, the houses themselves offer no clinical services to residents.  *See id.* ¶¶ 5, 7. As a result, three-quarter houses are unregulated, either by the New York State Office of Alcohol and Substance Abuse Services ("OASAS"), which regulates the outpatient programs, or by any other local, state or federal licensing entity or agency.  *See id.* ¶ 7.

Three-quarter houses typically are located in single-family or multi-family dwellings, in which residents are provided with a bunk bed in a shared bedroom, as well as access to bathroom and possibly kitchen facilities.  *See id.* ¶ 6.  The capacity of a three-quarter house can range from dozens to hundreds of residents.  *See id.*  Individuals wishing to reside in a three-quarter house typically are asked to sign house rules, and must abide by those rules in order to maintain their residence in the house.  *See id.* ¶ 9.  These rules are generated and enforced by the operator of the three-quarter house.  *See id.*

Three-quarter houses typically do not collect rent directly from residents.  Instead, three-quarter house residents, who generally receive public assistance, including a monthly housing allowance, through the New York City Human Resources Administration ("HRA"),  assign their

housing allowance (currently $215 per month) to either the three-quarter house itself or the landlord that owns the building in which the three-quarter house is located. *See id.* ¶ 8.

In the course of its investigation, the Government has found, through interviews of three-quarter house residents and individuals who provide services to those residents (such as case workers), that three-quarter houses, some of which are operated by Narco Freedom, have failed to provide a safe, sanitary environment for residents, and engage in abusive practices such as evictions without notice and failure to prevent drug use in the houses. *See id.* ¶ 10. Three-quarter houses in New York City also have been widely criticized in media reports, *see, e.g.*, Cindy Bernstein, *Drug Rehab for Housing: Alleged Scheme Targets City's Most Vulnerable*, WNYC, December 15, 2010 (*available at* http://www.wnyc.org/story/104149-jerome-david (last checked 10/26/14)), and by groups that work with housing-related issues, *see, e.g.*, *Three-Quarter Houses: the View From the Inside* (Prisoner Re-Entry Institute, John Jay College of Criminal Justice, City University of New York, October 2013) (*available at* http://johnjayresearch.org/pri/files/2013/10/PRI-TQH-Report.pdf (last checked 10/23/2014)).

## II. THE FREEDOM HOUSE KICKBACK SCHEME

### A. Development of the Scheme by Narco Freedom C.E.O. Alan Brand

According to its website, Narco Freedom is the "#1 Outpatient Alcohol and Substance Abuse Treatment Program in New York City," consisting of ten outpatient programs in the Bronx, Queens and Brooklyn. *See http://www.narcofreedom.com/locations/index.html* (last checked 10/26/2014). Since approximately 2006, Narco Freedom also has been operating three-quarter houses, which it refers to as Freedom Houses. *See* O'Connor Decl. ¶ 2, 11. Narco Freedom currently operates 18 Freedom Houses in the Bronx, Brooklyn, and Queens, with capacities ranging from 30 to 200 beds, *see* Exhibit B to O'Connor Decl., and, upon information

and belief, is the largest operator of three-quarter houses in the city of New York.  *See* O'Connor Decl. ¶¶ 17-18.

Narco Freedom began to open three-quarter houses for a specific purpose:  to drive more business to its outpatient programs.  *See id.* ¶ 11.  Specifically, Narco Freedom's C.E.O. at the time, Alan Brand ("Brand"), planned to open the Freedom Houses and condition residence in those houses upon enrollment in, and attendance at, one of Narco Freedom's outpatient programs.  *See id.* ¶¶ 12-13.  The individuals residing at the Freedom Houses otherwise would owe no rent other than their $215 monthly housing allowance provided by HRA.  *See id.* ¶ 19. Brand's rationale was that that offering a bed in a Freedom House to an individual who otherwise has no stable housing would ensure that the individual would both enroll in and attend Narco Freedom outpatient programs in order to maintain his or her residence at the Freedom House, thus generating Medicaid funds for Narco Freedom through its outpatient programs.  *See id.* ¶¶ 12, 14.

Pursuant to this scheme, Brand met with an individual ("Developer") who agreed to purchase a building that would house the first three-quarter house operated by Narco Freedom. *See id.* ¶ 12.  Brand agreed that Narco Freedom would be the tenant in that building and would make monthly rent payments.  *See id.*  Since opening the first Freedom House, Narco Freedom has repeated this model many times:  it rents a building from the Developer for the purpose of opening a new Freedom House.  Narco Freedom typically approves the building and agrees to sign a lease before the Developer closes on the purchase of the building.  *See id.* ¶ 25.

