UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,

        Plaintiff,

        — v. —

NARCO FREEDOM, INC.,

        Defendant.

-------------------------------------------------------- x

14 Civ. 8593 (JGK)

**DECLARATION OF SUE O'CONNOR IN SUPPORT OF
THE MOTION OF THE UNITED STATES
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Sue O'Connor, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a General Investigator in the Office of the Inspector General for the United States Department of Health and Human Services ("HHS-OIG"), and I have been with HHS-OIG since August 1999. I currently am assigned to the HHS-OIG Office of Investigations, New York Regional Office.

2. Since 2012, I have been involved in an investigation of Narco Freedom, Inc. ("Narco Freedom"), a provider of outpatient chemical dependency programs that is licensed by the New York Office of Alcohol and Substance Abuse Services ("OASAS"). This investigation, which is being conducted jointly by the HHS-OIG and the United States Attorney's Office for the Southern District of New York, has focused on, among other things, potential violations of the Federal Anti-Kickback Statute related to Narco Freedom's operation of short-term residential housing commonly known as "three-quarter houses," or, specifically with respect to the three-quarter houses operated by Narco Freedom, as "Freedom Houses." I make this declaration based

1

on my personal knowledge, as well as information that I have gained from reviewing records of the investigation.

3. Specifically, in the course of the investigation, I have interviewed current and former residents of the Freedom Houses, current and former employees of Narco Freedom, employees of other outpatient chemical dependency programs, operators of independent three-quarter houses, current and former residents of independent three-quarter houses, individuals who conduct business with Narco Freedom, and individuals who refer patients to Narco Freedom.

4. In addition, I have reviewed documents produced by Narco Freedom, former Freedom House residents, business associates of Narco Freedom, and operators of independent three-quarter houses.

### BACKGROUND ON THREE-QUARTER HOUSES

5. The three-quarter houses operated by Narco Freedom and certain other entities provide short-term housing for individuals who seek to enroll or are enrolled in an outpatient program for chemical dependency ("outpatient program"),[1] and who otherwise lack stable housing. A large majority of these individuals are Medicaid eligible and receive public assistance, including a monthly housing allowance, through the New York City Human Resources Administration ("HRA"), or other government assistance.

6. Three-quarter houses typically are located in single-family or multi-family dwellings, in which residents are provided with a bunk bed in a shared bedroom, as well as

---

[1] The reference to "outpatient programs" throughout this declaration refers to programs designed to facilitate recovery from all drug use through individual and group counseling ("drug-free" outpatient programs), as well as outpatient programs through which patients are treated for opioid addictions through counseling and the distribution of medically prescribed methadone. The distinctions between the programs are noted where relevant.

2

access to bathroom and possibly kitchen facilities. The capacity of a three-quarter house can range from dozens to hundreds of residents.

7. Unlike housing associated with inpatient chemical dependency programs, three-quarter houses provide no clinical services to residents. Accordingly, the three-quarter houses are not officially regulated by OASAS or any other local, state or federal licensing entity or agency.

8. In order to reside in a three-quarter house, an individual typically must assign his or her monthly housing allowance provided by HRA, currently $215 per month, to either the three-quarter house itself or the landlord that owns the building in which the three-quarter house is located.

9. Individuals wishing to reside in a three-quarter house typically are asked to sign house rules, and must abide by those rules in order to maintain their residence in the house. These rules are generated and enforced by the operator of the three-quarter house.

10. Three-quarter house residents and individuals who provide services to those residents (such as case workers) have criticized three-quarter houses (both those operated by Narco Freedom and other entities) for consistently failing to provide a safe, sanitary environment for residents, and for other abusive practices such as evictions without notice and failure to prevent drug use in the houses.

**OVERVIEW OF THE FREEDOM HOUSE KICKBACK SCHEME**

11. In or around 2006, Narco Freedom began to operate three-quarter houses, in order to drive more business to its outpatient programs.

12. Specifically, in or around 2006, Alan Brand ("Brand"), then the Chief Executive Officer and sole member of Narco Freedom, met with an individual ("Developer") who agreed to

purchase a building that would house the first three-quarter house operated by Narco Freedom.[2] Brand agreed that Narco Freedom would be the tenant in that building and would make monthly rent payments. Brand's express purpose in expanding the scope of Narco Freedom to include operating three-quarter houses was to generate increased enrollment in Narco Freedom's outpatient programs, and to increase the retention rate in those programs, thus generating significant Medicaid funds from those programs.

