**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ x

    UNITED STATES OF AMERICA,    :
                                           :
        Plaintiff,                        :
                                           :
        v.                        :      14 Civ. 8593 (JGK)
                                           :
    NARCO FREEDOM, INC.,          :
                                         :
        Defendant.                   :

------------------------------------------------------ x

# REPLY BRIEF IN FURTHER SUPPORT OF THE MOTION
# OF THE UNITED STATES FOR A PRELIMINARY INJUNCTION
# AGAINST DEFENDANT NARCO FREEDOM, INC.

                                                          PREET BHARARA
                                                          United States Attorney for the
                                                          Southern District of New York
                                                          86 Chambers Street, 3rd Floor
                                                          New York, New York, 10007
                                                          Telephone: (212) 637-2751/2696

Of Counsel:

KIRTI VAIDYA REDDY
CRISTINE IRVIN PHILLIPS
Assistant United States Attorneys

# TABLE OF CONTENTS

I. The Housing Offered by Narco Freedom Is an Unlawful Inducement That Violates the Anti-Kickback Statute ................................................................................................1

    A. The Court Should Apply the "One Purpose" Test .....................................................1

    B. One of Narco Freedom's Purposes in Running the Freedom House Was and Is to Induce Residents to attend its Clinical Programs .....................................................3

    C. Narco Freedom's Past Statements and Actions Belie Its Purported Clinical Purpose for Running the Freedom Houses .............................................................4

    D. The Conditions of the Freedom Houses Undermine Any Argument That Narco Freedom Operates Them for the Clinical Benefit of the Residents ..........................6

    E. The OIG Proposal and Advisory Opinions Are Not Relevant to the Court's Analysis; if They Were, Narco Freedom's Actions Would Still be Fraudulent ......7

II. Narco Freedom's Kickback Scheme Necessitates a Preliminary Injunction under 18 U.S.C. § 1345 ...................................................................................................10

    A. The Government Has Satisfied the Legal Standard for an Injunction under Section 1345 .........................................................................................................10

    B. The Equities in this Matter Weigh Heavily in Favor of Granting the Injunction ................................................................................................................11

III. This Action Does Not Infringe on State Regulatory Authority, Nor Is OASAS a Necessary Party to This Action ..........................................................................12

IV. Narco Freedom Has Made Clear That It Lacks the Will to Continue to Operate the Freedom Houses Absent the Unlawful Kickbacks, yet Doing So Is Both Entirely Possible and Necessary for the Protection of the Current Residents ................14

    A. Running Lawful Supportive Housing Programs Is Not Only Possible, It Is Being Achieved Successfully by Other Organizations .....................................................14

    B. Narco Freedom's Statements Demonstrate That It Refuses to Operate Its Houses Lawfully ...................................................................................15

CONCLUSION ................................................................................................................16

# TABLE OF AUTHORITIES

**CASES**                                                                                        **PAGE**

*Barton Mines Corp. v. Commissioner*,
    446 F.2d 981 (2d Cir. 1971)..................................................................................8

*LeCroy Research System Corp. v. Commissioner*,
    751 F.2d 123 (2d Cir.1984)....................................................................................8

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972)...............................................................................10

*Sweet v. Shehan*,
    235 F.3d 80 (2d Cir. 2000).....................................................................................7

*Tuccillo v. Geisha NYC, LLC*,
    635 F. Supp. 2d 227 (E.D.N.Y. 2009) .................................................................10

*United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*,
    No. 11 Civ. 8196, 2014 U.S. Dist. LEXIS 74461 (S.D.N.Y. May 29, 2014).......2

*United States v. Bay State Ambulance and Hospital Rental Serv., Inc.*,
    874 F.2d 20 (1st Cir. 1989)....................................................................................2

*United States v. Belden*,
    71 F. Supp. 42 (N.D.N.Y. 1987)..........................................................................10

*United States. v. Borrasi*,
    639 F.3d 774 (7th Cir. 2011) .................................................................................2

*United States v. Davis*,
    132 F.3d 1092 (5th Cir. 1998) ...............................................................................2

*United States v. Elton*,
    429 F. Supp. 2d 561 (E.D.N.Y. 2006) ...................................................................8

*United States v. Greber*,
    760 F.2d 68 (3d Cir. 1985)...........................................................................2, 3, 4, 5

*United States v. Kats*,
    871 F.2d 105 (9th Cir. 1989) .............................................................................2, 3

