**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------- x

UNITED STATES OF AMERICA,     :
    :
        Plaintiff,     :
    :
        v.     :    14 Civ. 8593 (JGK)
    :
NARCO FREEDOM, INC.,     :
    :
        Defendant.     :

---------------------------------------------------- x

## SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF THE MOTION OF THE UNITED STATES FOR A PRELIMINARY INJUNCTION AGAINST DEFENDANT NARCO FREEDOM, INC.

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York, 10007
Telephone: (212) 637-2751/2696

Of Counsel:

KIRTI VAIDYA REDDY
CRISTINE IRVIN PHILLIPS
Assistant United States Attorneys

# TABLE OF CONTENTS

**PAGE**

I.     The Evidence Presented by the Government in Its Declarations and at the
Preliminary Injunction Hearing Demonstrates That Narco Freedom is
Perpetrating Fraud, and Will Continue to do so Absent an Injunction................................1

II.    The Draft Preliminary Injunction Order Proposed by Narco Freedom
Does Not Afford Appropriate Relief to Stop the Illegal Inducements,
Protect Residents, or Facilitate the Transition of the Freedom Houses
to a Sustainable Legal Model.................................................................................................6

III.   OASAS-Certified Housing Models Would Appropriately House Narco
Freedom's Patient Population ............................................................................................11

      A.     The Community Residential Services Model Is Appropriate for a Significant
Portion of Individuals Living in Freedom Houses, Who Would Benefit From
a Congregate Setting With Case Support.............................................................11

      B.     Supportive Living Programs Would Best Serve Individuals
in Outpatient Programs Who Are Ready to Live Independently,
but Still Need, and Lack, a Stable Environment With Case Support ...................15

IV.   The Proposed Rule Change by OIG Is Irrelevant to the Court's Analysis Under
the Anti-Kickback Statute..................................................................................................17

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**CASES** **Page**

*U.S. ex rel. McDonough v. Symphony Diagnostic Services, Inc.*,
    No. 08-CIV-114, 2014 WL 3906461 (S.D. Ohio Aug. 12, 2014) .....................................18


**STATUTES**

18 U.S.C. § 1345 ..................................................................................................................1, 20

42 U.S.C. § 1320a-7b ..........................................................................................................1, 6, 18

42 U.S.C. § 1320a-7a ..........................................................................................................18, 19


**RULES & REGULATIONS**

42 C.F.R. § 1001.952 ..........................................................................................................18

79 Fed. Reg. 59717 (Oct. 3, 2014) .....................................................................................18, 19

14 N.Y.C.R.R. 819 ............................................................................................................. *passim*


**MISCELLANEOUS**

Guidelines for Level of Care Determination – LOCADTR 2.0, November 2013,
    *available at* http://www.oasas.ny.gov/treatment/health/locadtr/documents/
    LOCADTRGuidelines.pdf (last checked 12/11/14) ........................................................13

Plaintiff United States of America (the "Government"), by its attorney Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this supplemental memorandum of law in further support of its motion for a preliminary injunction against defendant Narco Freedom, Inc. ("Narco Freedom"), pursuant to 18 U.S.C. § 1345. This brief contains four sections, each provided as an aid to the Court in evaluating the arguments previously submitted by the parties and the evidence presented at the hearing held on December 2-4, 2014: a summary overview of the evidence presented in the Government's submitted declarations and at the hearing, and how it supports the Government's position that an injunction is merited under Section 1345; an assessment of the various provisions of the respective preliminary injunction orders submitted to the Court by the Government and Narco Freedom prior to the hearing; an analysis of the legal housing models that are certified by the New York State Office of Alcoholism and Substance Abuse Services ("OASAS"), in the context of the patient population that currently resides in the Freedom Houses; and a further analysis of the proposed rule change set forth by the U.S. Department of Health and Human Services Office of Inspector General ("OIG"), as identified by Narco Freedom in its response brief.

I.      **The Evidence Presented by the Government in Its Declarations and at the Preliminary Injunction Hearing Demonstrates That Narco Freedom is Perpetrating Fraud, and Will Continue to do so Absent an Injunction**

In its motion, the Government has alleged that Narco Freedom has and continues to violate the provision of the Anti-Kickback Statute that prohibits payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .", 42 U.S.C. § 1320a-7b(f)(1), through a scheme whereby Narco Freedom induces Medicaid recipients who lack stable housing to enroll in and attend its

outpatient drug rehabilitation programs by offering them subsidized housing that is conditioned upon participation in a Narco Freedom outpatient program. The evidence presented by the Government in connection with its motion, as well as the testimony presented at the hearing, has proven the Government's allegations to be correct, and Narco Freedom has failed to present any credible evidence to the contrary.

