**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                **Plaintiff,**         **14 Cv. 8593 (JGK)**

      **- against -**          **OPINION AND ORDER**

**NARCO FREEDOM, INC.,**

                **Defendant.**
_____


**JOHN G. KOELTL, District Judge:**

    The Government brought this action against Narco Freedom, Inc. ("Narco Freedom").  The Government alleges that Narco Freedom is violating 42 U.S.C. § 1320a-7b, the "Anti-Kickback Statute," by providing below-market housing at Narco Freedom's "Freedom Houses" only to persons that attend Narco Freedom's Medicaid subsidized drug treatment programs.

    The Government now has moved for a preliminary injunction pursuant to 18 U.S.C. § 1345.  The preliminary injunction would prohibit Narco Freedom from conditioning residence in the Freedom Houses on enrollment in Narco Freedom drug treatment programs, from requiring any individual residing in a Freedom House to move within the first thirty days of establishing residence, and from closing any Freedom House without advanced notice.  The Government also requests that the Court impose

1

obligations on Narco Freedom involving recordkeeping, reporting, and the terms of Narco Freedom's relationships with its patients.

On November 3, 2014, the Court issued—with the parties' consent—a temporary restraining order enjoining the defendant from evicting individuals who are participating in outpatient programs not controlled by Narco Freedom and enjoining the defendant from closing any Freedom House without advanced notice.

Narco Freedom consented to continue the temporary restraining order pending the Court's decision on the Government's motion for a preliminary injunction.  From December 2, 2014, to December 4, 2014, the Court held an evidentiary hearing.  At the request of both parties, the Court held the case in abeyance while the parties discussed a possible resolution.

On March 13, 2015, The New York State Attorney General issued a superseding indictment against Gerald Bethea, Narco Freedom's then chief executive officer ("CEO"), Richard Gross, Narco Freedom's then Comptroller, and Narco Freedom itself (among others).  On March 18, 2015, Bethea and Gross were arrested.  On March 19, 2015, the Government filed an order to show cause for the appointment of a temporary receiver.

On March 24, 2015, the New York Office of Medicaid Inspector General ("OMIG") informed Narco Freedom that a fifty percent withhold had been placed on Narco Freedom's current and future Medicaid payments.  OMIG Letter Ex. B.  On March 26, 2015, OMIG informed Bethea and Gross that they would be excluded from participating in the New York State Medicaid program, effective March 31, 2015.  See OMIG Letter Ex. A.  And on April 1, 2015, OMIG informed Narco Freedom that it would be excluded from the New York State Medicaid program, effective April 6, 2015.  See OMIG Letter Ex. C.

Having reviewed the record and assessed the credibility of the witnesses, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 65 of the Federal Rules of Civil Procedure.  For the reasons stated below, the Government's motion is **granted**.

## I.

### A.

Narco Freedom provides drug treatment programs in the Bronx, Queens, Brooklyn, and Long Island.  Narco Freedom serves over 3,000 clients, many of whom are referred to Narco Freedom by the New York City Department of Probation, the New York State Division of Parole, the United States Parole Commission, and the Brooklyn and Manhattan drug courts.  See Bethea Decl. ¶ 5; Def.'s Ex. A at 1; Hr'g Tr. at 413.  Narco Freedom's drug

3

programs include, among others, drug-free outpatient treatment and methadone treatment.  Hr'g Tr. at 424.  The drug treatment programs are regulated by the New York Office of Alcohol and Substance Abuse Services ("OASAS") and other federal and state agencies.  Hr'g Tr. at 413.  For individuals enrolled in drug-free outpatient programs, Medicaid reimburses all costs of up to seventy-five treatments.  O'Connor Decl. ¶ 46. §

Narco Freedom also runs "three-quarter houses," known as "Freedom Houses," for individuals who participate in Narco Freedom's outpatient treatment programs.  Hr'g Tr. at 339, 414. These three-quarter houses do not provide in-house services to tenants, are not licensed or regulated, and have no formal arrangement with any government agency.  O'Connor Decl. ¶ 7; Gov't Ex. S ("Kent Decl.") ¶¶ 11-12; Hr'g Tr. at 43.  The staff members at the Freedom Houses do not have mental health training, and some Freedom Houses staff as few as one employee for every one hundred residents.  Hr'g Tr. at 470.

Narco Freedom has opened a total of twenty-one Freedom Houses; at the time of the hearing, eighteen remained operational.  Gov't Ex. A.  Approximately 1,500 people currently live in the Freedom Houses.  Bethea Decl. ¶ 4; Hr'g Tr. at 414. And as of November 10, 2014, over 471 parolees resided in Freedom Houses.  Gov't Ex. T ("Herzog Decl.") ¶ 9.  The sizes of

the Freedom Houses vary, with occupancy ranging from thirty to two hundred people.  Hr'g Tr. at 390-91; Gov't Ex. B.

The Freedom Houses receive funding from two sources. First, many residents assign their monthly housing allowances from the New York City Human Resources Administration ("HRA"), currently $215 per month, to Narco Freedom.  Hr'g Tr. at 374-75. Second, Narco Freedom uses the funds that it receives from its other programs to cover the costs of the Freedom Houses.  Hr'g Tr. at 428-29.  Although Narco Freedom employees testified that the HRA allowances are insufficient to cover the costs of the Freedom Houses, Hr'g Tr. at 314, 374-75, 429, Narco Freedom did not submit documentary evidence showing the actual costs of running the Freedom Houses.