In deciding whether to open a new Freedom House in a particular building, Brand used a formula that factored in not only the monthly housing allowance paid by HRA on behalf of each Freedom House resident but, consistent with the rule that Freedom House residents must enroll in and attend Narco Freedom outpatient programs, also factored in the average amount of

Medicaid funds that each Freedom House "bed" would generate (based upon an average of 3.5 outpatient services per resident, per week). *See id.* ¶ 26. The Medicaid funds derived from the outpatient program services received by the Freedom House residents are thus an integral part of the Freedom House "business model."

B. **Expansion of the Freedom Houses and Narco Freedom's Ensuing Financial Gain**

From the time that Narco Freedom began operating Freedom Houses, demand for beds in those houses has been consistently high, with most houses operating at or near full capacity a majority of the time. *See id.* ¶ 15. This demand drove Brand and Narco Freedom to continually open new Freedom Houses from 2006 to 2013. *See id.* All Freedom House residents were and are required to attend outpatient programs at Narco Freedom as a condition of residency. *See id.* ¶ 16.

Consistent with Brand's intended purpose for opening and operating the Freedom Houses, the outpatient services received by the residents in those houses have generated tens of millions of dollars for Narco Freedom in Medicaid funds. *See id.* ¶ 24. Narco Freedom thus has reaped tremendous financial benefit from the Freedom Houses. This is true despite the fact that Narco Freedom pays significantly more in lease payments each month than it can possibly expect to receive in housing allowance payments from HRA, which ostensibly are the only source of payment provided to Narco Freedom for housing the Freedom House residents. *See id.* ¶¶ 22-23.

As just one example, Freedom House 18, located at 224 East Tremont Avenue, has a capacity of 90 beds. *See id.* ¶ 21. Assuming a 100% occupancy rate, this means that Narco Freedom can expect to receive approximately $19,350 per month in monthly housing allowances from HRA for Freedom House 18. *See id.* This amount is significantly less than the $33,416.66 monthly lease payment that Narco Freedom owes for Freedom House 18, which is exclusive of the cost of utilities paid by Narco Freedom, including water and property taxes, as well as labor

and supplies to operate the house.  *See id.*  Yet each of the 90 Freedom House 18 residents are

required to attend a Narco Freedom outpatient program, and those residents, assuming full

capacity, can generate approximately $92,750-$138,654 or more per month solely in Medicaid

reimbursements, based upon a conservative assumption that each resident is receiving three

treatments per week (many patients receive more than three weekly treatments).[2]  *See id.* ¶ 23.

Freedom House 18, like all of the Freedom Houses, thus generates significant funds for

Narco Freedom when the Medicaid funds for its outpatient programs, which the Freedom House

residents must attend as a condition of residency, are taken into account.  *See id.* ¶¶ 21, 23.

Consistent with these calculations, witness testimony has confirmed that Narco Freedom agrees

to pay more in monthly lease payments than it can receive in monthly HRA housing allowance

payments specifically because the outpatient program services that the Freedom House residents

are required to receive as a condition of their residency generate a large amount of Medicaid

funds for Narco Freedom.  *See id.* ¶ 22.

### C.    Narco Freedom's Practices Regarding Marketing and "Filling" of the Freedom Houses

Since approximately 2006, Narco Freedom has paid individuals to market its Freedom

Houses.  *See id.* ¶ 27.  The primary individual who performs marketing for Narco Freedom (the

"Marketer") was introduced to Brand by the Developer.  *See id.* ¶ 28.  The purpose of the

---

[2] The above-cited reimbursement range applies to individuals enrolled in a "drug-free" outpatient program.  *See* O'Connor Decl. ¶ 23, fn.4.  Freedom House residents enrolled in methadone outpatient programs generate lower amounts of Medicare reimbursements due to rate differences; the same calculation as above for individuals in the methadone outpatient program is $49,680-$67,221.  *See id.*  According to witness testimony, as a result of these disparate reimbursement rates, Narco Freedom disfavors, and only occasionally allows, individuals to reside in the Freedom Houses who are looking to enroll, or are already enrolled, in a Narco Freedom methadone outpatient program.  *See id.*; *see also* Section II.E, *infra*.  Accordingly, although either reimbursement rate results in the receipt of significant Medicaid funds by Narco Freedom, the higher "drug-free" outpatient program reimbursement rate more accurately approximates what Narco Freedom actually receives.  *See id.*