13. In order to drive business to its outpatient programs, Brand planned, as part of the Freedom House business model, to condition residence in a Freedom House upon enrollment in and attendance at one of Narco Freedom's outpatient programs.

14. Brand's rationale was that conditioning the offer of a bed in a Freedom House to an individual who otherwise has no stable housing ensures that the individual will both enroll in and attend Narco Freedom outpatient programs in order to maintain his or her residence at the Freedom House. Numerous witnesses have confirmed that this proved to be true.

15. From the time that Narco Freedom began operating Freedom Houses, demand for beds in those houses has been consistently high, with most houses operating at or near full capacity a majority of the time. This demand drove Brand and Narco Freedom to continually open new Freedom Houses from 2006 to 2013.

16. All of the residents of the Freedom Houses were and are required to attend outpatient programs at Narco Freedom as a condition of residency.

17. Narco Freedom opened a total of 21 Freedom Houses in the Bronx, Brooklyn, and Queens, referred to as Freedom Houses 1-21. Of those houses, 18 currently remain operational.

---

[2] Narco Freedom does not own the buildings in which its Freedom Houses are located. Rather, Narco Freedom's model for Freedom Houses is to locate those houses in a building that is leased from a landlord.

4

A complete list of the Freedom Houses, provided by Narco Freedom, is attached hereto as Exhibit A.

18. Upon information and belief, Narco Freedom currently is the largest operator of three-quarter houses in the City of New York.

### NARCO FREEDOM'S FINANCIAL GAIN FROM THE FREEDOM HOUSES

19. Although the only source of direct income that Narco Freedom obtains from the Freedom Houses is the $215 monthly housing allowance provided by HRA for each resident, Narco Freedom receives significant Medicaid funds for the outpatient program services provided to those Freedom House residents. The Medicaid funds generated as a result of the residents' attendance at the Narco Freedom outpatient programs have made the Freedom Houses a highly profitable enterprise for Narco Freedom.

20. I have reviewed lease agreements that Narco Freedom entered into for buildings out of which its Freedom Houses operate, and the corresponding payment records from Narco Freedom to the landlord that holds the lease. For each of the Freedom House buildings, the amount of the monthly payment that Narco Freedom owes to the landlord, which typically includes not only the rent agreed upon in the lease but also additional payments for utilities, water, property taxes, repairs, and building citations, significantly exceeds the amount that Narco Freedom could expect to receive in housing allowance payments from HRA, even assuming that each Freedom House operates at 100% capacity at all times.

21. For example, Freedom House 18, located at 224 East Tremont Avenue, has a capacity of 90 beds. Assuming a 100% occupancy rate, this means that Narco Freedom can expect to receive approximately $19,350 per month in housing allowances from HRA for Freedom House 18. But the lease payment for Freedom House 18 is $33,416.66 per month. This does not include the cost of all utilities, including water, and property taxes. Nor does this

monthly payment include the cost of labor and supplies that Narco Freedom incurs to operate each Freedom House. A list of the capacities of each Freedom House, provided by Narco Freedom, is attached hereto as Exhibit B; a copy of the lease agreement for Freedom House 18 at 224 East Tremont Avenue, provided by Narco Freedom, is attached hereto as Exhibit C.

22. According to witness testimony, the reason that Narco Freedom agrees to pay so much more in monthly lease payments than it can receive in monthly HRA housing allowance payments is because the outpatient program services that the Freedom House residents are required to receive as a condition of their residency generate a large amount of Medicaid funds for Narco Freedom – an amount greatly in excess of the costs incurred by Narco Freedom in running the Freedom Houses.

23. For example, Freedom House 18, which can hold up to 90 residents, all of whom are required to attend a Narco Freedom outpatient program, can generate approximately $92,750-$138,654 or more per month solely in Medicaid reimbursements, based upon Medicaid reimbursement rates for the relevant time period[3] and a conservative assumption that each resident is receiving three treatments per week (many patients receive more than three weekly treatments).[4] This allows Narco Freedom to receive significant Medicaid funds that exceed its rent obligations under the building lease and other costs.