*United States v. Krikheli*,
    461 Fed. App'x 7 (2d Cir. 2012)............................................................................2

*United States v. Livdahl*,
    356 F. Supp. 2d 1289 (S.D. Fla. 2005) ...............................................................................11

*United States v. McClatchey*,
    217 F.3d 823 (10th Cir. 2000) ..............................................................................................2

*United States v. Quadro Corp.*,
    928 F. Supp. 688 (E.D. Tex. 1996) ....................................................................................11

*United States v. Quest Diagnostics, Inc.*,
    734 F.3d 154 (2d Cir. 2013) ..........................................................................................13, 14

*United States v. Sriram*,
    147 F. Supp. 2d 914 (N.D. Ill. 2001) ..................................................................................10

*United States v. Williams*,
    476 F. Supp. 2d 1368 (M.D. Fla. 2007) .............................................................................11

**FEDERAL STATUTES**

42 U.S.C. § 1320a-7b .....................................................................................................................1

18 U.S.C. § 1345 ..................................................................................................................*Passim*

**RULES AND REGULATIONS**

79 Fed. Reg. 59717 (Oct. 3, 2014) ............................................................................................7, 8

**ADMINISTRATIVE ADVISORY OPINIONS**

*OIG Advisory Opinion Number 11-01*,
    2011 WL 96318 (Jan. 3, 2011) ............................................................................................9

*OIG Advisory Opinion Number 11-16*,
    2011 WL 5844583 (Nov. 8, 2011) .......................................................................................9

Plaintiff the United States of America (the "Government"), by its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this reply memorandum of law in further support of its motion for a preliminary injunction against defendant Narco Freedom, Inc. ("Narco Freedom"), pursuant to 18 U.S.C. § 1345. Narco Freedom's primary argument in its response brief – that providing subsidized short-term housing in its Freedom Houses, but conditioning that housing upon attendance at its outpatient programs, is not an illegal inducement under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, but instead is for a legitimate clinical purpose – is unsupported by any objective factual evidence and belied in numerous respects by the Government's evidence, including evidence of Narco Freedom's own past actions and statements. This argument also is unavailing under the applicable case law and the relevant equities, particularly given the availability of numerous legal, financially viable housing models. Narco Freedom's other arguments raised in its response are equally unavailing.

The Government's evidence makes clear that Narco Freedom is committing fraud and violating the rights of its Freedom Houses residents, and will continue to do so without injunctive relief from the Court. We therefore ask the Court to grant the proposed preliminary injunction order submitted herewith. Furthermore, in the event that Narco Freedom refuses to continue operating its Freedom Houses without the fraudulent inducements, the Government respectfully requests an expedited briefing schedule to move for a receivership pursuant to 18 U.S.C. § 1345(b), to, among other things, protect the Freedom House residents as the "class of persons for whose protection the action is brought."

## I. The Housing Offered by Narco Freedom Is an Unlawful Inducement That Violates the Anti-Kickback Statute

### A. The Court Should Apply the "One Purpose" Test

Every circuit to decide the issue of whether inducement to refer or order Medicare or Medicaid-reimbursed services must be the primary purpose, or need only be one purpose, of

providing remuneration in order to violate the Anti-Kickback Statute has uniformly adopted the "one purpose" standard. *See United States. v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) ("Nothing in the Medicare fraud statute implies that only the primary motivation of remuneration is to be considered in assessing [the defendant's] conduct."); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000) ("[A] person who offers or pays remuneration to another person violates the Act so long as one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals."); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (upholding the one purpose standard in a jury instruction); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) ("[T]he Medicare fraud statute is violated if one purpose of the payment was to induce future referrals.") (internal citation omitted); *United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985) ("Even if the physician performs some service for the money received, the potential for unnecessary drain on the Medicare system remains."); *cf. United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.*, 874 F.2d 20 (1st Cir. 1989) (declining to decide whether the "one purpose" test is appropriate, but stating that it was "impressed by the Third Circuit's reasoning" in adopting the 'one purpose' test in *United States v. Greber*). Narco Freedom's assertion that there "appears to be a continuum of tests," Def. Br. at 15, is incorrect.