Specifically, the Government presented evidence that Alan Brand, the former C.E.O. of Narco Freedom, worked with real estate developer Jay Deutchman in the early 2000s, devising a plan to open the Freedom Houses. *See* Declaration of Jay Deutchman ("Deutchman Decl."), ¶ 5. Mr. Deutchman testified that he developed an understanding of the business plan behind the Freedom Houses from conversations with Mr. Brand. *See* Transcript of Hearing, December 3, 2014 ("12/3 Tr."), at 315:14-18. Specifically, he developed an understanding, from speaking with Mr. Brand, that because the prospective Freedom Houses residents of the houses would be required to attend outpatient treatment at Narco Freedom, opening the houses would drive more business to Narco Freedom's clinical programs, and would generate profit to Narco Freedom from the clinical services billed for the Freedom House residents. *See* Transcript of Hearing, December 3, 2014 ("12/3 Tr."), at 315:3-18. As Mr. Deutchman explained, "[w]ell, there are two sides to it, and one side is you can't control your clients if you don't know where they are. And number two, it's just a mathematical formula that if you're at the end of the day, after you look at all your income, and you look at your expenses, and there will be a profit, then it makes sense. So the more you house, the more income you bring in for the organization." 12/3 Tr. at 317:12-22. Mr. Deutchman also testified that he did, in fact, partner with Narco Freedom in purchasing 15 buildings between 2002 and 2013 that were used for Freedom Houses, *see* Deutchman Decl. ¶ 11; 12/3 Tr. at 318:14-18, and that in calculating the rent for those houses, he utilized the formula taught to him by Mr. Brand, which factored in 3.5 Medicaid-funded

outpatient services per week for each Freedom House resident, reimbursed at a rate of $84 per service. *See* 12/3 Tr. at 319:7-320:1.

The Government also presented evidence, in the form of testimony by Donna DeCicco, who runs Narco Freedom's "outreach" department, regarding the manner in which Narco Freedom markets its Freedom Houses. Ms. DeCicco testified that the Freedom Houses were marketed to referral sources such as parole, detoxification or inpatient rehabilitation facilities, as providing "sober living" for clients who lacked stable housing. *See id.* at 338:15-23. Ms. DeCicco testified that she was hired by Alan Brand on a contract basis to "fill" the Freedom Houses through outreach to these referral sources. *See id.* at 342:6-11. As Ms. DeCicco stated, "when I made my referrals, they were people that needed a residence and outpatient treatment." *Id.* at 343:25-344:13. She also testified that when she made marketing presentations to referral sources, "[i]t was pretty clear when we went in there that we were there to represent an outpatient treatment program that provided living for their clients that needed somewhere to live," *id.* at 348:7-349:3, and that the outreach staff made clear during the presentations that the housing was conditioned upon enrollment in a Narco Freedom outpatient program: "they knew when they came there that they would have to attend Narco Freedom." *Id.* Ms. DeCicco opined that the success of her marketing efforts for Narco Freedom, and the corresponding expansion of the Freedom Houses, was due to the fact that "there was a service being offered that wasn't being provided by any other outpatient, that that's where people that had substance abuse issues that wanted to go to outpatient treatment that had nowhere to live would opt to go because it was asserted that it was needed, and nobody else was really offering it." *Id.* at 384:7-25.

Ms. DeCicco's testimony regarding Narco Freedom's outpatient efforts was corroborated by Dr. Kamala Greene, the clinical and administrative director of addiction treatment at Bronx Lebanon Hospital Center ("Bronx Lebanon"), who testified that Narco Freedom markets its

3

housing to the inpatient counselors at Bronx Lebanon, through faxes and annual marketing presentations. *See id.* at 251:21-252:7. Dr. Greene identified one such "flyer" provided to Bronx Lebanon by Narco Freedom, which heavily emphasizes the Freedom Houses as an aspect of Narco Freedom's services. *See* Govt. Exhibit N. Dr. Greene testified to her knowledge that Narco Freedom requires individuals in its Freedom Houses to attend Narco Freedom for outpatient treatment. *See* 12/3 Tr. at 251: 17:20. Dr. Greene also testified that the Bronx-Lebanon counselors contact Donna DeCicco and the other individuals in her department when they wish to procure housing and treatment for a client coming out of an inpatient program. *See id.* at 252:24-253:3; *see also id.* at 339:2-9. After taking certain information, the outreach department then sets an appointment for the client at a particular Freedom House. *See id.* at 257:3-7. Finally, Dr. Greene testified that Bronx-Lebanon refers its patients to Narco Freedom, in spite of having concerns about the conditions at the Freedom Houses, "[b]ecause Narco Freedom has housing availability." *Id.* at 259:5-8.