Narco Freedom leases the Freedom Houses from third-party realtors.  See Gov't Ex. C; Gov't Ex. AA ("Deutchman Decl.") ¶¶ 9-11.  Jay Deutchman is the largest single owner of the buildings that are leased to Narco Freedom.  Deutchman Decl. ¶ 15.  Deutchman testified that Alan Brand, the former CEO of Narco Freedom, informed him that Brand used a formula to determine whether to lease and open a Freedom House.  The formula added the $215 per person per month from the HRA to the Medicaid funds that Narco Freedom expected to receive from providing drug treatment to the persons residing at the Freedom Houses.  Brand would then subtract the costs—such as rent

payments and staff salary—to determine whether opening a new
Freedom House would be profitable.  Hr'g Tr. at 314-15; see also
Deutchman Decl. ¶¶ 16-17.

     When explaining Brand's business model, Deutchman
testified: "Well, there are two sides to it, and one side is you
can't control your clients if you don't know where they are.
And number two, it's just a mathematical formula that if you're
at the end of the day, after you look at all your income, and
you look at your expenses, and there will be a profit, then it
makes sense.  So the more you house, the more income you bring
in for the organization."  Hr'g Tr. at 317.[1]

### B.

     Narco Freedom provides housing only to patients that
participate in Narco Freedom's drug treatment programs.  Hr'g
Tr. at 428-29.  Donna DeCicco, a consultant who provides
marketing services for Narco Freedom, testified that individuals
could not live in a Freedom House "unless [they] were a client
of Narco Freedom's outpatient [treatment programs]."  Hr'g Tr.
at 347.  According to DeCicco, Brand hired her to fill the

---

[1]     Deutchman also declared that from 2006 to 2014, Brand asked
Deutchman to contribute to the "staffing" expenses of the
Freedom Houses.  Deutchman obliged and paid "$13,300 per month
to one of four entities that Mr. Brand specified."  Deutchman
Decl. ¶ 22.  Deutchman pleaded guilty in state court to criminal
charges related to this conduct.  Hr'g Tr. at 237; Deutchman
Decl. ¶ 22.

Freedom Houses through outreach to potential referral sources. Hr'g Tr. at 342.  She testified that "when I made my referrals, they were people that needed a residence and outpatient treatment." Id. at 344.  She also explained that when marketing Narco Freedom to potential referral sources, "[i]t was pretty clear when we went in there that we were there to represent an outpatient treatment program that provided living for their clients that needed somewhere to live."  Hr'g Tr. at 348.

Dr. Kamala Greene, the clinical and administrative director of addiction treatment at Bronx Lebanon Hospital Center ("Bronx-Lebanon"), testified that Narco Freedom markets its housing to the inpatient counselors at Bronx-Lebanon.  Hr'g Tr. at 251–52. One promotional flyer from Narco Freedom heavily emphasizes the Freedom Houses as an aspect of Narco Freedom's clinical services.  See Gov't Ex. N.  Dr. Greene also testified that the Bronx-Lebanon counselors contact DeCicco when they wish to find housing for clients that complete inpatient programs.  See Hr'g Tr. at 252–53.

Finally, Gerald Bethea, the CEO of Narco Freedom at the time of the hearing, testified that Narco Freedom's "budgetary model" depends on requiring all Freedom House residents to attend Narco Freedom's substance abuse programs.  Hr'g Tr. at 429.

## C.

When an individual arrives at a Freedom House, he or she must sign a "Code of Conduct" and a "Waiver of Tenant[']s Rights."  The Code of Conduct requires "[a]ll participants . . . to attend one (1) group treatment or counseling session a day, seven days a week, in their designated program with Narco Freedom Inc., or as approved by Program Director."  Gov't Ex. D, at 9.  The Waiver of Tenant's Rights also states that "all residents, as a pre-supposed condition in residing at the program, will attend said resident[']s designated outpatient program."  Gov't Ex. E. ¶ 8.

The Waiver of Tenant's Rights, as its name would suggest, also limits the rights of Narco Freedom residents.  Paragraph four provides that a "resident is excluded from all claims of 'Landlord-Tenant Law it's per uniform Landlord and Tenant Act: set part 11, section 1.202(1) Residence as an institution.'  Therefore the resident does not have ANY claims of further stay or rights unto the property if the resident is asked to leave the program for any reason."  Gov't Ex. E ¶ 4.

Similarly, the Code of Conduct states that "[p]articipants['] assigned areas are changed every 28 days and participants are required to prepare themselves and their personal property, in advance, to enable them to be reassigned

8

and moved upon the 28th day to their new assigned area . . . ."
Gov't Ex. D at 8.  This clause appears intended to skirt New
York City Administrative Code section 26-521(a), which provides
that "[i]t shall be unlawful for any person to evict or attempt
to evict an occupant of a dwelling unit who has lawfully
occupied the dwelling unit for thirty consecutive days or longer
. . . except to the extent permitted by law pursuant to a
warrant of eviction or other order of a court of competent
jurisdiction or a governmental vacate order . . . ."