Developer's interest in recruiting the Marketer to perform marketing for Narco Freedom was to ensure that the buildings he owned remained at or near capacity, thus motivating Narco Freedom to open more Freedom Houses in buildings that he would purchase and lease to Narco Freedom. *See id.*

Brand directed the Marketer at the outset to "fill" the first Freedom House, and since then, all subsequently opened Freedom Houses as well. *See id.* ¶ 29. The goal of the Marketer and all individuals in the Narco Freedom "marketing department" (which is staffed by Narco Freedom employees and by individuals operating on a contract basis) is to keep the Freedom Houses "filled" with residents who will enroll in and attend outpatient programs at Narco Freedom. *See id.*

Narco Freedom directs its marketing towards institutions that are likely to make referrals, such as detox facilities and inpatient treatment facilities, as well as the New York State Division of Parole. *See id.* ¶ 30. This marketing often includes an in-person presentation to the counselors or parole officers, which consists of describing the Freedom Houses and Narco Freedom's outpatient programs. *See id.* The marketing department communicates to the referring entities that enrollment at a Narco Freedom outpatient program is a condition of residence at the Freedom House. *See id.*

From the perspective of the programs that refer patients to Narco Freedom, the primary reason for the referral to Narco Freedom, as opposed to an outpatient program without a housing option, is the patient's or parolee's need to have housing. *See id.* ¶ 31. Because finding affordable housing is extremely difficult for many of the patients or parolees, the availability of the Freedom Houses drives referrals to Narco Freedom. *See id.* ¶ 31.

In referring an individual to Narco Freedom, a counselor or parole officer will typically reach out to a member of the marketing department, who will arrange for a bed at one of the

Freedom Houses to be reserved for the referred patient. *See id.* ¶ 32. Individuals seeking housing also hear about the Freedom Houses through word-of-mouth and will initiate a call with Narco Freedom. *See id.* ¶ 33. In this circumstance, the individual's call is routed to the marketing department, which then directs the individual to report to a particular Freedom House. *See id.*

Once at the Freedom House, residents are directed to report to Narco Freedom intake for immediate placement in an outpatient program. *See id.* ¶ 37. If the resident does not report to intake within 24 hours of arrival at the Freedom House, he or she risks removal from the Freedom House. *See id.*

**D.** **Narco Freedom's Practices Regarding the Operation of the Freedom Houses**

Once individuals arrive at a Freedom House, they are required to sign a series of forms that purport to relinquish each individual's rights in a number of areas. *See id.* ¶ 34. These forms include a "Code of Conduct" and a "Waiver of Tenant[']s Rights." *See* Exhibits D & E to the O'Connor Decl. Page 9 of the Code of Conduct states, "[a]ll participants are required to attend one (1) group treatment or counseling session a day, seven days a week, in their designated program with Narco Freedom Inc., or as approved by Program Director." *See* Exhibit D to O'Connor Decl., at 1. Paragraph 8 of the Waiver of Tenant's Rights states, "all residents, as a pre-supposed condition in residing at the program, will attend said resident[']s designated outpatient program." *See* Exhibit E to O'Connor Decl., ¶ 8. The Waiver of Tenant's Rights also states, at paragraph 4, that "[t]he resident does not have ANY claims to further stay or rights unto the property if the resident is asked to leave the program for any reason." *See id.* ¶ 4.

Freedom House residents also are required to sign, upon initial arrival, an acknowledgement that they can expect only "a 6-9 month stay, with a possible 30-day [e]xtension." *See* Exhibit F to the O'Connor Decl. Residents also must sign a waiver of rights

under the Health Insurances Portability and Accountability Act of 1996 ("HIPAA") and the federal regulations governing Confidentiality and Drug Abuse Patient Records, 42 C.F.R. Part 2, in order to allow Narco Freedom to disclose the resident's Toxicology and Treatment Report to the Freedom House staff. *See* Exhibit G to the O'Connor Decl.