---

[3] The range of payment amounts reflected above includes Medicaid reimbursement rates for outpatient programs, both before and after the implementation of new Medicaid reimbursement guidelines for Ambulatory Patient Groups ("APGs"), which, for outpatient chemical dependency programs, began to be implemented on July 1, 2011.

[4] The above-cited reimbursement range applies to individuals enrolled in a "drug-free" outpatient program. Freedom House residents enrolled in methadone outpatient programs generate lower amounts of Medicaid reimbursements due to rate differences; the same calculation as above for individuals in the methadone outpatient program is $49,680-$67,221. According to witness testimony, as a result of this this difference, Narco Freedom disfavors, and only occasionally allows, individuals in a Narco Freedom methadone outpatient program to reside in the Freedom Houses. According to witness testimony, in 2011 or 2012, Brand ordered the removal of 60 Freedom House residents enrolled in a Narco Freedom methadone outpatient program in order to

24.     In total, Narco Freedom has received tens of millions of dollars in Medicaid funds for outpatient services rendered to the residents of the Freedom Houses.

25.     A substantial majority of the buildings in which the Freedom Houses are located are owned by entities currently or formerly controlled by the Developer. For those buildings, Narco Freedom would approve the building for use as a Freedom House before the Developer agreed to purchase it. Often, Narco Freedom would agree to sign a lease for the building before the Developer closed on the purchase.

26.     According to witness testimony, in agreeing to lease a particular building for use as a Freedom House, Brand employed a mathematical formula, which factored in the $215 monthly housing allowance provided by HRA for each potential Freedom House resident, as well as an average of 3.5 Medicaid-reimbursed outpatient program services per week for each resident, multiplied by the capacity of the house. This formula allowed Brand to determine the total funds that Narco Freedom would receive as a result of its operation of the new Freedom House, and accordingly, whether Narco Freedom was willing to open a Freedom House in a particular building.

### MARKETING OF THE FREEDOM HOUSES

27.     Starting in or about 2006, Narco Freedom has paid individuals to market its Freedom Houses.[5]

28.     The primary individual who performs marketing for Narco Freedom (the "Marketer") was recruited and introduced to Brand by the Developer. The purpose of the

---

make room for prospective residents who would enroll in a drug-free outpatient program. Accordingly, although either reimbursement rate results in the receipt of significant Medicaid funds by Narco Freedom, the higher drug-free outpatient program reimbursement rate more accurately approximates what Narco Freedom actually receives.

[5] The individuals who perform marketing for Narco Freedom are referred to herein as the "marketing department," although some of them are Narco Freedom employees and others operate on a contract basis.

Developer's interest in facilitating marketing for Narco Freedom was to ensure that the buildings he owned remained at or near capacity, thus motivating Narco Freedom to open more Freedom Houses in buildings that he would purchase and lease to Narco Freedom.

29. Brand directed the Marketer at the outset to "fill" the first Freedom House, and since then, all subsequently opened Freedom Houses as well. The goal of the Marketer and all individuals in the marketing department, as directed by Narco Freedom, is to keep the Freedom Houses "filled" with residents, who will enroll in and attend outpatient programs at Narco Freedom.

30. The marketing efforts for Narco Freedom are directed towards institutions that are likely to make referrals, such as detox facilities and inpatient treatment facilities, as well as the New York State Division of Parole. This marketing often includes an in-person presentation to the counselors or parole officers, which consists of describing the Freedom Houses and Narco Freedom's outpatient programs. The marketing department communicates to the referring entities that enrollment at a Narco Freedom outpatient program is a condition of residence at the Freedom House.

31. From the perspective of the programs that refer patients to Narco Freedom, the primary reason for the referral to Narco Freedom, as opposed to an outpatient program without a housing option, is the patient's or parolee's need to have housing. Because finding affordable housing for many of the patients or parolees is extremely difficult, the availability of the Freedom Houses drives referrals to Narco Freedom.

32. Typically, a counselor or parole officer will reach out to a member of the marketing department, who will arrange for a bed at one of the Freedom Houses to be reserved for the referred patient or parolee.

33. Individuals seeking housing also hear about the Freedom Houses through word-of-mouth and initiate a call to Narco Freedom, which routes the call to the marketing department. The marketing department then directs the individual to report to a particular Freedom House.