The United States Court of Appeals for the Second Circuit also has affirmed the use of the "one purpose" test in *United States v. Krikheli*, 461 Fed. App'x 7, 11 (2d Cir. 2012). *See also United States ex rel. Kester v. Novartis Pharms. Corp.*, No. 11 Civ. 8196, 2014 U.S. Dist. LEXIS 74461, at *55 (S.D.N.Y. May 29, 2014). Specifically, the Second Circuit affirmed a jury instruction which stated that the prosecution must prove that "*one purpose* of the offer or payment [at issue] was to induce a person to refer patients to another." *Krikheli*, 461 Fed. App'x at 11 (emphasis added). Contrary to Narco Freedom's argument, there is no ambiguity in the Second Circuit's adoption of the one-purpose test in *Krikheli*.

2

Narco Freedom's reliance on a "subtle distinction" or a "caveat" to distinguish prevailing circuit authority is also baseless. For example, in *United States v. Kats*, the Court held that "the jury could convict unless it found the payment wholly and not incidentally attributable to the delivery of goods or services," and further explained that the Medicaid fraud statute is violated if "'one purpose of the payment was to induce future referrals, even if the payments were also intended to compensate for professional services.'" *Kats*, 871 F.2d at 108 (citing *Greber*, 760 F.2d at 72). Narco Freedom's assertion that *Kats* "attempts to narrow" the one purpose rule is contrary to the plain language of the decision. Def. Br. at 16. Similarly, while the *McClatchey* court recognized the distinction between a motivating factor and a collateral hope or expectation, it acknowledged that there is no violation only if the referrals that ensued from remuneration were designed *wholly* for other purposes. *McClatchey*, 217 F.3d at 834; *see also Greber*, 760 F.2d 68 at 71 (the presence of a legal purpose by itself will not shield a party from liability).

Accordingly, the "one purpose" standard comports with the statutory purpose of the Anti-Kickback Statute, Second Circuit precedent, and all other circuits that have addressed the issue and should be applied here. *See Greber*, 760 F.2d at 71 ("The statute is aimed at the inducement factor.").

> **B.** **One of Narco Freedom's Purposes in Running the Freedom Houses Was and Is to Induce Residents to attend its Clinical Programs**

As stated in the Declaration of Linda Clark, Esq. ("Clark Decl."), Alan Brand ("Brand"), the C.E.O. of Narco Freedom until July of this year who is now under criminal indictment, "was the initial architect of the housing model at issue." *See* Clark Decl. ¶ 11. As set forth in the declaration of Jay Deutchman ("Deutchman Decl."), Brand's purpose in adding the Freedom Houses to Narco Freedom's programs was to "drive more business to his outpatient programs" by providing patients with an "incentive" to enroll in and attend those programs. *See* Deutchman Decl. ¶¶ 5-6. From the time that he first established the Freedom Houses, Brand's actions were

3

entirely consistent with this fraudulent purpose: he hired a marketing director and staff to "fill" the Freedom Houses with residents who would then attend Narco Freedom's outpatient programs, *see* Deutchman Decl. ¶ 18; Declaration of Agent Sue O'Connor ("O'Connor Decl."), ¶ 29, and he personally kept weekly tabs on the number of counseling sessions that Freedom House residents were attending and directed that those residents not attending enough sessions be reprimanded or removed from the houses, *see* O'Connor Decl. ¶ 43. Indeed, he once removed sixty residents enrolled in the methadone program from their Freedom Houses to make room for residents in the higher-paying drug-free program, *see id.* ¶ 23 n.4. The Government also has presented evidence that Brand paid three-quarter house operators unaffiliated with Narco Freedom to refer their residents to Narco Freedom outpatient programs and then require those residents to attend the programs, an action that served an exclusively financial purpose. *See* O'Connor Decl. ¶¶ 57-62; Exhibit L. Narco Freedom has failed to respond to this evidence.

The actions of Brand, the admitted "architect" of the Freedom Houses and C.E.O. of Narco Freedom until July of this year, cannot be changed by after-the-fact justifications now provided by Narco Freedom solely through the declarations of two long-time employees. Narco Freedom's actions make clear that one of the purposes – indeed, the primary purpose – of the Freedom Houses was and is to induce residents to enroll in, and stay in, Narco Freedom's outpatient programs, until Narco Freedom maximizes its Medicaid payments for those residents, at which point the residents are promptly directed to leave. *See id.* ¶¶ 46-47; Exhibit F.