In sum, through the testimony of Mr. Deutchman, Ms. DeCicco, and Dr. Greene, among other evidence, the Government demonstrated that Narco Freedom opened the Freedom Houses in order to drive business to its clinical programs, marketed its housing program to likely referral sources in an effort to "fill" the houses with residents who would attend Narco Freedom's outpatient programs, and that this marketing effort successfully drove referrals to Narco Freedom from referral sources who needed to find housing for clients. Additionally, the Government presented evidence and testimony that, once the residents moved into the Freedom Houses, the Freedom House staff would enforce the residents' attendance at Narco Freedom's outpatient programs by monitoring attendance and threatening removal from the houses where residents ere not attending their outpatient treatments as directed. Specifically, the Government submitted Exhibits H and I, documents from Narco Freedom discussing "re-entry passes" that residents

would have to bring back to the Freedom Houses to prove that they had attended their outpatient treatments. *See* Govt. Exhibit H, I. Ms. DeCicco testified that the furnishing of "slips" demonstrating treatment attendance by residents to the Freedom House staff was a prior practice by Narco Freedom; under the newer system, staff would simply access patients' files through Narco Freedom's computer system. *See id.* at 374:2-16. Ms. DeCicco also testified that she provided a "census" that reported the outpatient program attendance of Freedom House residents to Alan Brand, who would monitor which residents had not attended their outpatient services. *See id.* at 373:6-25. Ms. DeCicco confirmed that residents who did not attend their treatments would be spoken to, then would receive a "writeup," and then would be removed from the Freedom House. *See id.* at 359:10-17. Additionally, Rashawnt Mack, a current Freedom House resident, confirmed that he was aware of people who had been removed from his Freedom House for not attending treatment, including individuals who were asked to leave during house meetings. *See id.* at 279:4-7, 16-21.

Finally, the Government presented numerous accounts of actions taken by Narco Freedom reflecting a financial motive for the rules applied to the Freedom House residents, such as forcing clients already enrolled and progressing in other programs to switch to Narco Freedom for outpatient treatment, once those individuals came to live in a Freedom House. *See* Declarations of Joanne Salmon, Amy Greengrass, Marsha Dommel. The declaration of Agent Sue O'Connor also recounts an incident in which Alan Brand forced 60 methadone patients to leave the Freedom Houses in order to make room for individuals in the drug-free outpatient programs, for whom the Medicaid reimbursements are higher. *See* O'Connor Decl. ¶ 23 n.4.

The Government's evidence, when considered as a whole, depicts a scheme created and perpetuated by Narco Freedom to provide housing as an inducement to maximize payments by Medicaid for individuals living in Freedom Houses, and in which Narco Freedom's housing

availability, marketing practices and rules enforced against the residents did, in fact, increase the number of referrals to Narco Freedom and the attendance at the outpatient programs by Freedom House residents. Narco Freedom's only defense to this evidence seems to be that, so long as the treatment of its patients was also a motivating factor, the provision of subsidized housing as an inducement is not a violation of the Anti-Kickback Statute. But as the Government set forth in its briefing, this is not the legal standard.[1] *See* Govt. Br. at 20-21; Reply Br. at 1-3. Narco Freedom failed to present any defense that effectively negated the consistent evidence presented by the Government, that Narco Freedom's business model and practices in operating the Freedom Houses constitute an illegal inducement that violates the Anti-Kickback Statute. *See* 42 U.S.C. § 1320a-7b.

## II. The Draft Preliminary Injunction Order Proposed by Narco Freedom Does Not Afford Appropriate Relief to Stop the Illegal Inducements, Protect Residents, or Facilitate the Transition of the Freedom Houses to a Sustainable Legal Model

The proposed preliminary injunction orders ("Narco PI Order," "Govt. PI Order," and collectively, "PI orders") submitted for the Court's consideration by the Government and Narco Freedom, respectively, are similarly structured, but with several fundamental differences. The Government highlights those similarities and differences below, and respectfully asks, for the reasons set forth below, that the Court adopt the Government's proposed PI order.

---

[1] Narco Freedom also failed to demonstrate its "clinical purpose" for the Freedom Houses, nor did it effectively combat the Government's evidence that the conditions in the Freedom Houses are, in fact, often detrimental to the treatment goals of its residents. See, e.g., Declarations of Rashawnt Mack, Bernard Grant, Evaristo Melendez, Oswaldo Ramos, Taquan Coley, Jason Kraker, and Rafael Rivera.