**D.**

Current and former Freedom House residents submitted
declarations stating that they had no history of substance
abuse.  But they nonetheless attended Narco Freedom treatment
programs in order to live at a Freedom House.  See Gov't Ex. FF
("Porter Decl.") ¶¶ 5-10; Gov't Ex. II ("Rivera Decl.") ¶¶ 5-11.

Narco Freedom disputes these allegations.  Bethea testified
that Narco Freedom clinicians interview every patient to
determine if he or she needs substance abuse counseling.  Hr'g
Tr. at 417-18; see also Def.'s Ex. E (Narco Freedom's
Psychosocial History Form).  But Bethea did note that some
patients who have been referred to Narco Freedom arrive when the
clinical intake office is closed.  In those limited cases, the
prospective patient is allowed to stay at a Freedom House before

a clinician determines whether substance abuse treatment is appropriate.  Id. at 432–34.

**E.**

Narco Freedom submitted evidence that stable housing is a necessary condition for successful drug treatment.  Dr. Edward Nunes, a recently appointed member of the Narco Freedom Board of Directors, testified that "homelessness is very bad for any effort to treat a substance use disorder," Hr'g Tr. at 58, and that tying housing to treatment provides an incentive for patients to remain substance free.  Hr'g Tr. at 62–63, 81. Similarly, Bethea testified that homeless people are unlikely to complete drug treatment successfully.  Hr'g Tr. at 425–26.  And Dr. Janet Lerner testified that there is a "tremendous literature on the need for housing for people with addiction, addictive behaviors, or behavioral health problems."  Hr'g Tr. at 490.  Narco Freedom submitted many of these scholarly articles.  See Def.'s Ex. L–R, X.

The Government does not dispute that homelessness undermines drug treatment or that homelessness is a problem for people addicted to drugs.

But the Government does question the quality of housing that Narco Freedom provides.  Rashwant Mack, a current Freedom House resident, testified that the Freedom House where he lives lacks sufficient bathrooms, has exposed asbestos, houses a

number of drug users, and is poorly staffed.  Hr'g Tr. at 278,
280-82.  The Government submitted declarations from other Narco
Freedom residents that corroborate Mack's testimony.  See, e.g.,
Gov't Ex. X ("Grant Decl.") ¶¶ 5-7; Gov't Ex. DD ("Rivera
Decl.") ¶¶ 13-17.

Unsurprisingly, Narco Freedom strongly disagrees and
submitted a number of letters from past and current Freedom
House residents that positively describe Narco Freedom and the
Freedom Houses.  See Def.'s Ex. AH.

**F.**

Beginning in 2012, the Office of Inspector General for the
United States Department of Health and Human Services ("the
Office of Inspector General") and the United States Attorney's
Office for the Southern District of New York jointly
investigated whether Narco Freedom was violating 42 U.S.C.
§ 1320a-7b(b).  O'Connor Decl. ¶ 2.  On October 14, 2014, the
Government disclosed to counsel for Narco Freedom that it
believed Narco Freedom was perpetrating an unlawful kickback
scheme.  The Government also informed Narco Freedom that unless
it voluntarily severed the relationship between its substance
abuse programs and the Freedom Houses, the Government would
petition for injunctive relief.  Phillips Decl. ¶ 3.

In July 2014, Brand stepped down as the CEO of Narco
Freedom, and Bethea was appointed in his place.  Hr'g Tr. at

11

412–13.  In October 2014, Alan Brand and Narco Freedom were indicted in New York state court on various criminal changes. See Oct. 29, 2014, Hr'g Tr. at 9.  Christopher Shaw, the Regional Director for the Medicaid Fraud Control Unit of New York State, represented that the State of New York's investigation of Narco Freedom is ongoing.  Id.  In October 2014, OASAS also informed Narco Freedom that it intended to appoint a temporary operator to oversee Narco Freedom's treatment programs.  Hr'g Tr. at 98.

On October 28, 2014, the Government brought an application for a temporary restraining order.  On October 29, 2014, the Court issued—with the parties' consent—a temporary restraining order prohibiting Narco Freedom from conditioning placement in its Freedom Houses on participation in Narco Freedom's drug treatment programs.  The Government then moved for a preliminary injunction, and the Court held an evidentiary hearing from December 2, 2014, to December 4, 2014.  At the parties' request, the Court held this case in abeyance while the parties discussed a resolution.

On March 13, 2015, The New York State Attorney General issued a superseding indictment against Bethea, Gross, and Narco Freedom (among others).  On March 18, 2015, Bethea and Gross were arrested.  And on March 19, 2015, the Government filed an order to show cause for the appointment of a temporary receiver.

12

On March 24, 2015, the New York Office of Medicaid Inspector General ("OMIG") informed Narco Freedom that a fifty percent withhold had been placed on Narco Freedom's current and future Medicaid payments.  OMIG Letter Ex. B.  On March 26, 2015, OMIG informed Bethea and Gross that they would be excluded from participating in the New York State Medicaid program, effective March 31, 2015.  See OMIG Letter Ex. A.  And on April 1, 2015, OMIG informed Narco Freedom that it would be excluded from the New York State Medicaid program, effective April 6, 2015.  See OMIG Letter Ex. C.