New Freedom House residents also are sent to HRA, to arrange for payment of their $215 monthly housing allowance directly to Narco Freedom. *See* O'Connor Decl. ¶ 40. Narco Freedom has a "rent" department that collects the HRA housing allowances. *See id.* Typically, Freedom House residents are not required to pay any rent beyond the HRA housing allowance. *See id.*

If an individual does not attend all of the outpatient services as directed by Narco Freedom, he or she risks being thrown out of the Freedom House. *See id.* ¶ 39. This condition is generally known by all Freedom House residents. *See id.* Freedom House staff members monitor the residents' attendance at the Narco Freedom outpatient programs and take action against residents who do not attend all services as directed by Narco Freedom. *See id.* ¶ 41. When Freedom Houses were first created by Narco Freedom, the residents were required, following any outpatient program service, to obtain a slip of paper, referred to by the Freedom House staff as a "re-entry pass," from the outpatient program, and deliver it to the Freedom House staff upon returning to the Freedom House. *See id.* Residents who did not return with their "re-entry pass" faced consequences such as removal from the house or sequestration in an "isolation room." *See* Exhibits H & I to the O'Connor Decl.

More recently, the use of re-entry passes was discontinued and the Freedom House staff now simply access patient records in Narco Freedom's computer system to determine whether Freedom House residents are attending all outpatient program services as directed. *See*

O'Connor Decl. ¶ 42.  In addition, when Brand was acting as the C.E.O. of Narco Freedom,[3] he personally received a roster of the Freedom House residents and a weekly report showing the number of outpatient program services those residents attended.  *See id.* ¶ 43.  If Brand saw that particular Freedom House residents were not attending all of their outpatient program services, he would direct the management of the Freedom House to speak with those residents, and/or to remove them from the Freedom Houses.  *See id.*

Removal of an individual from a Freedom House typically is conducted by one or more members of the Freedom House staff, who inform the resident that he or she needs to leave the house, and who remove that person's possessions from the house.  *See id.* ¶ 44.  No legal process is used in the removal.  *See id.*  Specifically, Narco Freedom takes special steps to attempt to avoid the requirement under New York City Administrative Code, Section 26-521(a), that "[i]t shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer . . . except to the extent permitted by law pursuant to a warrant of eviction or other order of a court of competent jurisdiction or a governmental vacate order . . . ."  *See id.* ¶ 45.  In order to attempt to circumvent this requirement, page 8 of the Code of Conduct states that "participants['] assigned areas are changed every 28 days and participants are required to prepare themselves and their personal property, in advance, to enable them to be reassigned and moved upon the 28th day to their new assigned area."  *See id.*; Exhibit D to O'Connor Decl., at 8.

### E.    Drug-Free vs. Methadone Outpatient Program Participants at the Freedom Houses

Narco Freedom treats Freedom House residents who enroll in its drug-free programs differently from those who enroll in its methadone programs; this disparate treatment relates

---

[3] In or about July 2014, Brand stepped down as C.E.O. of Narco Freedom, but remains the sole member of the corporation.

entirely to the amount of Medicaid funding received by Narco Freedom for each type of outpatient program services. As stated above, reimbursement rates by Medicaid for individuals enrolled in methadone outpatient programs are generally lower than rates for individuals enrolled in drug-free outpatient programs. *See supra* at 7, fn.2. Narco Freedom accordingly disfavors individuals enrolled in its methadone outpatient programs as Freedom House residents. *See* O'Connor Decl. ¶ 23, fn.4. For instance, according to a former Narco Freedom employee, in 2011 or 2012, Brand ordered the removal of 60 Freedom House residents enrolled in a Narco Freedom methadone outpatient program in order to make room for prospective residents who would enroll in a drug-free outpatient program. *See id.*

For individuals enrolled in a drug-free outpatient program, however, Medicaid reduces the reimbursement rate based on utilization thresholds under the current APG guidelines. *See* Laws of 2011, Ch. 59, § 26 (N.Y.S. Uncol. Law 2011). Accordingly, Medicaid reimburses Narco Freedom for a maximum of 75 services at a 100% rate under the current APG guidelines, then reimburses at a 75% rate for 76 to 95 services, and a 50% rate for more than 95 services.[4] *See* O'Connor Decl. ¶ 46; 14 N.Y.C.R.R. § 841 (providing general methodology for APG billings); http://www.health.ny.gov/regulations/state_plans/status/non-inst/approved/docs/app_2012-08-23_spa_11-28.pdf (last checked October 27, 2014). At Narco Freedom, typically after an individual enrolled in a drug-free outpatient program has completed 75 services, he or she is deemed to have "graduated" and is discharged from the outpatient program. *See* O'Connor Decl. ¶ 47

. Medicaid does not impose the same limitations related to number of services for methadone outpatient program participants; Narco Freedom therefore may allow methadone

---

[4] The current APG guidelines were issues in July 2011. Prior to their issuance, reimbursements for drug-free outpatient program services were not based on the number of total visits. *See* https://www.oasas.ny.gov/admin/hcf/cdoc.cfm (last checked Oct. 27, 2014).

outpatient program participants to remain in the Freedom Houses for a longer period (assuming those individuals have been allowed in the Freedom Houses at all). *See id.*, fn.9.