**OPERATION OF THE FREEDOM HOUSES**

34. Once the individual arrives at the Freedom House, he or she is required to sign a series of forms that includes a "Code of Conduct" and a "Waiver of Tenant[']s Rights." A copy of the Code of Conduct, provided by Narco Freedom, is attached hereto as Exhibit D; a copy of the Waiver of Tenant's Rights is attached hereto as Exhibit E. Page 9 of the Code of Conduct (Exhibit D) states, "[a]ll participants are required to attend one (1) group treatment or counseling session a day, seven days a week, in their designated program with Narco Freedom Inc., or as approved by Program Director."[6] Paragraph 8 of the Waiver of Tenant's Rights (Exhibit E) states, "all residents, as a pre-supposed condition in residing at the program, will attend said resident[']s designated outpatient program."

35. Residency at a Freedom House is short-term in nature. Freedom House residents are required, upon initial arrival, to sign an acknowledgement that they can expect only "a 6-9 month stay, with a possible 30-day [e]xtension." A copy of that acknowledgement is attached hereto as Exhibit F.

36. Also, in the Waiver of Tenant's Rights (Exhibit E), at paragraph 4, is the statement, "[t]he resident does not have ANY claims to further stay or rights unto the property if the resident is asked to leave the program for any reason."

---

[6] Although Exhibit D bears no date, witness testimony confirmed that Narco Freedom's one-service-per-day rule was in effect prior to the revision of Medicaid reimbursement rates (per the new APG guidelines) starting July 1, 2011. Following the implementation of the APG guidelines, Narco Freedom reduced the number of weekly services that its Freedom House residents have to attend as a condition of residency.

37. Residents are told by the Freedom House staff that they have to report to the intake department at Narco Freedom in order to be placed in an outpatient program, and that enrollment and participation in the Narco Freedom outpatient program is a condition of Freedom House residency. Page 1 of the Code of Conduct (Exhibit D) states that intake is required within 24 hours of "checking in" at the Freedom House, and that "[i]f you fail to complete your intake, your room will be closed."

38. The resident is also required to sign a waiver of his or her rights under the Health Insurances Portability and Accountability Act of 1996 ("HIPAA") and the federal regulations governing Confidentiality and Drug Abuse Patient Records, 42 C.F.R. Part 2, in order to allow Narco Freedom to disclose the resident's Toxicology and Treatment Report to the Freedom House staff. A copy of this waiver is attached hereto as Exhibit G.

39. If an individual does not attend all of the outpatient services as directed by Narco Freedom, he or she risks being thrown out of the Freedom House. This condition is generally known by all Freedom House residents.

40. New Freedom House residents also are sent to HRA, to arrange for payment of their $215 monthly housing allowance directly to Narco Freedom. Narco Freedom has a "rent" department that collects the HRA housing allowances. Typically, Freedom House residents are not required to pay any rent beyond the HRA housing allowance.

41. Freedom House staff members monitor the residents' attendance at the Narco Freedom outpatient programs and take action against residents who do not attend all services as directed by Narco Freedom. At or around the time that Narco Freedom established the Freedom Houses, the residents were required, following any outpatient program service, to obtain a slip of paper, referred to by the Freedom House staff as a "re-entry pass," from the outpatient program, and deliver it to the Freedom House staff upon returning to the Freedom House. Residents who

did not return with their "re-entry pass" faced consequences such as removal from the house or sequestration in an "isolation room." Copies of correspondence concerning the consequences of failing to provide a "re-entry pass" are attached hereto as Exhibits H and I.[7]

42. More recently, the use of re-entry passes was discontinued and the Freedom House staff members now simply access patient records in Narco Freedom's computer system in order to determine whether Freedom House residents are attending all outpatient program services as directed.

43. In addition, when Brand was acting as the C.E.O. of Narco Freedom,[8] he personally received a roster of the Freedom House residents and a weekly report showing the number of outpatient program services those residents attended. If Brand saw that Freedom House residents were not attending all of their outpatient program services, he would direct the management of the Freedom House to speak with those residents, and/or to remove them from the Freedom Houses.

44. Removal of an individual from a Freedom House typically is conducted by one or more members of the Freedom House staff, who inform the resident that he or she needs to leave the house, and who remove that person's possessions from the house. No legal process is used in the removal.