### C. Narco Freedom's Past Statements and Actions Belie Its Purported Clinical Purpose for Running the Freedom Houses

Narco Freedom's statements that its Freedom Houses serve a legitimate clinical purpose are belied in several ways. First, Narco Freedom's new-found position is contradicted by Brand's statements to the New York State Office of Alcoholism and Substance Abuse Services ("OASAS"), in which he specifically represented that the houses were not part of Narco

4

Freedom's clinical program.  *See* Declaration of Robert Kent ("Kent Decl."), ¶¶ 11, 14.  OASAS and other entities certify and provide funding for supportive housing that has an express clinical purpose, and that serves the populations in Narco Freedom's clinical programs, such as community residential services or supportive living services.  *See id.* ¶¶ 3-8.  Yet Narco Freedom has never attempted to certify its Freedom Houses for these programs.  *See id.* ¶ 11.  In fact, Alan Brand specifically represented to OASAS in the past that the houses were not part of the clinical programs, so that OASAS would not require the houses to become OASAS-certified.  *See id.*

Indeed, Narco Freedom does not deny that the Freedom Houses offer no clinical services and employ no clinical staff.  Avoiding OASAS certification allows Narco Freedom to house as many residents as it sees fit, each of whom drives Medicaid dollars to Narco Freedom, without having to abide by OASAS's capacity restrictions or clinical staffing requirements, which would reduce Narco Freedom's net financial benefit.  *See* Declaration of Janet Lerner ("Lerner Decl."), ¶ 35; Kent Decl. ¶ 9.  Narco Freedom essentially concedes this point by stating that it still cannot consider becoming OASAS-certified because to do so would require the hiring of clinical staff for the Freedom House residents, which would be more expensive than the current model.  *See* Lerner Decl. ¶ 35.  The Court should not permit Narco Freedom to change its position after years of reaping financial benefits by claiming the contrary.

As further evidence that the Freedom House model is driven by a financial motive rather than a clinical one, the declarations of three counselors from two different outpatient programs report that in numerous instances, Narco Freedom has forced their patients to switch from non-Narco Freedom outpatient programs, where the patients were stable and progressing, to Narco Freedom's outpatient programs, in order to keep their Narco Freedom housing.  *See* Declarations of Joan Salmon ("Salmon Decl."), Amy Greengrass, and Marsha Dommel ("Dommel Decl.") (collectively, the "outpatient counselor declarations").  This practice, for which Narco Freedom

5

is known in the industry, *see* Salmon Decl. ¶ 9, is disruptive to patients' treatment progress and runs entirely counter to any representation that Narco Freedom has a treatment motive for conditioning patients' housing on treatment at its programs.

Further, as described in the declaration of current Freedom House resident Rashawnt Mack ("Mack Decl."), the Freedom House staff, who have no clinical training, have the ability to remove a resident from a Freedom House even if their judgment in doing so conflicts with that of the Narco Freedom outpatient clinical staff. In Mr. Mack's case, his certified alcohol and substance abuse counselor ("CASAC") approved him to take an out-of-state trip, but while he was away, he was removed from his house by the Freedom House staff because he was not attending outpatient services, and only was reinstated following legal intervention. *See* Mack Decl. ¶¶ 21-27. This example further demonstrates the inconsistency in Narco Freedom's argument – claiming, on the one hand, that the Freedom Houses are clinical in nature, but on the other hand, running them in a manner that undermines clinical objectives.

> **D. The Conditions of the Freedom Houses Undermine Any Argument That Narco Freedom Operates Them for the Clinical Benefit of the Residents**

Perhaps most importantly, Narco Freedom's assertions regarding the clinical purpose for its current housing model are belied by the actual reports, from residents and those individuals who work with them, regarding the conditions in the Freedom Houses. As set forth in the nine declarations from current Freedom House residents, *see* Mack Decl., Declaration of Adam Rivera ("A. Rivera Decl."), Bernard Grant ("Grant Decl."), Evaristo Melendez ("Melendez Decl."), Oswaldo Ramos ("Ramos Decl."), Darien Porter ("Porter Decl."), Taquan Coley ("Coley Decl."), Jason Kraker ("Kraker Decl."), and Rafael Rivera ("R. Rivera Decl.") (collectively, the "resident declarations"), the houses fail to provide a sober environment for residents and in fact expose residents to routine drug use in close proximity, which the Freedom House staff is aware of but fails to stop. In just the past few months, this widespread drug use

has led to overdoses resulting in visits from emergency services in one house alone, and, according to at least four residents, death. *See* Mack Decl. ¶¶ 19-20; Grant Decl. ¶ 11; Coley Decl. ¶ 10; R. Rivera Decl. ¶ 19. As reflected in each of the residents' declarations, the houses also present stressors such as overcrowding, lack of basic utilities, bedbugs, mice and rats. *See* Mack Decl. ¶ 16; A. Rivera Decl. ¶¶ 16-17; Grant Decl. ¶¶ 5-6; Melendez Decl. ¶ 6, 8-10; Ramos Decl. ¶¶ 8-9; Porter Decl. ¶¶ 11-18; Coley Decl. ¶ 15-16; Kraker Decl. ¶¶ 7, 9 ; R. Rivera Decl. ¶¶ 11, 13-15.