The most central, and problematic, aspect of Narco Freedom's PI order is its insistence that, in exchange for housing individuals attending outpatient programs other than its own, Narco Freedom must receive payments from those programs, which it refers to as a "Housing Cost Differential." *See* Narco PI Order ¶¶ 2, 5, 8-10. This provision creates the potential for a new kickback scheme by requiring non-Narco Freedom outpatient programs without available housing to pay for referrals of Freedom House residents to their programs. Further, on a practical level, the structure is likely unworkable because it is unlikely that any non-Narco Freedom outpatient program will pay Narco Freedom's Housing Cost Differential – therefore, under this construct, the current scheme would continue by default. In contrast, the Government's paragraph 2 ends the kickback scheme by requiring that Narco Freedom allow its Freedom House residents to attend the outpatient program of their choice, and paragraphs 9-11 implement appropriate notice requirements so that current and future residents, as well as referral sources, are all made aware that Narco Freedom has ended its illegal inducements. *See* Govt. PI Order ¶¶ 2, 9-11.

Paragraphs 3 and 4 of Narco Freedom's proposed PI order purport to implement changes, but in fact continue to perpetuate the illegal inducements. With regard to paragraph 3, which states that Narco Freedom "agree[s] to disclose to each applicant to the program, upon enrollment, that there are various choices for housing, including licensed options associated with other providers, and that enrollment in the outpatient program would not guarantee housing at Narco Freedom, which would be reviewed on a case by case basis," Narco PI Order ¶ 3, it appears that Narco Freedom is attempting to include a provision that is an analogue to the notice provisions in the Government's proposed PI order. However, this provision is fundamentally flawed in that it does not purport to end, and in fact would perpetuate, the illegal inducements. Individuals who are enrolling in a Narco Freedom outpatient program because of the housing

that Narco Freedom offers presumably are aware that other programs exist. The necessary change to the current structure must involve severing the connection between being allowed a place in a Freedom House and being required to enroll at Narco Freedom for outpatient treatment. Furthermore, the statement that the provision of housing is not guaranteed and "would be reviewed on a case by case basis," *id.*, is inconsistent with Narco Freedom's stated goal of keeping its houses "filled" with residents who enroll in its outpatient programs. Similarly, Paragraph 4 of Narco Freedom's PI, which states that it will not admit individuals to any Freedom House until they are admitted into a Narco Freedom outpatient program, simply cements the connection between the Freedom Houses and Narco Freedom's outpatient programs. See Narco PI Order ¶ 4. Narco Freedom, in fact, claimed at the hearing that this policy of not admitting individuals to the Freedom Houses unless they are already admitted to a Narco Freedom outpatient program is already in place. However, this "policy" is, at best, full of exceptions, and as the evidence at the hearing demonstrated, even where an individual patient starts the process at Narco Freedom intake instead of at a Freedom House, the fact that housing is both offered and conditioned upon enrollment with Narco Freedom for outpatient treatment still constitutes an illegal inducement.

Paragraph 5 of Narco Freedom's PI order provides that it is enjoined from removing any resident from a Freedom House based on his or her refusal to enroll in or attend an outpatient program at Narco Freedom, but only for 30 days. *See* Narco Freedom PI Order ¶5. The practical effect of this paragraph is that Freedom House residents will have a longer period during which to enroll in an outpatient program at Narco Freedom, but must enroll nonetheless. It also appears to conflict with the previous paragraph 4.

The Government has no concerns with paragraph 6 of Narco Freedom's proposed PI order, and has a parallel provision in its order, at paragraph 7. *See* Narco PI order ¶ 6; Govt. PI Order ¶ 7.

Paragraph 7 of Narco Freedom's PI, which enjoins Narco Freedom from closing or materially altering the Freedom Houses without advance notice, is similar to the Government's paragraph 8, *see* Narco PI order ¶ 7; Govt. PI order ¶ 8; as well as paragraph 4 of the Temporary Restraining Order ("TRO") currently in place; *see* Dkt. No. 9. But in light of Narco Freedom's position that it may close the Freedom Houses if required to transition to a legal housing model, the Government's proposed PI order asks that the Court require Narco Freedom to provide 60 days notice, rather than 45 days notice, to the Government prior to closing or materially altering any Freedom House, so that the Government has sufficient time to act to protect the interests of the Freedom House residents, who may otherwise face eviction in large numbers.

Paragraphs 8-10 of Narco Freedom's proposed PI order, which pertains to notice to various individuals, mirror paragraphs 9-11 of the Government's proposed PI order, but add in the language regarding the "Housing Cost Differential," which, for the reasons stated above, is not acceptable. *See* Narco PI order ¶¶ 8-10; Govt. PI order ¶¶ 9-11. The Government asks that these provisions be included without Narco Freedom's added language.