## II.

Section 1345(a)(1)(C) of title 18 of the United States Code provides that "[i]f a person is committing or about to commit a Federal health care offense[,] the Attorney General may commence a civil action in any Federal court to enjoin such violation."  Section 24 of the same title provides that "the term 'Federal health care offense' means a violation of, or a criminal conspiracy to violate . . . section 1128B of the Social Security Act (42 U.S.C. § 1320a-7b)."  And 42 U.S.C. § 1320a-7b(b)(2)(B) provides:

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility,

13

service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

The Government argues that Narco Freedom is violating § 1320a-7b(b)(2)(B) because it is paying "remuneration" (below-market housing) to patients in order "induce such person[s]" to "order" or "arrange for" a "service" (drug treatment counseling) for which payment will be made under a federal health care program (Medicaid).[2]

## A.

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Generally, the party requesting a preliminary injunction must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

---

[2]   Subsection 1320a-7b(f) provides that a federal health care program includes "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5)." Medicaid is such a program. See United States ex rel. Kester v. Novartis Pharm. Corp., --- F. Supp. 3d ---, No. 11cv8196, 2014 WL 4230386, at *14 (S.D.N.Y. Aug. 7, 2014).

UBS Fin. Servs., Inc. v. W. Va. Univ. Hospitals, Inc., 660 F.3d
643, 648 (2d Cir. 2011) (internal quotation marks omitted)
(quoting Citigroup Global Mkts., Inc. v. VCG Special
Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010)).

But when, as here, a statute authorizes the government to
seek preliminary injunctive relief but does not specifically
require proof of irreparable harm, no such showing is required.
See, e.g., City of New York v. Golden Feather Smoke Shop, Inc.,
597 F.3d 115, 120-21 (2d Cir. 2010) (interpreting 18 U.S.C.
§ 2346(b)(2)); CFTC v. British Am. Commodity Options, 560 F.2d
135, 141 (2d Cir. 1977) (interpreting 7 U.S.C. § 13a-1).  In
such cases, courts have either employed "a presumption of
irreparable harm based on a statutory violation," Golden
Feather, 597 F.3d at 121, or held that the "plain meaning of the
statute" does not require a showing of irreparable harm.  See
United States v. William Savran & Assocs., Inc., 755 F. Supp.
1165, 1178 (E.D.N.Y. 1991).

Subsection 1345(a) provides that "the Attorney General may
commence a civil action in any Federal court to enjoin" a person
from committing a federal health care offense.  And § 1345(b)
states, in part, that "[t]he court . . . may, at any time before
final determination, enter such a restraining order or
prohibition, or take such other action, as is warranted to
prevent a continuing and substantial injury to the United States

15

or to any person or class of persons for whose protection the action is brought."  Neither subsection requires a showing of irreparable harm.

Accordingly, when interpreting § 1345, federal courts consistently have held that the government need not identify irreparable harm for a preliminary injunction to issue. Instead, the government must show that an injunction is necessary to prevent a "substantial injury to the United States" or to persons for "whose protection the action is sought."  See, e.g., United States v. Sriram, 147 F. Supp. 2d 914, 935–37 (N.D. Ill. 2001); United States v. Fed. Record Serv. Corp., No. 99cv3290, 1999 WL 335826, at *16 (S.D.N.Y. May 24, 1999); William Savran & Assocs., 755 F. Supp. at 1178–80; United States v. Belden, 714 F. Supp. 42, 44–46 (N.D.N.Y. 1987).

Although proof of irreparable harm is not required, concerns about fairness do not drop entirely from the equation. A preliminary injunction is a form of equitable relief.  And the Court therefore must consider the hardships that the public currently faces and that the defendant will endure if the injunction is granted.  As the Second Circuit Court of Appeals explained when discussing the standard for injunctive relief under the federal securities laws:

> We scarcely mean to imply that judges are free to set to
> one side all notions of fairness because it is the SEC,
> rather than a private litigant, which has stepped into

16

court. . . . And, as we said in <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d 1082, 1102 (2d Cir. 1972), "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." But the statutory imprimatur given SEC enforcement proceedings is sufficient to obviate the need for a finding of irreparable injury at least where the statutory prerequisite the likelihood of future violation of the securities laws has been clearly demonstrated.

<u>SEC v. Mgmt. Dynamics, Inc.</u>, 515 F.2d 801, 808-09 (2d Cir. 1975).

However, if the Government establishes that the defendant is violating § 1320a-7b, the balance of hardships likely weighs in the Government's favor. Congress has determined that violations of § 1320a-7b impose substantial costs on the public—namely, unnecessary and unwarranted distributions of public funds. <u>See</u> <u>United States v. Fang</u>, 937 F. Supp. 1186, 1199-2000 (D. Md. 1996). And a continuing violation of § 1320a-7b is a continuing violation of a federal law that imperils the integrity of a public benefit program.