Freedom House residents who are no longer enrolled in a Narco Freedom outpatient program are given 30 days or less to vacate the Freedom House. *See id.* ¶ 47. Freedom House residents often are told by Freedom House staff that they can move to a "graduate house" after they are required to leave the Freedom House; this is false, however, as Narco Freedom operates no three-quarter housing for "graduates," or anyone not actively enrolled in a Narco Freedom outpatient program. *See id.* ¶ 48. According to witnesses, once the resident approaches "graduation" and asks about graduate housing, he or she is told that it is full. *See id.* The resident is then required to leave the Freedom House, typically with no alternative housing option other than a referral to a shelter. *See id.*

**F.    Harm Incurred by Freedom House Residents Due to Narco Freedom's Policies and Practices**

Narco Freedom's policy and practice of requiring Freedom House residents to enroll in and attend Narco Freedom outpatient programs is harmful to the Freedom House residents in a number of ways. As an initial matter, this policy and practice, illegal under the AKS, coerces residents to use Narco Freedom's outpatient programs and therefore is violative of the Patient Rights provision of the New York State Code, 14 N.Y.C.R.R. § 815.5(15), which states that patients in outpatient programs have the right "to be free from any staff or patient coercion" or "undue influence."

Also, according to the testimony of multiple counselors from outpatient programs other than Narco Freedom, numerous patients who have subsequently taken up residence in a Freedom House have been required to request an immediate discharge from the non-Narco Freedom outpatient program so that they could enroll in Narco Freedom. *See id.* ¶ 50. Many of those patients have been very upset by the need to leave their existing outpatient program, but reported

that doing so was the only way for them to avoid losing their bed in the Freedom House.  *See id.*

When the counselors attempted to request that Narco Freedom allow the patients to remain in

their Freedom House without transferring to a Narco Freedom outpatient program, those requests

were uniformly denied.  *See id.* ¶ 51.  According to counselors, this forced transfer from

outpatient programs in which the patients were stable and progressing is, at the very least,

inconsistent with accepted standards of care in outpatient programs.  *See id.* ¶ 52.

Finally, the manner in which Narco Freedom operates its Freedom Houses is also harmful

to the residents.  Numerous Freedom House residents have reported that Narco Freedom does not

take sufficient steps to address ongoing drug use, and even selling of drugs, in the Freedom

Houses.  *See id.* ¶ 53.  This practice is consistent with witness testimony from former Narco

Freedom counselors (referred to as Certified Alcohol and Substance Abuse Counselors

("CASACs")) that the focus at Narco Freedom is ensuring that as many patients as possible

receive treatment, regardless of whether that treatment is effective.  *See id.* ¶ 54.  One former

CASAC reported that toxicology performed on his clients showed that more than 75% of the

patients were still using drugs, but that Narco Freedom discouraged discharge of patients despite

evidence of ongoing drug use.  *See id.*

Other complaints from current and former residents regarding the Freedom Houses

include lack of heat and other basic facilities, vermin infestations, fighting among residents,

aggressive behavior by Freedom House staff toward residents (including physical aggression),

and overcrowding.  *See id.* ¶ 55.  Freedom Houses also have received a large number of citations

from city agencies such as the Fire Department of New York and the New York City Department

of Buildings.  *See id.* ¶ 56.  One such citation, issued on July 15, 2014, to Freedom House 1,

cited a "Class 1" violation, which is defined as "immediately hazardous," due to the fact that the

building, which was intended to accommodate nine permanent, single-family apartments, in fact

was being used as an "adult home" that housed 69 residents. *See* Exhibit J to the O'Connor Decl. In short, contrary to what is represented by Narco Freedom to the Freedom House residents, including in the Code of Conduct, *see* Exhibit D to the O'Connor Decl., the Freedom Houses, at a minimum, fail to create the kind of environment that is conducive to successful recovery from chemical dependency and, further, in many instances allow illegal and dangerous living conditions.