45. Page 8 of the Code of Conduct (Exhibit D) states that "participants['] assigned areas are changed every 28 days and participants are required to prepare themselves and their personal property, in advance, to enable them to be reassigned and moved upon the 28th day to their new assigned area." This rule is in place in order to avoid the requirement under New York

---

[7] Exhibits H and I, which are internal Narco Freedom communications, were verified as true and accurate by a current Narco Freedom employee.

[8] In or about July 2014, Brand stepped down as C.E.O. of Narco Freedom, but remains the sole member of the corporation.

City Administrative Code, Section 26-521(a), that "[i]t shall be unlawful for any person to evict or attempt to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer . . . except to the extent permitted by law pursuant to a warrant of eviction or other order of a court of competent jurisdiction or a governmental vacate order . . . ."

46. For individuals enrolled in a drug-free outpatient program, Medicaid reimburses up to 75 services at a 100% rate under the newly implemented APG guidelines. Medicaid reimburses at a 75% rate for 76 to 95 services; the reimbursement rate is reduced to 50% when a beneficiary receives more than 95 services.[9]

47. At Narco Freedom, typically after an individual enrolled in a drug-free outpatient program has completed 75 services, he or she is deemed to have "graduated" and is discharged from the outpatient program. Once a Freedom House resident is no longer enrolled in a Narco Freedom outpatient program, he or she is given 30 days or less to vacate the Freedom House. Once again, no legal process is used to remove a resident from a Freedom House upon "graduation."

48. Freedom House residents often are told by Freedom House staff that they can move to a "graduate house" after they are required to leave the Freedom House; this is false, however, as Narco Freedom operates no three-quarter housing for "graduates," or anyone not actively enrolled in a Narco Freedom outpatient program. Typically, once the resident approaches "graduation" and asks about graduate housing, he or she is told that it is full. The

---

[9] The reimbursement restrictions for more than 75 services do not apply to individuals who are enrolled in a methadone outpatient program. While Narco Freedom generally disfavors allowing methadone patients to reside in the Freedom Houses, those who are Freedom House residents may be allowed to remain in the Freedom House for a longer time period than patients enrolled in a drug-free outpatient program, due to the disparate rules regarding reimbursement.

resident is then required to leave the Freedom House with no alternative housing option other than a referral to a shelter.

### FORCED DISCHARGE FROM OTHER OUTPATIENT PROGRAMS

49. If an individual who is already enrolled in an outpatient program operated by an entity other than Narco Freedom comes to reside in a Freedom House, he or she is directed to request a discharge from that program in order to enroll at Narco Freedom. This is done even if the person is stable and progressing in recovery at the other program.

50. Specifically, multiple counselors from outpatient programs that do not offer three-quarter housing have reported that numerous existing patients who have subsequently taken up residence in a Freedom House have requested an immediate discharge so that they could enroll in a Narco Freedom outpatient program. Many of those patients have been very upset by the need to leave their existing outpatient program, but reported that doing so was the only way for them to avoid losing their bed in the Freedom House.

51. Counselors from the other outpatient programs who have contacted Narco Freedom to request that a Freedom House resident remain in their care were told that the resident needed to be discharged in order to enroll in an outpatient program at Narco Freedom, or would be forced to leave the Freedom House.

52. According to the counselors from the other outpatient programs, this practice of forcing individuals to change their treatment provider is inconsistent with accepted standards of care in outpatient programs.

### CONDITIONS AT THE FREEDOM HOUSES

53. Current and former residents of Freedom Houses report that the conditions at the houses are highly problematic. The most common complaint from Freedom House residents is that the Freedom Houses are full of individuals who are still using, and even selling, drugs, and

thus do not provide an appropriate environment for residents who truly wish to focus on their recovery. According to the residents, the Freedom House staff members are aware of the drug use and do not take sufficient steps to stop it.

54. Testimony that Narco Freedom allows individuals who use drugs to remain in the Freedom Houses is consistent with witness testimony from former Narco Freedom counselors (referred to as Certified Alcohol and Substance Abuse Counselors ("CASACs")) that the focus at Narco Freedom is ensuring that as many patients as possible receive treatment, regardless of whether that treatment is effective. One former CASAC reported that toxicology performed on his clients showed that more than 75% of the patients were still using drugs, but that Narco Freedom discouraged discharge of patients despite evidence of ongoing drug use.