While the residents' depictions paint a consistent picture, their descriptions of the houses, and particularly the drug use there, also are corroborated by people who work with Freedom House residents, and who report that they hear the same complaints of drug use and other deplorable conditions. *See* Declaration of Dr. Kamala Greene ("Greene Decl."), ¶ 19; Dommel Decl. ¶ 10. As stated in the declaration of Parole Officer Stanley White ("White Decl."), parolees regularly report that the use and sale of drugs in the Freedom Houses is "flagrant." *See* White Decl. ¶ 7. The descriptions also are consistent with reports that Narco Freedom keeps patients in its program who are not serious about recovery in order to reap the financial benefits, such as the report from a former Narco Freedom CASAC that 75% of the patients in his caseload were still using drugs, but that Narco Freedom discouraged discharge of patients despite evidence of ongoing drug use. *See* O'Connor Decl. ¶ 54.

In the face of so much evidence to the contrary, statements from Narco Freedom such as "Narco Freedom's housing resources are a highly structured adjunct to its clinical services," *see* Lerner Decl. ¶ 15, are simply not credible.

### E. The OIG Proposal and Advisory Opinions Are Not Relevant to the Court's Analysis; if They Were, Narco Freedom's Actions Would Still Be Fraudulent

Narco Freedom's citation to the proposal of the U.S. Department of Health and Human Services Office of Counsel to the Inspector General ("OIG") for amendment of safe harbors

7

under the Anti-Kickback Statute and civil monetary penalty rules as well as the definition of the term "remuneration," *see* Def. Br. at 13 (citing 79 Fed. Reg. 59717 (Oct. 3, 2014)), is inapposite, as it is well-established that proposed rules have no legal effect. *See Sweet v. Shehan*, 235 F.3d 80, 97 (2d Cir. 2000); *see LeCroy Research Sys. Corp. v. Commissioner*, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing."); *Barton Mines Corp. v. Commissioner*, 446 F.2d 981, 990 n. 4, 993 n. 7 (2d Cir. 1971) (refusing to consider import of proposed regulations in rendering a decision); *United States v. Elton*, 429 F. Supp. 2d 561, 575, n.6 (E.D.N.Y. 2006) ("[P]roposed regulations are not entitled to judicial deference, and carry no more weight than a position advanced on a brief.") (internal citation omitted). Narco Freedom cannot cite to any legal authority to support its argument that the Court should rely on a proposed regulation in interpreting the current law.

Notably, however, the OIG, in its proposal, expresses specific concerns about the exact type of conduct in which Narco Freedom is engaged, and expressly distinguishes such conduct from the subject of its proposed changes. Specifically, OIG proposes to exempt only "any other remuneration which promotes access to care and poses a low risk of harm to patients and Federal health care programs" and states:

> [w]e continue to believe that offering valuable gifts to beneficiaries in connection with direct or indirect marketing activities is not low risk to beneficiaries or to the Medicare and Medicaid programs. In addition, we are concerned that rewards offered by providers or suppliers to patients purportedly for compliance with a treatment regimen pose a risk of abuse, <u>in cases when the offerors know or should know that the rewards are likely to influence the recipients to order or receive from a particular source items or services paid for by Medicare or Medicaid</u>."

79 Fed. Reg. 59717, 59726 (underline added). OIG also proposes to interpret the phrase "low risk of harm" as meaning that "the remuneration . . . is unlikely to increase costs to Federal health care programs or beneficiaries through overutilization or inappropriate utilization . . . ." *Id.* at 59725. Here, Narco Freedom is improperly incentivizing Medicaid recipients to obtain its

8

Medicaid-funded services through the furnishment of valuable in-kind consideration. Therefore, even if the OIG were to adopt the changes, the remuneration offered by Narco Freedom would still fall squarely within the definition of unlawful remuneration under the Anti-Kickback Statute.