Paragraph 11 of Narco Freedom's proposed PI order, which will allow governmental agencies access to the Freedom Houses, mirrors paragraph 12 of the Government's proposed PI order, except that the Government's proposed language includes OASAS among the agencies. *See* Narco PI order ¶ 11; Govt. PI order ¶ 12. The Government believes that including OASAS is appropriate and warranted, as it will foster transition of the houses to a legal model. Nor should Narco Freedom have an objection to this inclusion because, as stated in the hearing testimony of Robert Kent, general counsel for OASAS, Narco Freedom has already consented to

allow OASAS to inspect the Freedom Houses.  *See* Transcript of Hearing, December 2, 2014, ("12/2 Tr.") at 142:24-143:4.  Additionally, Narco Freedom's proposed language includes a last clause "in accordance with the government agency's rules and regulations," which the Government asks the Court to exclude because it may be used to circumvent access and inspection.

Paragraph 12 of Narco Freedom's proposed PI order, which requires Narco Freedom to submit monthly resident lists to the Government, mirrors paragraph 13 of the Government's proposed PI order as well as paragraphs 2 and 3 of the TRO.  *See* Narco PI order ¶ 12; Govt. PI order ¶ 13.  The Government has no concerns about Narco Freedom's version of this provision other than the final sentence, which states, "[t]his paragraph does not require an individual to provide his current or forwarding address and phone number to Narco Freedom."  Narco PI order ¶ 12.  Particularly in light of Narco Freedom's failure to fully abide by the terms of the TRO, which the Government has relayed to the Court previously, we have concerns that this sentence may be used to circumvent the purpose of this provision.

The Government has no concerns about paragraphs 13-16 or 18-20 of Narco Freedom's proposed PI Order, which are virtually identical to paragraphs 14-17 and 19-21 in the Government's proposed PI order.  *See* Narco PI order ¶¶ 13-16, 18-20; Govt. PI order ¶¶ 14-17, 19-21.

Paragraph 17 of Narco Freedom's proposed PI order, which provides that within three years, Narco Freedom "may apply" for licensing of the Freedom Houses, fails to provide sufficient assurances that Narco Freedom will make appropriate and timely efforts to legalize the Freedom Houses, and is of questionable utility given Narco Freedom's statements regarding the immediate financial consequences of moving to a housing model without kickbacks.  *See* Narco PI order ¶ 17.  Instead, the Government asks that the Court include the Government's proposed

paragraph 18, which requires Narco Freedom to engage a consultant to perform, within 120 days, a full evaluation of all potential alternative housing models for the Freedom Houses.  *See* Govt. PI order ¶ 18.  This provision provides a roadmap for Narco Freedom to transition its housing program, and does so in an appropriate timeframe.

Finally, Narco Freedom's proposed PI order omits three categories of provisions that the Government believes provide important protections.  The first involves Narco Freedom's use of legal process in removing any resident from a Freedom House, and not circumventing its legal obligations by moving individuals within the houses every 28 days.  *See* Govt. PI order ¶¶ 5-6; *see also* Declaration of Sue O'Connor ("O'Connor Decl."), ¶¶ 44-45, 47; Govt. Exhibit D.  The second involves Narco Freedom's conditioning of residence at the Freedom Houses upon the residents' signing of privacy waivers related to their confidential healthcare information.  *See* Govt. PI order ¶ 4; O'Connor Decl. 38.  Both of these categories afford important protections to the residents by curbing Narco Freedom's questionable practices, none of which it denied in the course of the motion briefing or PI hearing.  The third category is a civil penalties provision pertaining only to violation of certain terms of the PI order.  *See* Govt. PI order ¶ 22.  This provision will serve as an important enforcement mechanism for the other provisions, and will foster judicial efficiency in the event that Narco Freedom fails to comply with certain material terms of the PI order.  The Government, accordingly, asks that the Court include each of these provisions in any order that it issues.

III.    **OASAS-Certified Housing Models Would Appropriately House Narco Freedom's Patient Population**

A.      **The Community Residential Services Model Is Appropriate for a Significant Portion of Individuals Living in Freedom Houses, Who Would Benefit From a Congregate Setting That Offers Case Support**

During the hearing, the Government presented testimony describing two OASAS-certified housing models, codified in Part 819 of the New York Code of Rules and Regulations

("Part 819"), which reflect recognition of the need for stable, regulated housing as a complement to substance abuse treatment. Contrary to the statements made by Narco Freedom's Chief Executive Officer, Gerald Bethea, during his testimony, the regulations governing these models make clear that they would, collectively, provide appropriate housing for the majority of the individuals currently housed at Freedom Houses.