**B.**

Courts differ concerning the Government's burden of proof under § 1345. A number of courts have held that the Government need only show by a preponderance of the evidence that there is probable cause to believe that the defendant is committing or is about to commit a federal health care offense for a preliminary injunction to issue. <u>See, e.g.</u>, <u>United States v. Weingold</u>, 844

F.Supp. 1560, 1573 (D.N.J. 1994); William Savran & Assocs., 1165
F. Supp. at 1177; Belden, 714 F. Supp. at 45-46.  Other courts
have held that the Government instead must prove such a
violation by a preponderance of the evidence.  See, e.g., United
States v. Brown, 988 F.2d 658, 663-64 (6th Cir. 1993); Sriram,
147 F. Supp. 2d at 937-38; United States v. Barnes, 912 F. Supp.
1187, 1194-95 (N.D. Iowa 1996).  And one court explained that
these two standards are functionally the same.  See Fang, 937 F.
Supp. at 1195-97.

The Court need not resolve this issue.  Under the more
demanding standard—a preponderance of the evidence—the
Government has proven that Narco Freedom is committing a federal
health care offense.

### III.

The Government alleges that Narco Freedom is violating
§ 1320a-7b(b)(2)(B).  In order to prove a violation of that
subsection, the Government must prove that Narco Freedom (1)
knowingly and willfully offers to pay any remuneration, in cash
or in kind, to any person, (2) to induce that person to
purchase, lease, order or arrange or recommend purchasing,
leasing, or ordering, (3) any good facility, service, or item
for which payment may be made under a federal health care
program.

Narco Freedom does not dispute that its substance abuse programs are a service for which payment is made under a federal health care program.  But Narco Freedom does dispute (1) that it offered "remuneration" to its patients and (2) that the purpose of the remuneration was to induce them to purchase of Medicaid services.  The Court will address each issue in turn.

**A.**

Section 1320a-7b(b) defines remuneration to include "any kickback, bribe, or rebate" and payments "in cash or in kind." Federal courts consistently have held that remuneration is not limited to out-and-out bribes.  See, e.g., Hanlester Network v. Shalala, 51 F.3d 1390, 1398 (9th Cir. 1995) ("The phrase 'any remuneration' was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates."); Klaczak v. Consol. Med. Transp., 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006) ("Remuneration, for purposes of the AKS, is defined broadly, meaning 'anything of value.'").

Residence at the Freedom Houses thus is a form of remuneration: it is an in-kind benefit provided at below market value to Medicaid beneficiaries.

Narco Freedom insists that reduced-priced housing does not qualify as "remuneration," relying on a notice of a proposed rule change by the Office of Inspector General interpreting § 1320a-7a(i)(6)(F).  See Medicare and State Health Care

Programs: Fraud and Abuse, 79 Fed. Reg. 59,717 (Oct. 3, 2014).
Although creative, this argument is ultimately unpersuasive.
The Government brings this action pursuant to § 1320a-7*b*, the
provision of the statute dealing with criminal penalties, while
the proposed rule change discusses § 1320a-7*a*, a separate
section dealing with civil penalties.  This distinction makes a
difference.

Section 1320a-7a(a)(5) subjects to the imposition of a
civil monetary penalty any person who "offers to or transfers
remuneration to any individual eligible" for various state and
federal health care programs, where that person knows that the
remuneration "is likely to influence such individual in order to
receive" the health benefit.  Section 1320a-7a(i)(6) defines
remuneration for that subsection to include "the waiver of
coinsurance and deductible amounts (or any part thereof), and
transfers of items or services for free or for other than fair
market value."

Section 1320a-7a(i)(6)(A)-(H), in turn, exempts a number of
practices from § 1320a-7a(i)(6)'s definition of remuneration.
Of relevance here, section 6402(d)(2)(B) of the Affordable Care
Act, Pub. L. No. 111-148, 124 Stat. 119, 758 (2010), added an
additional exception to the definition of remuneration in
§ 1320a-7a(a).  That section, codified in relevant part at
§ 1320a-7a(i)(6)(F), excludes "any other remuneration which

20

promotes access to care and poses a low risk of harm to patients and Federal health care programs (as defined in section 1320a-7b(f) of this title and designated by the Secretary under regulations)." The Office of Inspector General has solicited comments to define the phrase "promotes access and poses a low risk of harm to patients and Federal health care programs" in § 132a-7a(i)(6)(F). See Medicare and State Health Care Programs, 79 Fed. Reg. at 59,725. Narco Freedom argues that § 1320a-7a(i)(6)(F) applies here.

But the exception at § 1320a-7a(i)(6)(F) applies to § 1320a-7a alone, and the Government brought this action to enjoin a violation of § 1320a-7b. Section 1320a-7b does cross-reference one of the exceptions to the definition of remuneration in § 1320a-7a(i)(6)(A)-(H),[3] but that exception is not applicable here. Thus, if Congress intended the exception to remuneration in § 1320a-7a(i)(6)(F) to apply to § 1320a-7b's dentition of remuneration, it would have done so explicitly.

In fact, in the proposed rule change cited by Narco Freedom, the Office of Inspector General explains that:

> one exception to the definition of "remuneration" for purposes of the beneficiary inducements [civil monetary penalty rules] incorporates exceptions to the anti-

---

[3]   Section 1320a-7b(b)(3)(G) authorizes cost sharing by pharmacies "if the conditions described in clauses (i) through (iii) of section 1320a-7a(i)(6)(A) of this title are met with respect to the waiver or reduction."