## III.    RELATED SCHEMES PERPETRATED BY NARCO FREEDOM

In addition to perpetrating a kickback scheme through the Freedom Houses, Narco Freedom also entered into financial arrangements with operators of "independent" three quarter houses, which are not part of Narco Freedom. *See* O'Connor Decl. ¶ 58. Pursuant to these agreements, Narco Freedom paid substantial sums to the independent three-quarter houses for referring all of their residents to Narco Freedom and requiring that the residents attend Narco Freedom outpatient programs. *See id.* These agreements were made by Brand personally. *See id.*

Specifically, Narco Freedom signed agreements with several independent three-quarter houses, pursuant to which Narco Freedom agreed to make a monthly payment to the three-quarter house operators. *See id.* ¶ 59. Although styled as "lease agreements," the agreements with the independent three-quarter house operators were, in fact, referral agreements. *See id.*; *see also* Exhibit K to the O'Connor Decl. Specifically, Brand made clear to the independent three-quarter house operators that he expected them to refer their residents to Narco Freedom in exchange for the payments. *See id.* ¶ 59. Payment records provided by Narco Freedom reflect that it paid as much as $10,000 per month, or more, for referrals from each independent three-quarter house. *See id.* ¶ 60; Exhibit L to the O'Connor Decl.

Once the independent three-quarter house operators referred their residents to Narco Freedom outpatient programs, Narco Freedom would contact the three-quarter house operators to report that residents were not attending their outpatient program services. *See id.* ¶ 60. Narco Freedom would ask the three-quarter house operators to enforce attendance at the outpatient programs, including by removing residents from the houses for non-attendance. *See id.* In this way, Narco Freedom orchestrated and participated in a number of schemes very similar to the scheme it perpetrated through the Freedom Houses. And although Narco Freedom appears to have ceased these schemes with the independent three-quarter house operators in late 2011, payment records provided by Narco Freedom show "management" fees paid to one independent three-quarter house operator, with whom Narco Freedom previously held a "lease agreement," as recently as 2013. *See id.* ¶ 62.

## IV. THE ONGOING NATURE OF THE FREEDOM HOUSE KICKBACK SCHEME

As described above, the use of Freedom Houses to induce residents to obtain services for which Narco Freedom receives significant Medicaid funds has been a fundamental part of the Freedom House business model from the outset. *See id.* ¶¶ 12, 26. It is, therefore, not surprising that this practice continues, and that current Narco Freedom employees recently have confirmed that Narco Freedom has no plans to change its policy. *See id.* ¶ 62. Indeed, counsel for Narco Freedom has represented that the practice continues and has not consented to voluntarily cease. Therefore, absent action by the Court, Narco Freedom's longstanding policy and practice of mandating attendance at its outpatient programs, as a condition of residence for its Freedom House residents, will continue, and will continue to substantially harm the Government.[5]

## ARGUMENT

---

[5] Despite Alan Brand's indictment on October 22, 2014, and the potential that Narco Freedom will be placed in receivership, *see* Phillips Decl. ¶ 5, the indication from multiple sources is that Narco Freedom's outpatient programs will remain operational. *See id.* ¶ 6.

# I.  THE STANDARD FOR INJUNCTIVE RELIEF UNDER 18 U.S.C. § 1345

Section 1345 of Title 18 provides that the Government may commence an action seeking an injunction to prevent the commission of "a Federal health care offense." *See* 18 U.S.C. § 1345(a)(1)(C).  Included in the definition of a "Federal health care offense" is violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. *See* 18 U.S.C. § 24(a)(1).  Once the Government commences such an action,

> The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought.

18 U.S.C. § 1345(b).

Injunctive relief under a federal statute, such as 18 U.S.C. § 1345, does not require the showing of irreparable harm, which ordinarily is necessary for a preliminary injunction under common law.  *See United States v. Fed. Record Serv. Corp.*, No. 99 Civ. 3290, 1999 WL 335826, at *16 (S.D.N.Y. May 24, 1999); *see also SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) ("[p]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction is not required" for an injunction pursuant to statute).  Rather, "so long as the statutory conditions are met, irreparable harm to the public is presumed." *United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1179 (E.D.N.Y. 1991) (internal citations omitted).  Thus, under 18 U.S.C. § 1345, injunctive relief is appropriate where there is "probable cause to believe that the defendants are currently engaged or are about to engage in a fraudulent scheme" that violates one of the offense categories listed in the statute.  *United States v. Belden*, 714 F. Supp. 42, 45-46 (N.D.N.Y. 1987) (discussing the legislative history of Section 1345); *see also United States v. Am. Therapeutic Corp.*, 797 F. Supp. 2d 1289, 1291 (S.D. Fla. 2011) (under 18 U.S.C. § 1345, injunctive relief is appropriate where "the government establishes that

defendants have violated the statute and . . . there exists some cognizable danger of recurrent violation") (internal citations omitted).