55. Other complaints from current and former residents regarding the Freedom Houses include lack of heat and other basic facilities, vermin infestations, fighting among residents, aggressive behavior by Freedom House staff toward residents (including physical aggression), and overcrowding.

56. Freedom Houses also have received a large number of citations from city agencies such as the Fire Department of New York and the New York City Department of Buildings. One such citation, issued on July 15, 2014, to Freedom House 1, cited a "Class 1" violation, which is defined as "immediately hazardous," due to the fact that the building, which was intended to accommodate nine permanent, single-family apartments, in fact was being used as an "adult home" that housed 69 residents. A copy of the violation is attached hereto as Exhibit J.

### THE INDEPENDENT THREE-QUARTER HOUSE KICKBACK SCHEME

57. Narco Freedom is not the only entity that operates three-quarter houses in New York City. As relevant here, certain entities operate three-quarter housing that is not part of, and

does not have common ownership with, any Narco Freedom outpatient program, but which have, in the past, housed individuals enrolled in Narco Freedom outpatient programs.

58. In addition to operating the Freedom Houses, Narco Freedom also entered into financial arrangements with operators of these "independent" three quarter houses, to refer all of their residents to Narco Freedom and require that the residents attend Narco Freedom outpatient program services. These agreements were made by Brand personally.

59. To this end, Narco Freedom signed agreements with several independent three-quarter houses, pursuant to which Narco Freedom agreed to make a monthly payment to the three-quarter house operators. Although styled as "lease agreements," the agreements with the independent three-quarter house operators were, in fact, referral agreements. One such "lease agreement" is attached hereto as Exhibit K. Specifically, Brand made clear to the independent three-quarter house operators that he expected them to refer their residents to Narco Freedom in exchange for the payments.

60. Payment records provided by Narco Freedom reflect that it paid as much as $10,000 per month, or more, for referrals from each independent three-quarter house. A sample of such payments is attached hereto as Exhibit L.

61. Once the independent three-quarter house operators referred their residents to Narco Freedom outpatient programs, Narco Freedom would contact the three-quarter house operators to report that residents were not attending their outpatient program services. Narco Freedom would ask the three-quarter house operators to enforce attendance at the outpatient programs, including by removing residents from the houses for non-attendance.

62. Although Narco Freedom appears to have ceased these schemes with the independent three-quarter house operators in late 2011, payment records provided by Narco Freedom show payments as recently as 2013 to one of the independent three-quarter house

operators with whom Narco Freedom previously held a "lease agreement." Narco Freedom characterized these payments as "management fees."

### THE ONGOING NATURE OF THE FREEDOM HOUSE KICKBACK SCHEME

63. In addition to Brand's departure as C.E.O. and appointment of an interim C.E.O., Narco Freedom also has changed the membership of its board of directors in the past six months.

64. Despite these changes in leadership at Narco Freedom, as recently as last month, management at Narco Freedom responsible for the Freedom Houses confirmed that the Freedom Houses continue to operate under the policy that attendance at a Narco Freedom outpatient program is a condition of residency, and failure to adhere to that condition will result in removal from the Freedom House. Management gave no indication that this policy is under review or that there is any plan to change it, notwithstanding the Government's investigation.

65. Additionally, Brand was criminally indicted this past week by the Office of the New York State Attorney General, and charged with receiving bribes from one of the owners of the Freedom House buildings, among other things. *See* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-arrest-and-indictment-nonprofit-executives-charged-kickback (last checked October 23, 2014). However, it is my understanding that both the Narco Freedom outpatient programs and the Freedom Houses remain operational and are anticipated to remain operational indefinitely.

66. Accordingly, there is no reason to believe that, absent court intervention, Narco Freedom will cease or curb its practice of billing Medicaid for outpatient program services that are predicated upon the inducement for those services provided by Narco Freedom to Freedom House residents, in the form of residency at the Freedom Houses.

I declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Dated:   October 27, 2014
           New York, New York

*Sue O'Connor*
Sue O'Connor
General Investigator
Office of the Inspector General
United States Department of
Health and Human Services