Similarly, the two OIG advisory opinions referenced by Narco Freedom are not only inapplicable as a matter of law, but also demonstrate the fundamental flaws in Narco Freedom's argument that the Freedom House scheme does not constitute an illegal inducement. *See* Def. Br. at 14. Not only does each opinion make unequivocally clear that it "has no application to, and cannot be relied upon by, any other individual or entity," OIG Advisory Opinion No. 11-01, 2011 WL 96318, at *10 (Jan. 3, 2011); OIG Advisory Opinion No. 11-16, 2011 WL 5844583, at *7 (Nov. 8, 2011), but additionally, the practices of the hospitals that were the bases of the advisory opinions are not factually analogous to, and are in many ways the factual opposite of, Narco Freedom's practices. In both cases, the OIG stated that a pediatric hospital's provision of lodging to certain patients and family members "could potentially generate prohibited remuneration under the anti-kickback statute if the requisite intent to induce or reward referrals of Federal health care program business were present." *Id.* OIG determined in each instance that the hospital had put forth requisite evidence that no such inducement was taking place because, among other reasons, the hospitals offered lodging to a small minority of financially needy families only after the patients' acceptance for treatment, did not promote or market its programs in connection with the lodging assistance, and did not, directly or indirectly, shift costs to Federal health care programs. *See id.* In contrast, Narco Freedom actively markets its housing to referring entities, *see* Greene Decl. ¶ 14; Exhibit N, and as demonstrated by the Greene Declaration and each of the outpatient counselor and resident declarations, it is common practice for Narco Freedom to admit individuals into its Freedom Houses before sending them to intake

9

for its clinical programs.  Further, Narco Freedom shifts the cost of running the Freedom Houses to Medicaid.  *See* O'Connor Decl. ¶¶ 19-23.  While the OIG opinions are not legally applicable, therefore, they serve to further demonstrate that Narco Freedom is providing illegal remuneration to Freedom House residents, in violation of the Anti-Kickback Statute.

## II.     Narco Freedom's Kickback Scheme Necessitates a Preliminary Injunction Under 18 U.S.C. § 1345

### A.     The Government Has Satisfied the Legal Standard for an Injunction under Section 1345

Injunctive relief is merited under § 1345 because the Government has established probable cause to believe that Narco Freedom is engaged in a fraudulent scheme and will continue to engage in fraud absent an injunction.  *See United States v. Belden*, 71 F. Supp. 42, 44 (N.D.N.Y. 1987) ("it is unlikely that Congress intended to hold the government to a more stringent standard than that of probable cause when relief under § 1345 was sought").  The Government's evidence demonstrates the fraudulent nature of the Freedom House scheme, and Narco Freedom has essentially conceded that it will continue this scheme absent an injunction, by defending its model and claiming that it cannot run the Freedom Houses any other way.

Narco Freedom appears to concede that the standard showing of irreparable harm is not necessary, see Def. Br. at 10, but nonetheless urges the Court to consider the impact of the injunction on Narco Freedom.  In support, Narco Freedom cites *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), and *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227 (E.D.N.Y. 2009), neither of which involved § 1345 injunctions.  In fact, courts have concluded, in the context of a § 1345 injunction, that the Government need not meet the other traditional elements for injunctive relief.  *See United States v. Williams*, 476 F. Supp. 2d 1368, 1377 (M.D. Fla. 2007) (once illegal activity is clearly demonstrated under 18. U.S.C. § 1345, the remaining equitable factors of continuing irreparable injury, the balance of hardships to the parties, and the

public interest are presumed to weigh in favor of granting injunctive relief); *United States v. Livdahl*, 356 F. Supp. 2d 1289, 1290-91 (S.D. Fla. 2005) (because § 1345 expressly authorizes injunctive relief, no specific finding of irreparable harm is necessary, no showing of inadequacy of other remedies at law is necessary, and no balancing of the interests of the parties is required); *United States v. Quadro Corp.*, 928 F. Supp. 688, 697 (E.D. Tex. 1996) (under § 1345 the government need not establish actual injury or irreparable harm because it is presumed). But even considering the equities, the injunction is still warranted, for the reasons set forth below.

B. **The Equities in this Matter Weigh Heavily in Favor of Granting the Injunction**

Contrary to Narco Freedom's arguments, the equities in this matter weigh in favor of granting the requested injunctive relief. Not only will the Court put an end to the resulting harm to the Government, which is an express purpose of § 1345, but also the Court will safeguard the rights of the residents for whose protection this suit has been brought. Specifically, the preliminary injunction order will protect residents from being evicted for failing to comply with the fraudulent scheme and will restore the right of the residents to choose the course of their outpatient treatment, a right that is required under the Patient Rights Provision of the New York State Code, 14 N.Y.C.R.R. § 815.5(a)(15).