The first model, community residential services, is described in Part 819 as "chemical dependence residential services providing supervised services to persons making the transition to abstinent living. Persons appropriate for this service require the support of a drug and alcohol-free environment while receiving either outpatient services or educational and/or vocational services." 14 N.Y.C.R.R. 819.2(a)(2). In order to be eligible for a community residential program under Part 819, an individual must meet two criteria: "(1) The individual must be homeless or must have a living environment not conducive to recovery"; and "(2) The individual must be determined to need outpatient treatment services and/or other support services such as vocational or educational services, in addition to the residential services provided by the community residence." 14 N.Y.C.R.R. 819.9(a). By Narco Freedom's own representations, this describes a large majority of Freedom House residents, all of whom Narco Freedom has represented are in need of outpatient treatment and lack stable housing.[2] Community residential

_____

[2] Part 819.9(b) states that a community residential program is "specifically required to provide a structured therapeutic environment designed to facilitate the individual's progress toward recovery from chemical dependence or abuse." 14 N.Y.C.R.R. 819.9(b). This description mirrors Narco Freedom's own description of its Freedom Houses as "a highly-structured adjunct to its clinical services," Response Br. at 5 – although the Government submits that this representation was not borne out by the evidence or testimony presented at the hearing.

programs are, according to the regulations, also appropriate for individuals enrolled in a methadone program. *See* 14 N.Y.C.R.R. 819.2(c).

Additionally, the Guidelines for Level of Care Determination ("LOCADTR"), set forth by OASAS, which providers use to select the appropriate level of care for patients, *see* 14 N.Y.C.R.R. 819.3(d), describes the community residential program as "designed to provide a safe, alcohol and drug-free therapeutic domestic environment for persons who are homeless or whose home environment does not support treatment and recovery. These services are provided in conjunction with outpatient treatment services and other services as indicated in the treatment plan."[3] *See* Guidelines for Level of Care Determination – LOCADTR 2.0, November 2013, *available at* http://www.oasas.ny.gov/treatment/health/locadtr/documents/ LOCADTRGuidelines.pdf (last checked 12/11/14) ("LOCATDR guidelines"), at 4. According to these guidelines, "Community Residential Services are indicated when the client is enrolled in an outpatient treatment program or other support services (such as vocational or educational services), but has an inadequate living environment due to homelessness or lack of support for recovery from household members or the community." *Id.* at 7.

Unlike the higher level of care provided by an intensive residential services program, for which forty hours of weekly in-house services are required, *see* 14 N.Y.C.R.R. 819.8(b), a community residential program is designed to allow residents to seek treatment outside the residence, and to complement that treatment with a relatively modest amount of in-house services. *See* 14 N.Y.C.R.R. 819.9. Part 819 sets forth specific guidelines for the types of

_____

[3] A primary component of any OASAS-certified residential program is the development of a treatment/service plan that addresses the individual's needs and unique circumstances. *See* 14 N.Y.C.R.R. 819.4(f), (g); *see also* 14 N.Y.C.R.R. 819.9(c).

services that a community residential program should either offer or for which it should provide referrals, including "vocational services such as vocational assessment"; "job skills training"; "employment readiness training"; "educational remediation services"; and "life, parenting and social skills training." 14 N.Y.C.R.R. 819.9(b)(3)(iv). As to outpatient treatment, however, the regulation is clear that the treatment is provided by a third party source. *See* 14 N.Y.C.R.R. 819.9(b)(3)(ii) ("Each community residence shall have written referral agreements with one or more chemical dependence outpatient services to provide outpatient treatment services, as necessary."). This provision disproves the testimony of Mr. Bethea, that community residential programs offer outpatient services directly and therefore would be duplicative of the outpatient services offered by Narco Freedom. *See* Transcript of Preliminary Injunction Hearing, dated December 4, 2014 ("12/4 Tr.") at 463:5-25.

The expectation that a community residential program provides housing that complements treatment in an outpatient program, but does not itself provides outpatient services, was corroborated by the testimony of Robert Kent, general counsel for OASAS, who described a community residential program by stating, "if you went into a community residential program during the day, it's pretty much empty because people are at their outpatient treatment program, they're at a vocational program, they're at an educational program." 12/2 Tr. at 113:25-114:4. Dr. Janet Lerner, an expert offered by Narco Freedom, also corroborated the scope of services provided by a community residential program. She testified that "Damon House," a community residential program for which she is executive director, "provides housing, case management, life skills training [and] recovery readiness training," 12/4 Tr. at 499:13-16, but that residents are referred to third parties for outpatient substance abuse programs, *see id.* at 499:20-22; 500:1-3.