> kickback statute and the safe harbor regulations. However, *no parallel exception* exists in the anti-kickback statute. Thus, the exceptions in section 1128A(i)(6) of the Act apply *only* to the definition of "remuneration" applicable to section 1128A.

Medicare and State Health Care Programs, 79 Fed. Reg. at 59,724 (emphasis added); see also Ameritox, Ltd. v. Millennium Labs., Inc., 20 F. Supp. 3d 1348, 1356 (M.D. Fla. 2014) ("[T]he AKS does not contain exceptions to the broad definition of remuneration.").[4]

Even if the "low risk" exception in § 1320a-7a(i)(6)(F) applied here, offering reduced-price housing poses more than a "low risk" to the Medicaid program.[5]   The Office of Inspector

---

[4]   A number of courts, without discussion, have cited the definition of "remuneration" in § 1320a-7a(i)(6)—"transfers of items or services for free or for other than fair market value"—when interpreting § 1320a-7b(b).  See, e.g., United States ex rel. Bilotta v. Novartis Pharm. Corp., --- F. Supp. 3d. ---, No. 11cv71, 2014 WL 4922291, at *13 (S.D.N.Y. Sept. 30, 2014); United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc., No. 05cv5393, 2011 WL 1330542, at *2 (S.D.N.Y. Apr. 5, 2011), aff'd,734 F.3d 154 (2d Cir. 2013); United States ex rel. Freedman v. Suarez-Hoyos, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011); United States v. Carroll, 320 F. Supp. 2d 748, 755-56 (S.D. Ill. 2004).  But none of those opinions applied the exceptions found in § 1320a-7a(i)(6)(A)-(H) to § 1320a-7b(b). Indeed, § 1320a-7b includes its own set of "safe harbors," which are found at § 1320a-7b(b)(3) and the accompanying regulations. Narco Freedom does not contend that any of those safe harbors apply here.

[5]   The Government insisted at the preliminary injunction hearing that § 1320a-7a(i)(6)(F) is not the "law."  Just because the Office of Inspector General has not issued a regulation interpreting that subsection does not mean § 1320a-7a(i)(6)(F) lacks legal force.

General suggested that "low risk" remuneration: "(1) Is unlikely to interfere with, or skew, clinical decision-making; (2) is unlikely to increase costs to Federal health care programs or beneficiaries through overutilization or inappropriate utilization; and (3) does not raise patient-safety or quality-of-care concerns." Medicare and State Health Care Programs, 79 Fed. Reg. at 59,725.

Providing below-market housing to Medicaid recipients increases costs to the Medicaid program through over- and inappropriate utilization. For those who need housing, the prospect of nearly free housing creates a strong incentive to overuse Narco Freedom's drug treatment programs. Indeed, Joan Salmon, the Director of the Comprehensive Treatment Institute-Bronx and Care Coordination Programs, testified that a number of her patients had transferred to Narco Freedom in order to obtain free housing, despite success in their current programs. Hr'g Tr. at 168-69. And Freedom House residents submitted declarations stating that they currently attend Narco Freedom's outpatient programs—despite not having a substance abuse problem—in order to receive inexpensive housing. See Porter Decl. ¶¶ 5-10; Rivera Decl. ¶¶ 5-11.

Narco Freedom also cites two Office of Inspector General advisory opinions interpreting §§ 1320a-7a(i)(6)(F) and 1320a-7b. Neither is apposite.

23

In the Office of Inspector General Advisory Opinion Number 11-16 (Nov. 8, 2011), a non-profit children's hospital, which does not bill for medical services, explained that it provides housing and meal assistance for out-of-town families in financial need.  Id. at 2-3.  The Office of Inspector General concluded that the hospital's program did not run afoul of §§ 1320a-7a and 1320a-7b.  The advisory opinion reasoned that the hospital "is reimbursed for less than a quarter of the costs it expends," that the hospital "focuses on the treatment and cure of catastrophic diseases in children, [which] are not susceptible to overutilization," that "patients and their families must travel or temporarily relocate to the Requestor's metropolitan area," that the services "are not advertised or marketed to prospective patients, their families, or referring physicians," and that "none of the costs of the items . . . have their costs shifted—either directly or indirectly—to the Federal health care programs."  Id. at 6-7.  The advisory opinion concluded that these factors protected against the risk of fraud and abuse.  Id. at 6.

The Office of Inspector General Advisory Opinion Number 11-01 (Jan. 3, 2011), discussed a similar program.  This opinion considered whether another non-profit children's hospital could provide free lodging and transportation to financially needy "families of inpatients only in the context of recent spinal

cord or burn injuries; during hospital instruction of family members on the patient's particular home care needs; and in situations when the patient's condition requires family accompaniment." Id. at 8-9.  The Office of Inspector General concluded that the program "would pose a low risk of harm to Federal health care programs":

> Services would only be provided under the proposed
> Programs in the context of a financial need
> determination and when the Hospitals deem they are
> merited by the patient's medical situation. The
> services would not be advertised or marketed, and, in
> the case of the Lodging Assistance Program, the patient
> would be informed by Hospital staff of its availability
> after his or her acceptance for treatment. The Hospitals
> would not promote Hospital programs in connection with
> the Lodging Assistance Program or the Transportation
> Assistance Program. Although the Programs would only be
> available to patients of the Hospital, the Requestors
> would not condition eligibility for the Programs on the
> receipt of any particularly lucrative services.
> Finally, the costs related to the Programs would not
> appear on any cost report or claim, and would not be
> otherwise shifted to any Federal health care program.