The probable cause standard in the context of a statutory injunction is met if the Government shows that there are "reasonable grounds, rising above the level of mere suspicion" to expect future fraudulent conduct. *United States v. All Right, Title & Interest in Real Property etc.*, 901 F.2d 288, 291 (2d Cir. 1990) (the Government does not need to prove its allegations by a "preponderance of the evidence" to obtain a statutory injunction). In other words, injunctive relief is appropriate when there is "a reasonable likelihood that the activity complained of will be repeated." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984). To demonstrate the likelihood of future misconduct, a "[d]efendant's past violations are suggestive of the reasonable likelihood of future violations." *United States v. Quadro Corp.*, 928 F. Supp. 688, 697 (E.D. Tex. 1996); *see also Mgmt. Dynamics*, 515 F.2d at 807 ("past illegal conduct is highly suggestive of the likelihood of future violations").

Furthermore, as the Second Circuit recently held, courts can rely on hearsay to grant preliminary injunctive relief. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("we . . . conclude that hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction").

## II. NARCO FREEDOM HAS BEEN VIOLATING THE ANTI-KICKBACK STATUTE THROUGH A CONSISTENT COURSE OF CONDUCT THAT CONTINUES TODAY

The Anti-Kickback Statute prohibits payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care

program . . . ."[6]  As detailed below, the evidence regarding Narco Freedom's policy and practice

of conditioning residence on attendance at Narco Freedom's programs constitutes

"remuneration" paid to "induce" individuals to "arrange for" Narco Freedom's services, which

are paid for by Medicaid, a Federal health care program.  *See* 42 U.S.C. § 1320a-7b(f)(1)

(defining "Federal health care program" to include "[a]ny plan or program that provides health

benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or

in part, by the United States Government (other than the health insurance program under chapter

89 of Title 5)"); *U.S. v. Conner*, 262 Fed. App'x 515, 516 fn.1 (4th Cir. 2008) ("Medicaid is a

federal health care program"); *U.S. ex rel. Bilotta v. Novartis Pharmaceuticals Corp.*, -- F. Supp.

3d --, 2014 WL 4922291, at *4 (S.D.N.Y. Sept. 30, 2014) (same).

A.       **Narco Freedom Pays Remuneration Directly to Medicaid Recipients in the
         Form of Short-Term Residence in the Freedom Houses**

Narco Freedom's furnishing of short-term residential housing to Medicaid recipients

constitutes unlawful remuneration under the relevant provision of the AKS.  Remuneration need

not be purely monetary; rather, "[r]emuneration, for purposes of the AKS, is defined broadly,

meaning 'anything of value.'"  *Klaczak ex rel. United States v. Consol. Med. Transp.*, 458 F.

Supp. 2d 622, 678 (N.D. Ill. 2006).  In fact, due to the lack of affordable housing options, in

offering residence in the Freedom Houses, Narco Freedom is providing a form of remuneration

that, to the Freedom House residents, has substantial value – temporary but stable housing.  *See*

O'Connor Decl. ¶ 31.

---

[6] Violation of the Anti-Kickback Statute also gives rise to a cause of action under the False
Claims Act, 31 U.S.C. § 3729 *et seq.  See, e.g.*, *United States ex rel. Kester v. Novartis Pharms.
Corp.*, No. 11 Civ. 8196 (CM), 2014 U.S. Dist. LEXIS 124761, at *70-71 (S.D.N.Y. Sept. 3,
2014).  While this action seeks only injunctive relief pursuant to 18 U.S.C. § 1345, the
Government may seek relief under the False Claims Act at a future date for the same underlying
conduct.

Further, the Medicaid recipients who become Freedom House residents are "persons" as defined by the AKS, *see* 42 U.S.C. § 1301(a)(3); *see also U.S. ex rel. Wall v. Vista Hospice Care, Inc.,* 778 F. Supp. 2d 709, 722 (N.D. Tex. 2011) (internal quotation omitted) ("persons" are not limited to healthcare professionals), and as the Second Circuit has recognized, the AKS applies to payments made directly to beneficiaries, *see United States v. Aginsky*, 165 F.3d 15 (2d Cir. 1998) (affirming the conviction of a defendant who provided "cash and household items" to Medicare recipients in exchange for their agreement to accept certain medical equipment). Thus, Narco Freedom's policy and practice of allowing Medicaid recipients to reside in a Freedom House in exchange for utilization of Narco Freedom's outpatient services is sufficient to satisfy the remuneration requirement in the AKS.