Narco Freedom argues that the equities do not favor an injunction because if the Court requires it to allow Freedom House residents to attend an outpatient program of their choice, Narco Freedom would be "forced" to close those houses and displace the residents. *See* Def. Br. at 19. Narco Freedom, however, fails to offer a scintilla of financial information to prove this contention, and in fact, as detailed in the Kent Declaration and the declaration of Pamela Mattel ("Mattel Decl."), as well as demonstrated through numerous other programs throughout the city, operating legal supportive housing, where residents enjoy the freedom to attend a program of

11

their choice, is an entirely attainable goal.[1]  *See* Section IV.A., *infra*.  Narco Freedom's equitable argument regarding closing houses is, therefore, based on its refusal to pursue any number of alternative legal and proven housing models.  Nor would requiring Narco Freedom to stop forcing Freedom House residents to attend its programs necessarily materially change its financial circumstances, as the residents would be free to choose to attend Narco Freedom's outpatient programs, which, in turn, would continue to general Medicaid funds for Narco Freedom.

Finally, Narco Freedom's continued attempts to expand the scope of this action to include "similar sober living and holistic treatment programs," and claim that an injunction would negatively impact legitimate programs, *see* Def. Br. at 19, is nothing more than an unsupported scare tactic.  As made clear in the Kent and Mattel declarations, a variety of legal supportive housing models exist, and the allegations and relief sought by the Government in this action are specific to the fraudulent conduct of one entity.

### III. This Action Does Not Infringe on State Regulatory Authority, Nor Is OASAS a Necessary Party to This Action

Narco Freedom's argument that the Government's allegations in this action usurp the power of the states to regulate health care and public safety, *see* Def. Br. at 20-23, is meritless.  The Government is not attempting to regulate Narco Freedom's clinical programs; rather, it simply seeks to stop Narco Freedom from offering an illegal inducement to attend those programs, in violation of the Anti-Kickback Statute.  Were Narco Freedom's usurpation argument to be correct, it would apply to every instance in which the Anti-Kickback Statute is

---

[1] Narco Freedom's apparent unwillingness to pursue a legal housing model, and the actions that the Court should take as a result, are addressed in Section IV.B., *infra*.

12

applied to a healthcare program – in particular, any Medicaid program, all of which are administered and regulated by the state.

Narco Freedom cites to *United States v. Quest Diagnostics, Inc.*, 734 F.3d 154 (2d Cir. 2013), as purported authority for this argument; this decision, however, states that a *qui tam* plaintiff cannot violate state ethics rules in pursuit of prosecuting fraud under the False Claims Act. Here, there is no argument that the Government is violating state law. And as Narco Freedom admits, "the State has not legislated or promulgated a regulatory framework governing three-quarter houses."[2] Def. Br. at 21.

Nor is Narco Freedom's statement that the Government "has also implicitly recognized the authority of the state to regulate in this area by stating that it will not prosecute state-regulated housing such as the OASAS-certified Community Residential Services housing" grounded in fact. *See* Def. Br. at 22; Clark Decl. ¶ 31. The reality is that OASAS-certified housing models do not allow housing providers to require residents to attend their outpatient services, *see* Kent Decl. ¶ 9, thereby rendering all housing in those models distinct from Narco Freedom's uncertified, unregulated, and illegal model.

Meriting similarly little consideration is Narco Freedom's argument that OASAS is a necessary party to this action because it regulates Narco Freedom's clinical programs, and that OASAS's immunity from suit under the Eleventh Amendment thereby renders the action

---

[2] Narco Freedom's argument that its Freedom Houses are regulated by the Department of Corrections and Community Supervision ("DOCCS") neglects to mention that the scope of Narco Freedom's obligations to DOCCS consists of one contract pertaining to 20 of Narco Freedom's 1625 Freedom House beds. *See* Declaration of Thomas Herzog, ¶ 13. Otherwise, DOCCS has no regulatory authority over the Freedom Houses. *See id.*

dismissible. *See* Def. Br. at 23-25. The Government is seeking to stop fraud in a health care program that is providing illegal inducements through subsidized housing, which housing is unregulated by OASAS or any other entity. The Court need not join OASAS as a party in order to find that Narco Freedom is violating the Anti-Kickback Statute.