Community residential programs are congregate residences with staff available 24 hours per day. *See* 14 N.Y.C.R.R. 819.9(d)(2). In this way, a community residential program is

similar to the Freedom Houses, which are also congregate settings with staff present at all times. However, community residential programs, like all OASAS-certified programs, have staffing requirements, including a 15:1 resident-to-clinical staff ratio. *See* 14 N.Y.C.R.R. 819.9(d)(3). This allows for appropriate management of the residents and provision of services that actually foster a stable environment geared towards facilitating a successful recovery from addiction, such as case evaluations, *see* 14 N.Y.C.R.R. 819.4(a), discharge planning, *see* 14 N.Y.C.R.R. 819.4(m), and health care coordination, *see* 14 N.Y.C.R.R. 819.7(f). As Dr. Lerner explained during her testimony, "[i]t is very important to have a comprehensive, integrated system of care, and especially when you're working with homeless people because homeless people by and large don't have a lot of structure or any structure in their lives . . . ." 12/4 Tr. at 509:18-21. In other words, community residential programs, if correctly run, offer the type of congregate environment that the Freedom Houses should, but fail, to provide. As the hearing testimony revealed, the majority of the Freedom Houses are minimally staffed with non-clinical employees, such as Freedom House 2, operated with a 100-to-1 resident-to-(non-clinical) staff ratio. *See* 12/3 Tr. at 391:4-392:20.

In sum, were Narco Freedom to transition any of its Freedom Houses to the community residential program model, the houses would appropriately serve those individuals who would benefit from a congregate setting with appropriate clinical staffing during their enrollment in an outpatient program or after its completion. Narco Freedom's statements that this model would not fit its patient population or would be inconsistent with individuals in outpatient treatment, *see* 12/4 Tr. at 418:10-419:20, are simply incorrect.

**B.** **Supportive Living Programs Would Best Serve Individuals in Outpatient Programs Who Are Ready to Live Independently, but Still Need, and Lack, a Stable Environment With Case Support**

According to the governing regulations, the model for a supportive living program is "chemical dependence treatment services which are designed to promote independent living in a supervised setting for individuals who have completed another course of treatment, are making the transition to independent living, and whose need for services does not require staffing on site on a twenty four hour a day basis." 14 N.Y.C.R.R. 819.2(a)(3). As described by Robert Kent of OASAS, "[s]upportive living is not 24/7, but there's case managers. People can live in congregate settings but it's most usually apartment-type settings and it's one more step before an individual ultimately would go back out in the community and live on their own." 12/2 Tr. at 44:19-23.

The criteria for admission to a supportive living program, as set forth in Part 819, are "(1) the individual requires support of a residence that provides an alcohol- and drug-free environment; (2) the individual requires the peer support of fellow residents to maintain abstinence; (3) the individual does not require 24 hours a day on-site supervision by clinical staff; and (4) the individual exhibits the skills and strengths necessary to maintain abstinence and readapt to independent living in the community while receiving the minimal clinical and peer support provided by this residential environment." 14 N.Y.C.R.R. 819.10(a). According to the LOCADTR guidelines, individuals should be referred to a supportive living program from other OASAS-certified services, *see* LOCADTR guidelines at 4, including inpatient and residential rehabilitation programs where clinically appropriate. *See id.* at 7. Supportive living is also appropriate for patients enrolled in a methadone program. *See* 14 N.Y.C.R.R. 819.2(c). Additionally, while attendance at an outpatient treatment is not a requirement of residence in a supportive living program, the regulations allow, and in fact require, such attendance where it is

clinically indicated. *See* 14 N.Y.C.R.R. 819.2(e) ("All residential services shall provide, either directly or through referral to appropriate agencies, habilitative and rehabilitative services consistent with identified needs and plans for services for individual residents.").

Services provided through a supportive living program include "clinical interaction at least one time per week designed to support residents in their efforts to maintain abstinence and reduce the probability of relapse," 14 N.Y.C.R.R. 819.10(b), review of the treatment/service plan, 14 N.Y.C.R.R. 819.10(c), and staffing at a 15-to-1 ratio that allows personal visits conducted by clinical staff once per week, as well as "adherence to the established service plan and support for daily independent living, through guidance, training, and assistance, as necessary." While counsel for Narco Freedom represented, during closing arguments, that this level of supervision would be insufficient for Narco Freedom's patient population, *see* 12/4 Tr. at 566:16-25, in fact, this represents more guidance and oversight than is currently provided by the non-clinical Freedom House staff. Counsel for Narco Freedom also stated, incorrectly, that an individual must have completed a Narco Freedom outpatient program before being referred to a supportive living program. *See id.* In fact, someone referred from an inpatient or residential program could be a candidate for supportive living, as could someone currently enrolled and experiencing success in either a Narco Freedom drug-free or methadone outpatient program. *See* 14 N.Y.C.R.R. 819.2(c); LOCADTR guidelines at 7.

While a supportive living program may not be appropriate for every patient currently living in a Freedom House, it could serve as a valuable model for some of the patient population, particularly those whose level of success in treatment would not necessitate the 24-hour oversight provided by the community residential program model, such as those successfully enrolled in long-term methadone maintenance. *See id.* Contrary to Narco Freedom's representations, therefore, the organization could effectively utilize the supportive living

program model as an option for certain Freedom House residents whose needs are on the lower end of the treatment spectrum.