Id. at 10.

The Freedom Houses are substantially different from these two programs.  Medicaid reimburses Narco Freedom completely for seventy-five drug treatment services per patient; the services that Narco Freedom offers have a greater risk of overutilization than the treatment of catastrophic diseases; Narco Freedom's patients do not temporarily relocate to a different metropolitan area for emergency care; Narco Freedom advertises and promotes

its housing services; and Narco Freedom indirectly shifts the costs of the Freedom Houses to Medicaid.

Therefore, the Court concludes that Narco Freedom provides remuneration to Medicaid recipients in the form of below-market housing.

### B.

The parties next dispute whether the Government must prove that the "primary purpose" or instead that "one purpose" of the Freedom Houses is to induce Medicaid beneficiaries to enroll in Narco Freedom's drug treatment programs.  The Court adopts the majority view that the Government must prove that "one purpose" of the Freedom Houses is to induce Medicaid beneficiaries to use Narco Freedom's drug treatment programs.  Moreover, the Court finds that Narco Freedom provides housing to induce patients to enroll in Narco Freedom's drug treatment programs.

### 1.

Section 1320a-7b(b)(2)(B) prohibits health care providers from offering to provide any remuneration "to any person to induce such person" to order a service for which "payment may be made in whole or in part under a Federal health care program." Courts consistently have held that the Government need only prove that "one purpose" of remuneration is to induce a person to use a service for which payment is made under a federal health care program.  See United States v. Borrasi, 639 F.3d

774, 781-82 (7th Cir. 2011); <u>United States v. McClatchey</u>, 217
F.3d 823, 834-35 (10th Cir. 2000); <u>United States v. Davis</u>, 132
F.3d 1092, 1094 (5th Cir. 1998); <u>United States v. Kats</u>, 871 F.2d
105, 108 (9th Cir. 1989) (per curiam); <u>United States v. Greber</u>,
760 F.2d 68, 71-72 (3d Cir. 1985).  And in a summary
disposition, the Second Circuit Court of Appeals also found no
error in the "one purpose" test.  <u>United States v. Krikheli</u>, 461
F. App'x 7, 10-11 (2d Cir. 2012).

    <u>United States v. Bay State Ambulance and Hosptial Rental</u>
<u>Service, Inc.</u>, 874 F.2d 20 (1st Cir. 1989), is not to the
contrary.  In that case, the district court instructed a jury
that "the Government has to prove that the improper purpose is
the primary purpose or was the primary purpose in making and
receiving the payments."  <u>Id.</u> at 29.  The First Circuit Court of
Appeals declined to answer whether "*any* amount of inducement is
illegal . . . since, in this case, the district court instructed
that the defendants could only be found guilty if the payments
were made primarily as inducements."  <u>Id.</u> at 30.

    Narco Freedom also contends that in <u>Krikheli</u>, the district
court instructed the jury that "the prosecution had to prove
'that the remuneration was offered or paid as a quid pro quo in
return for the referring of the patient.'"  461 F. App'x at 10-
11; <u>see also</u> <u>Kats</u>, 871 F.2d at 108 (approving the "the
admonition that the jury could [not] convict unless it found the

payment 'wholly and not incidentally attributable to the delivery of goods or services'").

But even assuming Krikheli, an unpublished disposition, endorsed some heightened standard of proof, the Government has met it here.  Narco Freedom offers a "quid-pro-quo" to its patients: they must use Narco Freedom's drug treatment programs to live in the Freedom Houses.

**2.**

There is no doubt that Narco Freedom runs the Freedom Houses in part to induce Medicaid beneficiaries to enroll in Narco Fredom's outpatient programs.  Multiple witnesses—including Bethea, Deutchman, and DeCicco—testified that Narco Freedom's business model for the Freedom Houses is based on the receipt of Medicaid funds.  See Hr'g Tr. at 314-15, 347, 428-29. And DeCicco testified that if a Freedom House resident fails to attend Narco Freedom's drug treatment programs, the resident will face eviction.  Hr'g Tr. at 347; see also Gov't Exs. D, E.

Narco Freedom insists that it provides housing solely to help its patients remain drug free.  See Bethea Decl. ¶¶ 10-14. This finds no support in the record.  To move into a Freedom House, Narco Freedom requires clients enrolled in other outpatient programs to switch to Narco Freedom for treatment, regardless of their success in the previous programs.  See Hr'g Tr. at 168-69; Gov't Ex. KK ("Dommel Decl.") ¶¶ 7-9; Gov't Ex.

LL ("Grenngas Decl.") ¶ 7-10.  This strongly suggests that a major purpose of the Freedom Houses is to induce Medicaid beneficiaries to use Narco Freedom's drug treatment programs. And by *requiring* patients to abandon a successful drug treatment program to live in the Freedom Houses, Narco Freedom has established a quid-pro-quo relationship with its patients.