**B.** **The Purpose of the Remuneration Provided by Narco Freedom Is to Induce the Residents to Arrange for Narco Freedom Outpatient Services That Are Paid for by Medicaid, a Federal Health Care Program**

To establish an AKS violation, the Government does not need to show that the remuneration was offered solely or primarily for an unlawful purpose; instead, it is sufficient simply to show that "one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals." *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000). The evidence obtained during the Government's investigation indicates that inducing the Freedom House residents to enroll in Narco Freedom outpatient program services that are paid for by Medicaid was Brand and Narco Freedom's primary objective in opening the Freedom Houses, and has remained a cornerstone of the operation of those Freedom Houses up to the present date.

Numerous witnesses have made it clear that Narco Freedom's business model for the Freedom Houses is based on the receipt of Medicaid funds and that the practice of evicting residents from the Freedom Houses is designed to coerce the residents into using Narco Freedom's outpatient services. Further, ample evidence demonstrates the financial motive

behind virtually every decision regarding the Freedom Houses.  For example, the requirement that Freedom House residents transfer from other outpatient programs to Narco Freedom, even where the residents are stable in their existing program, serves only to maximize Narco Freedom's potential to receive Medicaid funds for its Freedom House residents.  Similarly, the disparate treatment of individuals in Narco Freedom's methadone and drug-free outpatient programs with respect to the Freedom Houses is motivated by the goal of maximizing Medicaid reimbursements.  Finally, Narco Freedom's payments to independent three-quarter houses further evidences Narco Freedom's goal of obtaining additional referrals by using a residence as the inducement. These are just a few of the many examples demonstrating Narco Freedom's overarching objective in opening the Freedom Houses and using residence to coerce individuals to use its outpatient program.

### III.   A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PREVENT NARCO FREEDOM FROM CONTINUING TO COMMIT AN ONGOING FEDERAL HEALTH CARE OFFENSE

The Court has three independent bases to conclude that Narco Freedom intends to continue committing the same Federal health care offense that has been the hallmark of the Freedom Houses since their inception by Brand.  First, as described above, Narco Freedom has, since the opening of the first Freedom House, repeatedly and uniformly violated the Anti-Kickback Statute in connection with its inducement of Medicaid recipients to obtain outpatient program services through making such services a condition of residence at the Freedom Houses. That record of past violations is "highly suggestive of the likelihood of future violations." *Mgmt. Dynamics*, 515 F.2d at 807; *see also Quadro Corp.*, 928 F. Supp. at 697.

Second, Narco Freedom employees have confirmed in the past month that, despite the resignation of Alan Brand as C.E.O. and change of the membership of its board of directors, Narco Freedom continues to operate its Freedom Houses under the same set of rules, and has no apparent intention to change its policy or practice regarding conditioning Freedom House

residence upon attendance at a Narco Freedom outpatient program.  *See* O'Connor Decl. ¶¶ 62-63.

Finally, Narco Freedom has refused to curb its kickback scheme voluntarily despite having been requested to do so by the Government.  *See* Phillips Decl. ¶¶ 3, 5.  In other words, Narco Freedom has decided to persist with violative conduct after being told by the Government of its potential illegality.  As the Second Circuit has recognized, conduct that continues even after it is alleged to be unlawful makes "the likelihood of future violations, if not restrained, [] clear."  *CFTC v. British American Commodity Options*, 560 F.2d 135, 142 (2d Cir. 1977); *see also City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2009 WL 2612345, at *41-42 (E.D.N.Y. Mar. 16, 2009).

## CONCLUSION

Pursuant to 18 U.S.C. § 1345, and for the reasons set forth above, the Court should issue the attached temporary restraining order against Narco Freedom.  The Court should further, following a hearing as necessary, issued the attached preliminary injunction order against Narco Freedom.

Dated:   October 28, 2014
             New York, New York

Respectfully submitted,

PREET BHAHARA
United States Attorney

By:  s/ Cristine Irvin Phillips
     KIRTI VAIDYA REDDY
     CRISTINE IRVIN PHILLIPS
     Assistant United States Attorneys
     *Attorneys for the United States*