IV. **Narco Freedom Has Made Clear that It Lacks the Will to Continue to Operate the Freedom Houses Absent the Unlawful Kickbacks, Yet Doing So Is Both Entirely Possible and Necessary for the Protection of the Current Residents**

A. **Running Lawful Supportive Housing Programs Is Not Only Possible, It Is Being Achieved Successfully by Other Organizations**

As set forth in the Mattel Declaration and Exhibit O, numerous different legal models for supportive housing exist and are utilized by organizations that wish to provide lawful housing to individuals who attend outpatient chemical dependency programs. Such models are financially supported by OASAS as well as other federal, state and local entities such as the U.S. Department of Housing and Urban Development, the New York State Office of Mental Health, and the New York City Department of Health and Mental Hygiene. *See* Mattel Decl. ¶ 8; *see also* Kent Decl. ¶ 8. Nor is it financially necessary for organizations that run these housing models to condition residence upon utilization of their other programs; in the case of one such organization, the Acacia Network, Ms. Mattel makes clear that in all of their supportive housing models, a patient's freedom of choice is respected. *See id.* ¶¶ 14-15; *see also* Kent Decl. ¶ 9.

In addition to available funding from various government entities, the level of reimbursement that is available for an OASAS-certified program increases to significantly more than the $215 monthly shelter allowance typically provided for Freedom House residents by the New York City Human Resources Administration ("HRA"). As set forth in Exhibit P to the Kent Declaration, funding levels for congregate care housing such as community residential services and supportive living services increases to more than $1,100 per resident, per month. *See* Kent Decl. ¶ 7; Exhibit P. While the Government is not asserting conclusions about the

14

economic viability of other housing models solely due to the increased HRA allowances, consideration of these factors is important in understanding the landscape of legal supportive housing models, which, if utilized here, could represent an alternative to the current illegal Freedom House model.

### B. Narco Freedom's Statements Demonstrate That It Refuses to Operate Its Houses Lawfully

Despite the availability and success of legal supportive housing models, Narco Freedom definitively states, in the declaration of its current C.E.O., among other places, that it would be a "financial impossibility" for Narco Freedom to operate the Freedom Houses other than through the current illegal model. *See* Declaration of Gerald Bethea, ¶ 19. Narco Freedom has failed, however, to put forth a single piece of evidence supporting this "financial impossibility," and such a representation is questionable at best from an organization that, just last month, received $2,827,709 million in Medicaid funds alone. *See* Kent Decl. ¶ 27. These statements, however, along with Narco Freedom's track record with the Freedom Houses, which involved the direct influence of Alan Brand until just last month, and the continued operation of those houses by the same staff and leadership that worked under Mr. Brand, calls into serious question the organization's willingness to transition to a legal but potentially less lucrative housing model.

The severity of the consequences to Freedom House residents, should Narco Freedom make good on its representations and close the Freedom Houses in the event the Court grants the Government's requested injunctive relief, necessitates further action. If Narco Freedom continues to refuse to expeditiously pursue a legal supportive housing model, the Government intends to ask the Court to appoint a receiver who can conduct a thorough evaluation of the best housing model to serve the needs of the residents and the public, while ensuring that the houses remain operational in the meantime. The Court is vested with the authority to take such an action under 18 U.S.C. § 1345(b), which empowers the Court "to take such other action, as is

warranted to prevent a continuing and substantial injury . . . to any person or class of persons for whose protection the action is brought."

## CONCLUSION

Pursuant to 18 U.S.C. § 1345, and for the reasons set forth above, the Court should find that the Freedom Houses as currently operated by Narco Freedom violate the Anti-Kickback Statute, and should enter the attached order for a preliminary injunction. We also respectfully ask that the Court set an expedited briefing schedule for the Government's motion for a temporary receiver.[3]

Dated: November 26, 2014
      New York, New York

                                      Respectfully submitted,

                                      PREET BHAHARA
                                      United States Attorney

                          By: s/ Cristine Irvin Phillips
                              KIRTI VAIDYA REDDY
                              CRISTINE IRVIN PHILLIPS
                              Assistant United States Attorneys
                              *Attorneys for the United States*

---

[3] We respectfully request that the briefing schedule set by the court provide for an adjudication of the Government's motion for a receiver within 45 days, which is the mandatory notice period for any closing of or material change to a Freedom House currently in place under the temporary restraining order entered by the Court on October 29, 2014, to ensure that Narco Freedom is unable to close the Freedom Houses before the Court decides the Government's motion.