**IV.** **The Proposed Rule Change by OIG Is Irrelevant to the Court's Analysis Under the Anti-Kickback Statute**

As set forth in detail in the Government's reply brief, Narco Freedom's reliance on the proposal of the U.S. Department of Health and Human Services Office of Counsel to the Inspector General ("OIG") for certain amendments under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b) and Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a ("CMP Law") is not relevant because proposed rules have no legal effect, and because the changes would not protect the type of scheme perpetrated by Narco Freedom. *See* Reply Br. at 7-10; *see* 79 Fed. Reg. 59717 (Oct. 3, 2014). A further analysis of the OIG's proposed rule reveals, additionally, that OIG's proposed amendments to the Anti-Kickback Statute, which are limited to its safe harbor provisions, are inapplicable to the conduct in which Narco Freedom is engaged, nor do they impact any defense raised by Narco Freedom. Additionally, the proposed amendments to the interpretation of "remuneration" as defined by the CMP Law are limited to that statute, and therefore are not relevant to this action.

The Anti-Kickback Statute prohibits payment of "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . ." 42 U.S.C. § 1320a-7b(b)(2). "Remuneration" under this statute includes "anything of value in any form whatsoever." *See U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, No. 08-CIV-114, 2014 WL 3906461 (S.D. Ohio Aug. 12, 2014). A defendant can avoid liability under the Anti–Kickback Statute by demonstrating that either a statutory or regulatory exception, known as a "safe harbor," applies. 42 C.F.R. § 1001.952. The

OIG's proposed rule seeks to modify existing safe-harbor provisions to the Anti-Kickback Statute and add new ones, such as cost-sharing waivers to pharmacies or local transportation. *See* 79 Fed. Reg. 59717, 59720, 59723-59724. Even if those amendments become law, however, they would not apply to the type of inducement that the Government alleges Narco Freedom to have utilized – namely, subsidized housing. *See id.* Notably, Narco Freedom does not argue that the amendments to the safe-harbor provisions are in any way applicable to its actions. Response Br. at 13-14.

The second statute addressed by the proposed rule is the CMP Law, which authorizes OIG to pursue civil monetary penalties administratively as against a recipient of funds from a federal health care program. This statute includes a prohibition against offering or transferring remuneration to a Medicare or State health care program beneficiary that the person knows or should know is likely to influence beneficiary selection of a particular provider, for which payment may be made in whole or part by Medicare or a State health care program. *See* 42 U.S.C. § 1320a-7a(a)(5). "Remuneration" under the CMP Law includes "transfer of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6). Recently, an exception to this definition for "remuneration which promotes access to care and poses a low risk of harm to patients and Federal health care programs" was added by Section 6402(d)(2)(B) of the Affordable Care Act. *See* 79 Fed. Reg. 59717, 59725; *see also* 42 U.S.C. § 1320a-7a(i)(6)(F). The proposed OIG amendment would amend the definition of "remuneration" in the applicable regulations to reflect the new statutory exception. *See* 79 Fed. Reg. 59717, 59725. Regardless of the outcome of the proposed change, however, this definition of remuneration is specific to the CMP Law, and does not apply to the Anti-Kickback Statute. *See id.* ("However, no parallel exception exists in the anti-kickback statute. Thus, the exceptions in section 1128A(i)(6) of the Act apply only to the definition of ''remuneration'' applicable to section 1128A."). The

proposed change, even if implemented, thus would apply only to the interpretation of "remuneration" under the CMP Law, and so would not impact this action.[4]

As such, in addition to the proposed rule lacking relevance for the reasons set forth in the Government's reply brief, the OIG's proposed rule has no bearing on this matter as it relies exclusively upon the Anti-Kickback Statute, and none of the proposed changes to that statute's safe harbor exceptions are in any way applicable to Narco Freedom's actions.

---

[4] As discussed in greater detail in the Government's reply brief, even if the proposed definition of "remuneration" that is specific to the CMP Law were also applicable to the Anti-Kickback Statute, Narco Freedom's use of the Freedom Houses as inducements to drive business to its outpatient programs still would constitute illegal remuneration. *See* Reply Br. at 7-9.

**CONCLUSION**

Pursuant to 18 U.S.C. § 1345, and for the reasons set forth above and in the

Government's prior briefing, the Court should find that the Freedom Houses as currently

operated by Narco Freedom violate the Anti-Kickback Statute, and should enter the

Government's order for a preliminary injunction.

Dated:  December 12, 2014
      New York, New York

                                    Respectfully submitted,

                                    PREET BHAHARA
                                    United States Attorney

By:  s/ Cristine Irvin Phillips          
                                    KIRTI VAIDYA REDDY
                                    CRISTINE IRVIN PHILLIPS
                                    Assistant United States Attorneys
                                    *Attorneys for the United States*