### 3.

Narco Freedom does not dispute that absent an injunction, it will continue conditioning residence in the Freedom Houses on participation in Narco Freedom's treatment programs.  Even after the resignation of Brand as CEO, Narco Freedom continued to tie residence in the Freedom Houses on attendance at Narco Freedom's outpatient programs.  See O'Connor Decl. ¶¶ 62-64.  And Narco Freedom refused to change its policy despite having been requested to do so by the Government.  See Phillips Decl. ¶¶ 3, 5.  Conduct that continues even after it is alleged to be unlawful makes "the likelihood of future violations, if not restrained, [] clear."  British Am. Commodity Options, 560 F.2d at 142.

Accordingly, the Government has proved by a preponderance of the evidence that Narco Freedom is committing a violation of § 1320a-7b(b)(2)(B).

### IV.

Because the Government has established an ongoing violation of § 1320a-7b(b)(2)(B), the balance of hardship tips in the Government's favor.  But "[e]ven assuming the balance of hardship[s] does not tip decidedly in favor of the Government, the stronger the probability of the Government succeeding on the merits, the greater its entitlement to preliminary injunctive relief."  <u>Fung</u>, 937 F. Supp. at 1199-1200.  Here, the cost to the public is clear—by offering remuneration in exchange for the purchase of Medicaid covered services, Narco Freedom promotes the overuse of federally funded health care services.

Narco Freedom insists that a preliminary injunction would undermine its treatment model and force it to close the Freedom Houses.  However, Narco Freedom has failed to offer any financial information to substantiate this claim.  Bethea testified—without any supporting documentation—that the viability of the Freedom Houses depends on conditioning residence on enrollment in Narco Freedom's treatment programs.  Hr'g Tr. at 429; <u>see also</u> Bethea Decl. ¶ 19.  Unsupported assertions are insufficient to prove that a preliminary injunction risks the closure of the Freedom Houses.

Indeed, the preliminary injunction does not prohibit Narco Freedom from housing those that enroll in its drug treatment programs.  Nor does it prohibit Narco Freedom from requiring

30

Freedom House residents to attend *some* form outpatient treatment
program.  And Narco Freedom offers no evidence to suggest that
unless each and every Freedom House patient attends Narco
Freedom's programs, the Freedom Houses will become economically
unsustainable.[6]

Accordingly, the Court concludes that equitable concerns do
not counsel against the imposition of a preliminary injunction.

**V.**

Finally, Narco Freedom argues that health care regulation
is traditionally an area regulated by the states. N.Y. State
Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
514 U.S. 645, 661 (1995). Therefore, absent clear evidence that
Congress intended to regulate substance abuse providers, Narco
Freedom argues that the Court should presume that § 1320a-
7b(b)(2)(B) does not apply here.  This argument lacks merit.

Section 1320a-7b "regulates" substance abuse programs by
prohibiting Medicaid providers from offering remuneration to
induce patients to participate in federally funded programs.  In
interpreting the statutory predecessor to § 1320a-7b, the Second

---

[6]    The parties dispute whether Narco Freedom could transition
to OASAS-certified housing models, such as community residential
services and supporting living services.  Although the
government persuasively argues that a number of Narco Freedom
patients would qualify for such services, it is unclear whether
Narco Freedom has the resources—or the State of New York would
provide the resources—for such services.

Circuit Court of Appeals explained that "[we] do not question the power of Congress to make such behavior criminal, and it has recently done so with clarity." United States v. Zacher, 586 F.2d 912, 917 (2d Cir. 1978). And Narco Freedom's interpretation would render § 1320a-7b meaningless for all cases involving Medicaid, because it "is the state-level policy discretion and experimentation that is Medicaid's hallmark." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2633 (2012) (Ginsburg, J., concurring in part and dissenting in part).

## VI.

Section 1345 affords the Court broad equitable authority. Specifically, it provides that the Court may "take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." § 1345(b). And this section provides the Court with the flexibility and the power to impose relief necessary to protect the public. See, e.g., United States v. Payment Processing Ctr., LLC, 435 F. Supp. 2d 462, 464-68 (E.D. Pa. 2006); William Savran & Assocs., 755 F. Supp. at 1182.

Although some of the provisions in the order granting preliminary relief do not directly "prohibit" an ongoing violation of § 1320a-7b(b)(2), those paragraphs are necessary to

32

ensure compliance with this Court's order and protect the public.  For example, paragraphs eight and nine—which prevent Narco Freedom from closing the Freedom Houses without advanced notice—will "prevent a continuing and substantial injury . . . to any person or class of persons for whose protection the action is brought." § 1345(b).  For the same reason, paragraphs twelve and eighteen require the Freedom Houses to be open to inspection.  Paragraphs nine, ten, and eleven are necessary to ensure that Freedom House residents receive notice of the preliminary injunction order.  And paragraphs thirteen, fourteen, eighteen, nineteen, twenty, and twenty-one guarantee that Narco Freedom's compliance is properly monitored.

## CONCLUSION

For the reasons explained above, the Government's motion for a preliminary injunction is **granted**.  A separate order with the terms of the preliminary injunction will follow.

**SO ORDERED.**

**Dated:    New York, New York**
**          April 2, 2015          _____/s/_____**
**                                 John G. Koeltl**
**                       United States District Judge**